1   NICOLA T. HANNA
    United States Attorney
2   BRANDON D. FOX
    Assistant United States Attorney
3   Chief, Criminal Division
    STEVEN R. WELK
4   Assistant United States Attorney
    Chief, Asset Forfeiture Section
5   DAN G. BOYLE (Cal. Bar No. Pending)
    Assistant United States Attorney
6   Asset Forfeiture Section
         1400 United States Courthouse
7        312 North Spring Street
         Los Angeles, California 90012
8        Telephone: (213) 894-2426
         Facsimile: (213) 894-0142
9        E-mail: Daniel.Boyle2@usdoj.gov

10  Attorneys for Party in Interest
    UNITED STATES OF AMERICA
11



                   UNITED STATES BANKRUPTCY COURT
12
            CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION
13

14  In re:                          Case No. 2:20-bk-13530-BR

15  JADELLE JEWELRY AND DIAMONDS,    Chapter 7
    LLC,
16                                   GOVERNMENT'S NOTICE OF MOTION AND
            Alleged Debtor.          MOTION FOR A LIMITED STAY OF
17                                   DISCOVERY; MEMORANDUM OF POINTS
                                     AND AUTHORITIES; DECLARATIONS OF
18                                   DAN G. BOYLE AND SPECIAL AGENT
                                     MADISON MACDONALD
19
                                     Hearing Date: September 22, 2020
20                                   Hearing Time: 2:00 p.m.
                                     Location:     Courtroom of the
21                                                 Hon. Barry Russell
22

23       The United States of America, by and through its counsel of

24  record, the United States Attorney for the Central District of

25  California and Assistant United States Attorney Dan G. Boyle, hereby

26  files a Motion for a Limited Stay of Discovery, or alternatively, to

27  Stay this Case, to be heard on September 22, 2020 at 2:00 p.m. at the

28  Courtroom of the Honorable Barry Russell, Edward R. Roybal Federal

1  Building and Courthouse, 255 E. Temple Street, Suite 1660 / Courtroom

2  1668, Los Angeles, CA 90012, or telephonically or by videoconference,

3  if so ordered.

4      This Motion is based upon the attached memorandum of points and

5  authorities, the attached Declarations of Dan G. Boyle and Federal

6  Bureau of Investigation Special Agent Madison MacDonald, and the

7  declaration of IRS-CI Special Agent Nolan Fuller, which the

8  government has separately applied for leave to file under seal and

9  for *in camera* review, the files and records in this case, and such

10  further evidence and argument as the Court may permit.

11

12  Dated: August 24, 2020          Respectfully submitted,

13                                  NICOLA T. HANNA
                                    United States Attorney
14                                  BRANDON D. FOX
                                    Assistant United States Attorney
15                                  Chief, Criminal Division
                                    STEVEN R. WELK
16                                  Assistant United States Attorney
                                    Chief, Asset Forfeiture Section

17

18                                  _____/s/_____
                                    DAN G. BOYLE
19                                  Assistant United States Attorney

20                                  Attorneys for Party in Interest
                                    UNITED STATES OF AMERICA

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2   DESCRIPTION                                                          PAGE

3   **Contents**

4   TABLE OF AUTHORITIES ................................................ ii

5   MEMORANDUM OF POINTS AND AUTHORITIES ................................ 1

6   I.    INTRODUCTION .................................................. 1

7   II.   SUMMARY OF PUBLICLY AVAILABLE RELEVANT BACKGROUND ............ 2

8         A.    The Civil Forfeiture Actions ........................... 3

9         B.    The Noval-Jadelle Transfers ............................ 5

10        C.    The Federal Criminal Investigations .................... 6

11  III. ARGUMENT ...................................................... 8

12        A.    This Court has the power to stay the instant
                bankruptcy proceedings in the interest of justice ....... 8
13

          B.    The Pending Criminal Investigation and the Instant
14              Bankruptcy Proceedings Share Areas of Overlap .......... 10

15        C.    Jadelle's creditors do not have a unique interest in
                proceeding expeditiously .............................. 11
16

17        D.    If a stay is not granted, one or more parties in this
                case will likely have to choose between invoking the
                Fifth Amendment privilege against self-incrimination,
18              and potentially negatively-impacting the bankruptcy
                case itself ........................................... 12
19

20        E.    A stay would allow this Court to avoid extensive
                delays and protracted litigation resulting from
                invocations of the privilege during discovery .......... 14
21

22        F.    A stay of the proceedings is critical for the
                preservation of the integrity of the government's
                ongoing criminal investigation ........................ 15
23

24        G.    The public and non-parties have a greater interest in
                seeing that any criminal activity is expediently
                investigated than in advancing the bankruptcy
25              proceedings ........................................... 16

26  IV.   The Court Should Stay This Action if a Discovery Stay Would
          Prove Inefficient or Unworkable ............................. 17
27

28  V.    CONCLUSION .................................................. 18

# TABLE OF AUTHORITIES

DESCRIPTION                                                                          PAGE

**CASES**

Amsave Credit Corp. v. Marceca,
        131 B.R. 774 (S.D.N.Y. 1991) ............................... 12

Ashworth v. Albers Med., Inc.,
        229 F.R.D. 527 (S.D. W. Va. 2005) ......................... 15

Baker v. SeaWorld Entm't, Inc.,
        2018 WL 1726534 (S.D. Cal. Apr. 10, 2018) ................. 16

Federal Sav. & Loan Ins. Corp. v. Molinaro,
        889 F.2d 899 (9th Cir. 1989) ............................... 9

In re Marceca,
        131 B.R. 774 (Bankr. S.D.N.Y. 1991) ....................... 9

In re SK Foods, L.P.,
        2010 U.S. Dist. LEXIS 136188 (E.D. Cal. Dec. 9, 2010) ....... 9

In re Zinnel,
        2013 WL 128439 (E.D. Cal. March 28, 2013) ................. 9

Landis v. North American Co.,
        299 U.S. 248 (1936) ....................................... 9

SEC v. Chestman,
        861 F.2d 49 (2nd Cir. 1988) ............................... 15

SEC v. Dresser Industries, Inc.,
        628 F.2d 1368 (D.C. Cir. 1980) ......................... 9, 12

United States v. Kordel,
        397 U.S. 1 (1970) ......................................... 9

Walsh Sec. v. Cristo Prop. Mgmt.,
        7 F. Supp. 2d 523 (D.N.J. 1998) ........................... 12

**STATUTES**

18 U.S.C. § 3771 ................................................. 17

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3

On April 6, 2020, petitioning creditors Victor Franco Noval

4

("Franco"), Peter Marco, LLC ("Marco"), and First International

5

Diamond, Inc. ("FID") filed an involuntary Chapter 7 bankruptcy

6

petition against Jadelle Jewelry and Diamonds, LLC ("Jadelle") (Case

7

No. 2:20-BK-13530-BR, ECF No.1 (the "Petition")).

8

As has been publicly disclosed, the United States Attorney's

9

Office in the Central District of California, the Internal Revenue

10

Service ("IRS"), and the Federal Bureau of Investigation ("FBI") are

11

conducting parallel civil and criminal investigations into the

12

activities involving Franco and associates, including the recent

13

filing of a series of interrelated civil forfeiture actions against

14

assets currently or previously owned or controlled by Franco or his

15

entities. At the same time, the FBI is also investigating the alleged

16

theft or taking by fraud of millions of dollars in diamonds while on

17

consignment with Jadelle, some or all of which have recently been

18

recovered and are being held as evidence.

19

While some aspects of the government's investigations have been

20

addressed in the public reporting and public filings, other facts

21

known to the government as part of its investigations remain

22

sensitive and confidential, and accordingly, the government has

23

applied separately for leave to file under seal and in camera the

24

declaration of IRS-CI Special Agent Nolan Fuller, which provides

25

further detail on these investigations. In light of the substantial

26

overlap between the federal criminal investigations and discovery on

27

issues almost certain to be raised in order to establish claims in

28

bankruptcy here, the government believes that its investigations

1  would be severely compromised if discovery into matters under

2  criminal investigation were permitted, as it would likely reveal

3  sensitive facts. This disclosure would allow other criminal subjects

4  to potentially change their testimony/statements, seek to interfere

5  with witnesses, alter evidence or otherwise undermine the integrity

6  of the investigation. Additionally, such discovery would likely force

7  one or more parties to invoke their Fifth Amendment protections,

8  compromising their ability to fully litigate this action.

9  Accordingly, the government seeks a limited stay of discovery here,

10 as detailed in the Proposed Order accompanying this application.

11       Alternatively, if the Court believes a limited stay of discovery

12 would be inefficient or unworkable, the government submits that a

13 stay of this bankruptcy case for the duration of the pending criminal

14 investigations is warranted in the interest of justice, in order to

15 preserve the integrity and confidentiality of the government's

16 investigation.

17       In either event, the government agrees to provide a status

18 report to the Court in 120 days addressing whether a continued stay

19 remains necessary.

20 **II.    SUMMARY OF PUBLICLY AVAILABLE RELEVANT BACKGROUND**

21       The following information in this section is largely compiled

22 from public court filings and published news articles, and where this

23 section relies on information not previously made public, this is so

24 indicated. The government sets forth this summary for the sole

25 purpose of providing this Court with sufficient information to

26 consider this motion. If further details are necessary to that

27 purpose, the government respectfully requests that the Court advise

28 what additional information would be helpful and whether the

1  government could provide such information under seal and/or *in*

2  *camera*.

3  **A.    The Civil Forfeiture Actions**

4  On July 16, 2020, the United States filed seven interrelated

5  civil forfeiture actions seeking forfeiture of six pieces of real

6  property and assorted personal property and financial assets alleged

7  to be proceeds of foreign corruption. A copy of the lead complaint in

8  those actions (the "Complaint"), is attached as Exhibit A to the

9  accompanying Declaration of Dan Boyle.

10  As stated in the Complaint, in or about 2010, a senior official

11  in the Kuwaiti Ministry of Defense ("KO1") entered into an agreement

12  with Franco's father, Victorino Noval ("Noval"),[1] to pay tens of

13  millions of dollars for the purchase of an interest in an entity

14  owned by Noval, in order to develop a substantial parcel of real

15  estate in Beverly Hills California (the "Mountain"). Compl. ¶ 47-48.

16  To execute this agreement, KO1, Noval, and Franco created a series of

17  shell companies, opened bank accounts in California, and executed

18  promissory notes. Compl. ¶ 49. During this time, KO1 served as the

19  Minister of Defense of the Republic of Kuwait, and prior to that, as

20  the Chief of General Staff of the Kuwaiti Armed Forces. Compl. ¶ 6.

21  Following this agreement, at least $104,000,000.00 was

22  transferred from accounts held in the name of the Republic of

23  Kuwait's Military Attache's Office in London (the "MAO") at Ahli

24  United Bank ("AUB") to bank accounts in the State of California held

25

26  [1] Noval was formerly known as "Victor Jesus Noval." Noval
changed his name following a 2003 conviction for mail fraud and tax

27  evasion, in violation of 18 U.S.C. § 1341, and 26 U.S.C. § 7201,
respectively. On September 24, 2003, Noval was ordered to pay

28  $25,358,494 in restitution to the victims of the underlying mortgage
fraud scheme. Compl. ¶ 9.

1   by certain of these shell companies purportedly-controlled by Franco

2   (hereinafter, the "AUB Transfers"). Compl. ¶ 50. As detailed in the

3   Complaint, the AUB Transfers were made from official Kuwaiti funds

4   which had been improperly transferred to unauthorized accounts held

5   in the name of the MAO, but which were not properly disclosed to

6   Kuwaiti authorities in accordance with Kuwaiti law, and thus the AUB

7   Transfers occurred in violation of Kuwaiti law. Compl. ¶¶ 30-33, 51-

8   53. In addition, none of the entities receiving the AUB Transfers had

9   any apparent contracts or business with the MAO which would justify

10  transfers of this size, and some of the AUB Transfers were falsely

11  described as for military purposes in order to conceal their nature.

12  Compl. ¶ 53. In one instance, a transfer to one of Franco's entities

13  was identified as for the "technical development at the new Kuwait

14  military academy under construction," but there is no Kuwaiti

15  military academy either in Beverly Hills or anywhere else in

16  California. Id.

17      Once transferred into the United States, some of the funds from

18  the AUB Transfers were invested in the development of the Mountain,

19  but the vast majority of the AUB Transfer money was used to purchase

20  a series of multimillion dollar properties in the Beverly Hills and

21  Los Angeles area, and spent on a variety of luxury vehicles,

22  memorabilia, financial investments and other lifestyle expenses.

23  Compl. ¶ 77-87. In September of 2019, KO1 brought a civil action

24  against Franco, Noval and others in California state court alleging

25  that the defendants there fraudulently diverted or stole funds from

26  the AUB Transfers, and that litigation remains pending. Compl. ¶ 76.

27

28

1      **B.    The Noval-Jadelle Transfers**

2          According to filings in this action, including the Petition (ECF

3    No. 1) and a May 19, 2020 sworn declaration filed by Franco and the

4    exhibits attached thereto (ECF No. 16), between January 2019 and the

5    filing of the Petition, Franco transferred least $5,800,000 to

6    Jadelle (hereinafter, the "Noval-Jadelle Transfers"), which Franco

7    characterized as loans. Of this $5,800,000, $2,850,000 was

8    memorialized in a "Debt Acknowledgement, Promissory Note and Security

9    Agreement." ECF No. 16. The Noval-Jadelle Transfers were secured by

10   undefined "jewelry" purported to be valued at "over $7,000,000." Id.,

11   ¶ 6. This jewelry was originally held by Franco, but subsequently

12   transferred (purposely due to fraud) to Jadelle's de facto manager,

13   Jona Rechnitz ("Rechnitz"), to be held as collateral. Id., ¶ 5-7.

14   According to Franco's sworn declaration,

15          Jadelle and Jona not only liquidated my diamond collateral

16          and the funds I agreed to and, did, in fact, loan pursuant

17          to the Debt Agreement, but they refused to disclose to me

18          either the whereabouts of the diamonds, if the diamonds

19          were liquidated or transferred to third parties, including

20          family members. . .

21   Id., ¶ 9.

22          As publicly reported, beginning in or about January of 2020,

23   Franco and others filed a series of criminal complaints and civil

24   actions against Jadelle and Rechnitz, accusing Rechnitz and/or

25   Jadelle of fraud and other misconduct, including a police report

26   filed by Franco against Rechnitz on or about January 15, 2020. See

27

28

1  ECF No. 16, at Ex.C.[2] These complaints and lawsuits generally alleged

2  that Rechnitz, through Jadelle, took millions of dollars in loans

3  purportedly backed by at least $7 million in diamonds supposedly held

4  as collateral, but that Rechnitz then failed to repay these loans and

5  liquidated or absconded with that collateral.[3] Counsel for Franco has

6  also publicly accused Rechnitz of a "large scale scheme to defraud

7  perpetrated by Jona and his accomplices," and accused Rechnitz of

8  "delay tactics . . . to avoid justice while he provides no

9  information as to how he spent this money or where the collateral

10  is." Id. A federal criminal investigation is ongoing. Id.[4]

11      **C.    The Federal Criminal Investigations**

12      As has been publicly reported,[5] and as is further detailed in

13  the sealed and *in camera* declaration of IRS-CI Special Agent Nolan

14  _____

15      [2] See also Gabriele Fonrouge, "FBI Probing Crooked De Blasio
Donor Jona Rechnitz in Diamond Scam," N.Y. Post, March 10, 2020,
16  available at https://nypost.com/2020/03/10/fbi-probing-crooked-de-
blasio-donor-jona-rechnitz-in-diamond-scam/ ("Noval reported the
17  alleged con to the Beverly Hills Police Department, which allegedly
said there were other victims," and Rechnitz "is facing a new
18  criminal probe from the FBI in California for allegedly bilking an
investor out of millions of dollars."); see also Ben Fuerherd, "Jona
19  Rechnitz Headed for Self Destruction Like Adam Sandler in 'Uncut
Gems': Suit," N.Y. Post, April 15, 2020, available at
20  https://nypost.com/2020/03/10/fbi-probing-crooked-de-blasio-donor-
jona-rechnitz-in-diamond-scam/ ("Rechnitz is out on bail pending
21  appeal of his conviction in New York and is now under federal
investigation for his alleged jewelry scheme in California, which
22  targeted Marco and other jewelers.")

23      [3] See Larry Celona, "De Blasio Donor Jona Rechnitz Accused of
$1M Scam in California," N.Y. Post, February 28, 2020, available at
24  https://nypost.com/2020/02/28/de-blasio-donor-jona-rechnitz-accused-
of-1m-scam-in-california/.

25      [4] See also, Declaration of SA Madison MacDonald ("MacDonald
Decl."), ¶ 8-11.

26      [5] See Jennifer Gould, "Feds Probe John Travolta Pal's Lavish
Lifestyle, N.Y. Post, July 17, 2020, available at
27  https://nypost.com/2020/07/17/feds-probe-john-travolta-pals-
jetsetter-lifestyle/ ("Assets tied to ex-con Victorino Noval, aka
28  Victor Jesus Noval, are at the center of a civil forfeiture lawsuit

1  Fuller, the government is currently investigating both the AUB

2  Transfers and the subsequent Noval-Jadelle Transfers.[6] Based on the

3  government's present investigation, some or all of the funds for the

4  Noval-Jadelle Transfers appear to be traceable to the AUB Transfers

5  described above and in the Complaint. A detailed explanation of this

6  tracing, and the government's current investigative steps, is stated

7  in the Fuller Declaration.

8      Relatedly, and as detailed in the accompanying Declaration of

9  FBI Special Agent Madison MacDonald, the government also recently

10 recovered personal property in the form of high-end jewelry (the

11 "Recovered Jewelry") which appears to be connected to this action.[7]

12 Specifically, the government is holding as evidence certain pieces of

13 jewelry previously reported stolen, which were recovered by federal

14 agents during the execution of an unrelated search warrant seeking

15 evidence regarding, and the recovery of, two endangered species[8] from

16 the residence of non-party "T.T."[9]

17

18 filed this week by the US Attorney's office in Los Angeles over money
   allegedly stolen by his Middle Eastern investors. A criminal probe is
   also underway, sources added.")

19    [6] See Declaration of IRS Special Agent Nolan Fuller. Concurrent
20 with the filing of this motion, the government has applied for leave
   to file the Fuller Declaration in camera and under seal, because it
21 relies on and references Grand Jury information, the disclosure of
   which is prohibited under Fed. Crim. Rule 6 (e)(2), and because
22 public disclosure of the same would threaten the criminal
   investigation, as described in the Fuller Declaration.

23    [7] See MacDonald Decl., ¶ 4-6.

24    [8] 16 U.S.C. § 1538(1)(E) makes it a violation of federal
   criminal law to transport an endangered species in commerce in
25 certain circumstances.

26    [9] While the government does not believe it is necessary to
   publicly identify T.T. at this time, to avoid any confusion, the
   government confirms that the "T.T." referenced in the MacDonald
27 Declaration is the same individual referenced by those initials in
   ¶¶ 83(b), 83(e), and 86 of the Complaint, where he/she is identified
28 as "an associate of NOVAL's."

1    While the government is still investigating the exact provenance

2  of the Recovered Jewelry,[10] the government has communicated with

3  counsel for the trustee in this matter and noted that one issue in

4  this proceeding appears to be a disputed consignment of diamonds

5  allegedly held as collateral, see ECF No. 16 (Franco Decl.), ¶ 9, and

6  informed the trustee's counsel of the discovery of the Recovered

7  Jewelry.[11] The government is currently holding the Recovered Jewelry

8  as evidence pending an investigation into the reported theft.[12]

9    The government is conducting active criminal investigations into

10  matters including the above allegations, among others. Because these

11  federal criminal investigations are sensitive, ongoing and contain

12  confidential aspects, and at least one petitioning creditor appears

13  to have indicated an intent to elicit testimony or other discovery

14  about the above events in order to establish their claims,[13] the

15  government requests that this Court exercise its inherent power to

16  partially stay discovery in the bankruptcy proceedings so as to

17  protect the integrity of the government's pending investigations, or

18  alternately, to stay these proceedings.

19  **III. ARGUMENT**

20    **A.    This Court has the power to stay the instant bankruptcy
      proceedings in the interest of justice**

21

22  "The power to stay proceedings is incidental to the power

23  inherent in every court to control the disposition of the causes on

24  its docket with economy of time and effort for itself, for counsel,

25  and for litigants."  Landis v. North American Co., 299 U.S. 248, 254

26  ----

  [10] See MacDonald Decl., ¶ 7-9.

27  [11] See Declaration of Dan G. Boyle, ¶ 4.

  [12] See MacDonald Decl., ¶10-11.

28  [13] See Boyle Decl., ¶ 4-5.

1   (1936).  While the Constitution does not mandate the stay of civil

2   proceedings in the face of parallel criminal proceedings, "a court

3   may [nevertheless] decide in its discretion to stay civil

4   proceedings, postpone civil discovery, or impose protective orders

5   and conditions when the interests of justice seem to require such

6   action. . . ."  SEC v. Dresser Industries, Inc., 628 F.2d 1368, 1375

7   (D.C. Cir. 1980) (quoting United States v. Kordel, 397 U.S. 1, 12 n.

8   27 (1970)).

9        With respect to bankruptcy proceedings in particular, courts

10  have found that a stay may be warranted where a bankruptcy proceeding

11  seriously implicates a debtor's Fifth Amendment rights.  See, e.g.,

12  In re Zinnel, 2013 U.S. Dist. LEXIS 46114, 2013 WL 128439 (E.D. Cal.

13  March 28, 2013) (granting stay of bankruptcy appeal where debtor was

14  criminally accused of engaging in enterprise through which he

15  allegedly obtained assets); In re SK Foods, L.P., 2010 U.S. Dist.

16  LEXIS 136188 (E.D. Cal. Dec. 9, 2010); (reversing bankruptcy court's

17  denial of stay because bankruptcy litigation seriously implicated

18  principal's privilege against self-incrimination); In re Marceca, 131

19  B.R. 774, 778 (Bankr. S.D.N.Y. 1991) (granting motion to stay

20  adversary proceeding pending criminal investigation).

21       A determination of whether to stay a case is made on a case-by-

22  case basis, depending on "the particular circumstances and competing

23  interests involved in the case."  Federal Sav. & Loan Ins. Corp. v.

24  Molinaro, 889 F.2d 899, 902 (9th Cir. 1989).  The Ninth Circuit has

25  held that in making this decision, courts should consider the extent

26  to which a defendant's Fifth Amendment rights are implicated, as well

27  as the following factors:

28

1        (1)   the interest of the plaintiffs in proceeding expeditiously

2               with this litigation or any particular aspect of it, and

3               the potential prejudice to plaintiffs of a delay;

4        (2)   the burden which any particular aspect of the proceedings

5               may impose on defendants;

6        (3)   the convenience of the court in the management of its

7               cases, and the efficient use of judicial resources;

8        (4)   the interests of persons not parties to the civil

9               litigation; and

10       (5)   the interest of the public in the pending civil and

11              criminal litigation.

12  Id. at 903.

13     Here, the balance of these factors mitigates in favor of a

14  limited stay of discovery, or if such a stay would be unworkable, a

15  stay of this proceeding.

16     **B.    The Pending Criminal Investigation and the Instant
Bankruptcy Proceeding Share Areas of Overlap**

17

18     As a threshold matter, there is at least one clear overlap

between this bankruptcy proceeding and the pending criminal
19

investigation, in the form of the Noval-Jadelle Transfers. As
20

described above, the Noval-Jadelle Transfers form the basis for the
21

claims brought by alleged creditor Franco. Relatedly, the recent
22

recovery of the Recovered Jewelry from the residence of T.T., and
23

corresponding criminal investigation, provides further overlap with
24

this proceeding, as preliminary investigation indicates that the
25

Recovered Jewelry was either property of, or on consignment to,
26

Jadelle prior to the inception of this bankruptcy case. As described
27

herein, the nature of these claims suggests that discovery in this
28

1  action would necessarily include documents and testimony from Jadelle

2  and/or its de facto manager, Rechnitz, and potentially from Franco

3  and other alleged creditors, who may also have relevant Fifth

4  Amendment rights on such topics, that risks compromising the

5  integrity of the federal criminal investigation.

6    **C.    Jadelle's creditors do not have a unique interest in
         proceeding expeditiously**

7

8    Here, as in any bankruptcy proceeding, Jadelle's creditors have

an interest in seeing their Petition addressed in a timely manner.

9
But given that the instant Petition was filed relatively recently,

10  the proposed delay cannot be characterized as highly prejudicial.

11

12   Any interest Jadelle's creditors have in proceeding rapidly must

be weighed against the needs of non-parties (as discussed below),

13
including as to the proper handling of the Recovered Jewelry. Here,

14  the Recovered Jewelry is being held as evidence, and will not be

15  available as part of this bankruptcy proceeding until the conclusion

16  of the criminal investigation, and possibly criminal proceedings.

17  While the connection between the Recovered Jewelry and this

18  proceeding is not yet fully clear, if indeed the Recovered Jewelry is

19  related to the petitioning creditors' claims (possibly as

20  collateral), then these assets may not be available for some time.

21   Jadelle's creditors may reasonably wish to move with haste in

22  recovering from Jadelle, but any impact on the alleged creditors is

23  mitigated by the limited nature of the government's request. The

24  government is not seeking a complete stay of this action, or even a

25  complete stay of discovery, but rather, only a limited stay. The

26  government only requests that the Court stay this action in its

27

28

1    entirety if the Court believes a limited stay would prove inefficient

2    or unworkable.

3    **D.    If a stay is not granted, one or more parties in this case
        will likely have to choose between invoking the Fifth
4       Amendment privilege against self-incrimination, and
        potentially negatively-impacting the bankruptcy case itself**

5

6    In determining whether a stay is warranted, many courts have

     agreed that "the strongest case for deferring civil proceedings is
7
     where a party under indictment for a serious offense is required to
8
     defend a civil or administrative action involving the same matter."
9
     SEC v. Dresser Industries, Inc., 628 F.2d 1368, 1375-76 (D.C. Cir.
10
     1980).  This is because "[t]he noncriminal proceeding, if not
11
     deferred, might undermine the party's Fifth Amendment privilege
12
     against self-incrimination, expand rights of criminal discovery
13
     beyond the limits of Federal Rule of Criminal Procedure 16(b), expose
14
     the basis of the defense to the prosecution in advance of criminal
15
     trial, or otherwise prejudice the case."  Id. at 1376.
16
     Even where no indictments have yet been returned, a pre-
17
     indictment stay may still be warranted if the government is
18
     conducting an active parallel criminal investigation.  This is
19
     particularly the case where search warrants have been executed,
20
     subpoenas have been issued, and defendants have been notified that
21
     they are targets of the criminal investigation.  Walsh Sec. v. Cristo
22
     Prop. Mgmt., 7 F. Supp. 2d 523, 527 (D.N.J. 1998); see also Amsave
23
     Credit Corp. v. Marceca, 131 B.R. 774 (S.D.N.Y. 1991) (granting pre-
24
     indictment stay because criminal investigation was "reaching a
25
     terminal phase that will likely result in the issuance of indictments
26
     against [the defendant] and possibly others involved in this case").
27

28

1    If this bankruptcy proceeding is not stayed, it appears likely

2  that Franco, Rechnitz, and possibly others may be forced to choose to

3  invoke their Fifth Amendment privilege against self-incrimination, at

4  the risk of prejudice in this action. As noted above and in the

5  Fuller Declaration, the Noval-Jadelle Transfers are the subject of a

6  criminal investigation, and it appears highly-unlikely that discovery

7  can proceed as to those transfers without risk to one or both parties

8  in addressing these transfers of funds in sworn testimony. For

9  example, the Complaint references Franco nearly 50 times, and

10  describes numerous transactions in funds traceable to the AUB

11  Transfers, which appear to have funded some or all of the Noval-

12  Jadelle Transfers. Government counsel has been informed that Rechnitz

13  has already invoked his Fifth Amendment privilege in response to

14  limited question at a prior meeting of creditors, so this concern is

15  certainly not speculative. See Boyle Decl., ¶ 4.

16    Similarly, while the provenance of the Recovered Jewelry is the

17  subject on ongoing investigation, if the Recovered Jewelry is indeed

18  some or all of the "collateral" referenced in both filings in this

19  case, including the sworn declaration filed by Franco, and public

20  statements of counsel, it appears likely that Rechnitz, Franco, or

21  other parties may face the decision to invoke the privilege or be

22  forced to disclose under oath the full extent of their knowledge

23  regarding the Recovered Jewelry and how it came to be found in the

24  residence of non-party T.T.

25    Accordingly, the government submits that this factor weighs

26  heavily in favor of granting a stay.

27

28

1  **E.    A stay would allow this Court to avoid extensive delays and
protracted litigation resulting from invocations of the
2       privilege during discovery**

3        While this Court has an overall interest in judicial efficiency

4  with respect to managing its docket, it also undoubtedly has "an

5  interest in resolving individual cases efficiently." Walsh, 7 F.

6  Supp. 2d at 528 (granting pre-indictment stay, in part because

7  "[w]ithout a stay, interrogatory and deposition discovery would

8  likely cause inefficiency, because several defendants [would] be

9  forced to assert Fifth Amendment privileges"). If the instant

10  proceeding is not stayed, then the future invocation of the Fifth

11  Amendment by one or more parties in the course of discovery will

12  likely result in protracted litigation with respect to privilege

13  issues, thereby resulting in inevitable delays. Counsel for the

14  trustee has informed government counsel that, at a prior Section

15  341(a) meeting, Rechnitz already invoked his Fifth Amendment

16  Privilege in response to limited questioning, so it appears likely

17  that he may do so again if discovery is not stayed. Boyle Decl., ¶ 5.

18        While the government cannot — publicly or otherwise — predict

19  with precision when the federal criminal investigation will be

20  completed, that lack of certainty can be mitigated by the

21  government's offer to provide a status update after 120 days or

22  allowing the parties to petition the Court to lift or modify the stay

23  once circumstances have materially changed.  Either way, the

24  government respectfully submits that the efficiency gained by

25  imposing the stay will outweigh the prejudice of any resulting delay.

26

27

28

**F.   A stay of the proceedings is critical for the preservation of the integrity of the government's ongoing criminal investigation**

As noted above, the government has a significant interest in the stay of discovery in this bankruptcy proceeding to protect the integrity of its continuing investigation. It is beyond dispute that "[t]he United States' interest in an unimpeded criminal investigation favors a stay." Ashworth v. Albers Med., Inc., 229 F.R.D. 527, 532 (S.D. W. Va. 2005). Even in cases where the government is not a party, it has "a discernible interest in intervening in order to prevent discovery in a civil case from being used to circumvent the more limited scope of discovery in [a related] criminal matter." SEC v. Chestman, 861 F.2d 49, 50 (2nd Cir. 1988); see also Dresser, 628 F.2d at 1375-76 (noting that prejudice to a criminal case might result from the availability of broader discovery in the parallel civil action).

Here, both the Noval-Jadelle Transfers and the Recovered Jewelry are subjects of federal criminal investigation, and accordingly, it appears that Franco, Rechnitz, and others involved may have substantial sensitive information related to the federal criminal investigation, and the forced disclosure of this information in discovery would be highly detrimental to the integrity of that investigation. The issues that the government is investigating undeniably overlap with areas of interest to those trying to establish claims as creditors of Jadelle, creating a direct conflict between the bankruptcy proceedings and the federal criminal investigation, such that any relevant testimony given in the bankruptcy proceeding is likely to have some level of negative impact on the federal criminal investigation. Permitting the bankruptcy

1   proceeding to continue in light of these conflicting interests would

2   not only likely interfere with the federal criminal investigation,

3   but would also jeopardize the public interest in the prompt and

4   efficient resolution of criminal matters. As such, this factor

5   militates strongly in favor of granting a stay. [14]

6       **G.    The public and non-parties have a greater interest in
               seeing that any criminal activity is expediently**

7       **investigated than in advancing the bankruptcy proceedings**

8       The public interest in uncompromised criminal investigations

9   likewise weighs strongly in favor of a stay. See Baker v. SeaWorld

10  Entm't, Inc., 2018 U.S. Dist. LEXIS 60958, 2018 WL 1726534 at *3

11  (S.D. Cal. Apr. 10, 2018) ("The government has a strong interest in

12  maintaining and protecting the integrity of its criminal

13  investigation, and a stay would prevent premature disclosure of

14  criminal discovery materials.")  This is particularly true here,

15  where in the alleged illegal conduct relates to more than $100

16  million in allegedly-embezzled foreign assets. The Court should

17  consider not only the interests of citizens of this district, but

18  also the Kuwaiti public, who have an undeniably-strong interest in

19  seeing a full and complete investigation of apparent misconduct at

20  the highest levels of their government. Permitting this bankruptcy

21  proceeding to undermine a criminal investigation into those

22  allegations would be devastating to this public trust. In contrast,

23  the public's interest in a swift progression of Jadelle's bankruptcy

24  proceedings is relatively minimal.

25

26

27  ───────────────

28  [14] Should the Court wish to hear additional details concerning
    the status of the criminal investigation, the United States requests
    the opportunity to make a further in camera showing to the Court.

1    To the extent the Court separately considers the interests of

2   non-parties who might have a greater interest than the public in

3   general, the Court should note that non-party V-1 (see MacDonald

4   Decl., ¶ 8) reported the theft of the Recovered Jewelry, which was

5   alleged to be on consignment with Jadelle. As a putative victim of

6   crime, V-1 thus would have a strong interest in seeing the proper

7   resolution of the criminal investigation into the Recovered Jewelry

8   and potentially any subsequent restitution (see generally, 18 U.S.C.

9   § 3771(a)(6)), and presumably, would not want the instant bankruptcy

10  proceeding in interfering with the same.

11  **IV.    The Court Should Stay This Action if a Discovery Stay Would
        Prove Inefficient or Unworkable**

12

13    While the government believes that the public interest in an

14  uncompromised criminal investigation can be protected through a

15  limited stay of discovery, in the form of the accompanying Proposed

16  Order, the government recognizes that this action has been heavily-

17  litigated, with at least 150 filings, multiple appeals, and numerous

18  discovery applications in less than four months. Considering the pace

19  and tenor of the litigation in this action, the Court may determine

20  that a limited stay would prove unworkable or inefficient. In such a

21  case, the government respectfully requests the Court stay this

22  bankruptcy case entirely.

//

//

//

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court stay discovery in the instant bankruptcy proceedings as detailed in the accompanying Proposed Order, until the conclusion of the federal criminal investigation. After 120 days, the government will file a status report addressing whether a continued stay is necessary.

Dated: August 25, 2020              NICOLA T. HANNA
                                    United States Attorney
                                    BRANDON D. FOX
                                    Assistant United States Attorney
                                    Chief, Criminal Division
                                    STEVEN R. WELK
                                    Assistant United States Attorney
                                    Chief, Asset Forfeiture Section


                                    /s/
                                    _____
                                    DAN G. BOYLE
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

**DECLARATION OF DAN G. BOYLE**

I, Dan G. Boyle, declare as follows:

1.    I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California. I am an attorney representing the government in this case.

2.    On July 16, 2020 the United States filed seven interrelated verified complaints in this district, seeking forfeiture of six pieces of real property and various personal property. Specifically, these complaints were filed in cases numbered: 20-cv-6313, 20-cv-6314, 20-cv-6316, 20-cv-6318, 20-cv-6319, 20-cv-6320, 20-cv-6321.

3.    A true and correct copy of the verified complaint in the lead action, United States v. All Right and Title to Real Property Known as the Mountain of Beverly Hills, 20-cv-6313, is attached as Exhibit A to this declaration.

4.    On or about on February 12, 2020, I spoke by telephone with David Seror, counsel to Chapter 7 Trustee Sam Leslie. During that call I informed counsel of the recovery of the Recovered Jewelry, and of the government' intent to file the instant motion. Counsel informed me that at a previous § 341 meeting of creditors, Jona Rechnitz, appearing on behalf of Jadelle Jewelry & Diamonds, LLC, had invoked his privilege against self-incrimination in response to questioning.

5.    On that call and subsequent emails, dated August 19, 2020 and August 22, 2020, counsel for the trustee identified and provided copies of the Court's August 17, 2020 discovery Order [ECF No. 147] and identified associated deadlines, and requested that any motion to stay filed by the government address any pending deadlines under that same order.

1    I declare under penalty of perjury under the laws of the United

2  States of America that the foregoing is true and correct and that

3  this declaration is executed at Los Angeles, California, on August

4  25, 2020.

5                                          /s/ Dan G. Boyle
                                           DAN G. BOYLE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
MICHAEL R. SEW HOY (Cal. Bar No. 243391)
DAN G. BOYLE (Cal. Bar No. Pending)
Assistant United States Attorneys
Asset Forfeiture Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3314/2426
     Facsimile: (213) 894-0142
     E-mail:   Michael.R.Sew.Hoy@usdoj.gov
               Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CV 20-6313 |
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | 18 U.S.C. §§ 981(a)(1)(A); (a)(1)(C) |
| ALL RIGHT AND TITLE TO REAL PROPERTY KNOWN AS THE MOUNTAIN OF BEVERLY HILLS, | [I.R.S.] |
| Defendant. | |

The United States of America brings this claim against the above-captioned defendant ("the Defendant Asset"), and alleges as follows:

**JURISDICTION AND VENUE**

1.    This is a civil forfeiture action brought pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

2.    This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3.    Venue lies in this District pursuant to 28 U.S.C. § 1395(a).

**PERSONS AND ENTITIES**

4.    The plaintiff is the United States of America ("plaintiff" or the "government").

5.    The Defendant is all right and title to real property commonly known as 1652 Tower Park Drive in Beverly Hills, California (APN NOS. 4384-034-002; 4384-034-003; 4384-034-004; 4384-034-005; 4384-034-006; 4384-034-007; 4384-034-008; 4384-034-009; 4384-034-010; 4384-034-011; 4384-034-012; 4384-034-013; 4384-034-014; 4384-019-002; 4384-019-003; 4384-019-015, and 4384-019-017), also known as the Mountain of Beverly Hills (the "MOUNTAIN") or the Vineyard at Beverly Hills, including all appurtenances, improvements, and attachments thereon. The full legal description of the defendant real property is attached hereto as Exhibit A.

6.    KUWAITI OFFICIAL 1 was the Minister of Defense of Kuwait between 2013 and 2017. KUWAITI OFFICIAL 1 served as the Chief of General Staff of the Kuwaiti Armed Forces from 2012 to 2013. Prior to March 2012, KUWAITI OFFICIAL 1 was a Lieutenant General in the Kuwaiti Armed Forces. During each of these times, KUWAITI OFFICIAL 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv).

7.    KUWAITI OFFICIAL 2 was the Kuwaiti Deputy Minister of Defense from 2008 to 2017. Prior to becoming Deputy Minister of Defense, KUWAITI OFFICIAL 2 was the Assistant Deputy for Financial Affairs of the Ministry of Defense from 2001 through 2008. During each of these times, KUWAITI OFFICIAL 2 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv).

8.    MAO OFFICIAL 1 was the head of the Kuwaiti Ministry of Defense's Military Attaché Office in London (the "MAO") between 2010 and in or about 2017. During this time, MAO OFFICIAL 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv).

9.    Victorino Noval ("NOVAL") is an individual who resides in Los Angeles County, California. NOVAL was formerly known as "Victor Jesus Noval" but changed his name following a 2003 conviction for mail fraud, in violation of 18 U.S.C. § 1341, and tax evasion, in violation of 26 U.S.C. § 7201. On September 24, 2003, NOVAL was ordered by the Hon. J. Spencer Letts of the United States District Court of the Central District of California to pay $25,358,494 in restitution to the victims of the mortgage fraud scheme leading to his criminal conviction.

10.   Victor Franco Noval ("FRANCO") is an individual who resides in Los Angeles County, California, and is the son of NOVAL.

11.   Charles "Chip" Dickens ("DICKENS") is an individual who resides or resided in Los Angeles County, California during the relevant period, and is the former manager of Tower Park Properties, LLC.

12.   Tower Park Properties, LLC, ("TPP") is an entity incorporated in the State of Delaware in or about 2003 and registered in the State of California in 2004. DICKENS was the manager of TPP

23

1  during all or part of the relevant period described in this

2  Complaint.

3      13.  Secured Capital Partners, LLC, ("SCP") is a California

4  entity formed in or about 2010, with a principal place of business in

5  Los Angeles, California. FRANCO is the manager of SCP, or was during

6  all or part of the relevant period described in this Complaint.

7      14.  8484 Wilshire Blvd LLC ("8484 Wilshire") is a California

8  entity formed in or about 2012, with a principal place of business in

9  Los Angeles, California. FRANCO is the manager of 8484 Wilshire, or

10  was during all or part of the relevant period described in this

11  Complaint.

12      15.  The Awal Trust ("AWAL"), on information and belief, was

13  created in or about 2012.[1] KUWAITI OFFICIAL 1 is both the grantor and

14  trustee of AWAL. According to a trust agreement dated February 23,

15  2012, and corresponding signature page notarized on or about December

16  17, 2012, AWAL's beneficiaries are the five children of KUWAITI

17  OFFICIAL 1, namely M.K.A.-1, M.K.A.-2, A.K.A., S.K.A., and J.K.A.,

18  and the spouse of KUWAITI OFFICIAL 1, A.M.A. FRANCO purported to be

19  an authorized agent of AWAL until in or about 2015.

20      16.  The Rexford Trust ("REXFORD") was created under the laws of

21  California in or about 2009. FRANCO is both the grantor and trustee

22  of REXFORD. The REXFORD trust document identifies the sons of NOVAL

23  as the trust beneficiaries.

24

25

26  _____

27  [1] According to an unsigned copy of the trust document obtained
from First Choice Bank, AWAL was formed on or about February 23,
2012. While it does not specifically state that it is created under

28  California law, the instrument includes several references to
California law.

-4-

2Y

17.  Beverly Hills Real Estate Holdings, LLC, ("BHREH") is a California entity formed in or about 2010, with a principal place of business in Los Angeles, California. FRANCO is the manager of BHREH, or was during all or part of the relevant period described in this Complaint. As of January 1, 2015, AWAL and REXFORD each held a 50% interest in BHREH.

18.  LA Stars, LLC, ("LA STARS") was incorporated in the State of California in or about 2007. NOVAL is the managing manager of LA STARS, or was during all of part of the relevant period described in this Complaint.

19.  Ahli United Bank ("AUB") is a financial institution headquartered in Manama, Bahrain, with branches in cities including Kuwait City, Kuwait, and London, UK.

20.  National Bank of Kuwait ("NBK") is a financial institution headquartered in Kuwait City, Kuwait, with branches in cities including London, UK. The government of Kuwait, including through departments such as the Ministry of Defense, maintains accounts at NBK for official government purposes.

21.  The interests of the State of Kuwait, KUWAITI OFFICIAL 1, KUWAITI OFFICIAL 2, NOVAL, FRANCO, TPP, SCP, BHREH, LA STARS, DICKENS, Hughes Investment Partnership, LLC, and Fiduciary Trust International of California (acting as interim successor trustee of the Mark Hughes Family Trust) may be adversely affected by these proceedings.

22.  Contemporaneously with the commencement of this action, the government is filing related *in rem* civil forfeiture actions against the following defendants:

1          a.    All right and title to real property in Los Angeles,

2   California (APN 4360-033-012) (the "WILSHIRE 402 PROPERTY"),

3   including all appurtenances, improvements, and attachments thereon;

4          b.    All right and title to real property in Los Angeles,

5   California (APN 4360-033-112) (the "WILSHIRE PENTHOUSE PROPERTY"),

6   including all appurtenances, improvements, and attachments thereon;

7          c.    All right and title to real property in Beverly Hills,

8   California 90210 (APN 4350-001-018) (the "ALTA PROPERTY"), including

9   all appurtenances, improvements, and attachments thereon;

10          d.    All right and title to real property in Beverly Hills,

11   California (APN 4348-003-014) (the "MARILYN PROPERTY"), including all

12   appurtenances, improvements, and attachments thereon;

13          e.    All right and title to real property in Beverly Hills,

14   California (APN 4348-013-030) (the "SUMMIT PROPERTY"), including all

15   appurtenances, improvements, and attachments thereon;

16          f.    All right and title to one British Aerospace BAE125

17   Series 800A aircraft bearing registration number N716BB (the "BAE125

18   JET"), and its tools and appurtenances, including any and all

19   logbooks (hard copy and/or electronic) documenting engine and

20   airframe maintenance, flights, number of hours flown, number of

21   landings and types and frequency of instrument approaches made by the

22   aircraft;

23          g.    All right and title to one 2011 Azimut 68' 68S Yacht,

24   bearing hull number XAX68SANE011 (the "AZIMUT YACHT"), and its tools,

25   appurtenances, and associated logbooks;

26          h.    All right to and interest in the Hertz Investment

27   Group Midwest Office Portfolio (the "HERTZ INVESTMENT") owned, held

28   or acquired, directly or indirectly, by the Rexford Trust and/or

1  Victor Franco Noval as trustee of the Rexford Trust, including but

2  not limited to any right to collect and receive any profits and

3  proceeds therefrom, and any interest derived directly or indirectly

4  from the proceeds invested in HERTZ INVESTMENT by the Rexford Trust

5  and/or Victor Franco Noval as trustee of the Rexford Trust;

6         i.   All right and title to one 2014 Lamborghini Aventador

7  automobile bearing vehicle identification number ZHWUR1ZD3ELA02540

8  and Montana license number LYYT (the "2014 LAMBORGHINI"), and its

9  tools, appurtenances, and associated logbooks;

10         j.   All right and title to assorted Manny Pacquiao

11  memorabilia purchased between March and April of 2015, for

12  approximately $40,000.00 from Cliff Sawyer (the "PACQUIAO

13  MEMORABILIA").

**EVIDENCE SUPPORTING FORFEITURE**

Background

16  23.   The State of Kuwait ("Kuwait") is a country located on the

17  Arabian Peninsula adjacent to the Persian Gulf.

18  24.   Kuwait is a constitutional emirate governed by a

19  constitution promulgated in 1962. The government of Kuwait is divided

20  between the Emir, a cabinet appointed by the Emir, and an elected

21  parliament in the form of the National Assembly of Kuwait (the

22  "National Assembly").

23  25.   Kuwait's Ministry of Defense ("MOD") is a governmental body

24  of Kuwait, responsible for the implementation of the government's

25  defense policy and governing all branches of the Kuwait Armed Forces.

26  The MOD consists of more than 58,000 personnel and manages a defense

27  budget which generally exceeds $5,000,000,000.00 annually.

28

26.   The budget and financial affairs of the MOD are the responsibility of the Ministry of Defense Financial Affairs Department ("MODFAD").

27.   The MOD operates under the direction of the Kuwaiti Minister of Defense (the "Minister"). The Minister is appointed by the Emir, but the National Assembly has the right to summon, question, and remove ministers appointed by the Emir, including the Minister.

28.   The MOD maintains military liaison offices in certain foreign countries, including in the United Kingdom. The MAO is the MOD's military liaison office in the United Kingdom.

29.   One function of the MAO is the administration of official Kuwaiti bank accounts in London in the name of the MOD or MAO, overseen by MODFAD.

Kuwaiti Law on Public Funds and Governmental Transactions

30.   Under the laws of Kuwait, public funds are protected and inviolable, whether inside or outside Kuwait.

31.   Under the laws of Kuwait, before any ministry may open a foreign bank account, the ministry must notify and obtain approval from the Kuwaiti Ministry of Finance ("MOF"), or a financial authority designated by MOF, such as MODFAD.

32.   Under the laws of Kuwait, a government ministry must register approved foreign bank accounts with MOF and/or MODFAD and also enter all transactions for any such foreign bank account in official registers and preserve supporting documentation of any such transactions.

33.   Finally, under the laws of Kuwait, a government ministry must provide reports to the state audit authority every six months

8

disclosing foreign investments and holdings, and provide the status of any such investments.

### The Unauthorized MAO Accounts

34.  In or about 2010, MAO OFFICIAL 1 became the head of the MAO in London. With that position, MAO OFFICIAL 1 assumed oversight over the MAO and all financial accounts and assets administered by the MAO.

35.  During this handover of authority, as required by Kuwaiti law, MAO OFFICIAL 1 received and accepted an official accounting of the assets, bank accounts, and cash holdings of the MAO at that time (the "Handover Accounting").

36.  The Handover Accounting identified six AUB accounts and seven NBK accounts in the name of the MAO at that time, with a total balance of less than $14 million.

37.  In fact, however, both KUWAITI OFFICIAL 2 and MAO OFFICIAL 1 knew that the Handover Accounting was incomplete, and that additional accounts in the name of the MAO existed and were in use by KUWAITI OFFICIAL 2 and others, in violation of Kuwaiti law.

38.  Rather than inform MOF, MODFAD, or any state audit authority of the accounts missing from the Handover Accounting, MAO OFFICIAL 1, KUWAITI OFFICIAL 1, KUWAITI OFFICIAL 2, and others known and unknown conspired to open additional accounts in the name of the MAO, without authorization from MOF or MODFAD, and fund these accounts with Kuwaiti public funds for their own personal use.

39.  While head of the MAO, and with the knowledge of KUWAITI OFFICIAL 1 and KUWAITI OFFICIAL 2, MAO OFFICIAL 1 opened at least six AUB Accounts in the name of the MAO, denominated in Euros, GBP and USD (the "AUB MAO Accounts"). The AUB MAO Accounts consisted of:

1   a. AUB MAO Account ending x3470;

2   b. AUB MAO Account ending x4481;

3   c. AUB MAO Account ending x4910;

4   d. AUB MAO Account ending x5277;

5   e. AUB MAO Account ending x6496; and

6   f. AUB MAO Account ending x6559.

7  40. None of the AUB MAO Accounts were reported to or registered

8 with MOF or MODFAD.

9  41. None of the AUB MAO Accounts were properly recorded in the

10 MAO's books and records in accordance with Kuwaiti law.

11  42. Once opened, the AUB MAO Accounts were funded by tens of

12 millions of dollars, Euros, and GBP in transfers into the AUB MAO

13 Accounts from Kuwaiti government accounts at NBK, including Kuwaiti

14 governmental accounts at NBK ending x2501, x9099, x9103.

15  43. In order to execute these transfers, KUWAITI OFFICIAL 2

16 executed a series of transfer directives to NBK (the "NKB

17 Transfers"), including:

18   a. On or about December 15, 2011, KUWAITI OFFICIAL 2

19 executed a transfer letter directed to NBK's London branch office

20 requesting the transfer of €23,500,000.00 from NBK Account x2501 to

21 AUB MAO Account x5277. The requested transfer was executed on or

22 about December 19, 2011, and was equivalent to approximately

23 $30,662,800.00 as of that date.

24   b. On or about September 12, 2012, KUWAITI OFFICIAL 2

25 executed a transfer letter directed to NBK's London branch office

26 requesting the transfer of €30,000,000.00 from NBK Account x2501 to

27 AUB MAO Account x5277. The requested transfer was executed on or

28

1   about September 18, 2012, and was equivalent to approximately

2   $39,360,000.00 as of that date.

3         c.   On or about September 19, 2013, KUWAITI OFFICIAL 2

4   executed a transfer letter directed to NBK's London branch office

5   requesting the transfer of 30,000,000.00 GBP from NBK Account x9099

6   to AUB MAO Account x4481. The requested transfer was executed on or

7   about October 1, 2013, and was equivalent to approximately

8   $48,591,000.00 as of that date.

9         d.   On or about October 8, 2014, KUWAITI OFFICIAL 2

10   executed a transfer letter directed to NBK's London branch office

11   requesting the transfer of $8,840,000.00 from NBK Account x9103 to

12   AUB MAO Account x6402. The requested transfer was executed on or

13   about October 14, 2014.

14         e.   On or about February 20, 2015, KUWAITI OFFICIAL 2

15   executed a transfer letter directed to NBK's London branch office

16   requesting the transfer of $60,000,000.00 from NBK Account x9099 to

17   AUB MAO Account x6496. The requested transfer was executed on or

18   about February 25, 2015.

19     44.   The NBK Transfers were not entered into MAO books and

20   records in accordance with Kuwaiti law, and were not disclosed to, or

21   approved of by, MOF or MODFAD.

22     45.   The AUB MAO Accounts were also funded by the liquidation of

23   Kuwaiti government funds held on fixed deposit in other MAO accounts

24   at AUB, including:

25         a.   On or about January 11, 2012, a fixed deposit of MOD

26   funds at AUB in the amount of $14,361,490.64 was liquidated and

27   deposited into AUB MAO Account x3470.

28

1          b.    On or about September 21, 2012, a fixed deposit of MOD

2    funds at AUB in the amount of $18,000,000.00 was liquidated and

3    deposited into AUB MAO Account x3470.

4          46.    The January 11, 2012 and September 21, 2012 liquidations of

5    Kuwaiti government funds held on fixed deposit at AUB were not

6    entered into MAO books and records as required by Kuwaiti law, and

7    were not disclosed to, or approved of by, MOF or MODFAD.

8          Tens of Millions of Dollars Were Transferred from the AUB MAO

9                   Accounts to Bank Accounts in California

10         47.    In or about 2010, KUWAITI OFFICIAL 1 and NOVAL entered into

11   an agreement to invest in property in the Los Angeles area, and

12   specifically, to purchase, develop, and resell the MOUNTAIN.

13         48.    On or about November 23, 2010, NOVAL and KUWAITI OFFICIAL 1

14   executed a partnership agreement for LA STARS, granting KUWAITI

15   OFFICIAL 1 a 50% interest in LA STARS in return for a series of

16   payments totalling no less than $20,000,000.00, to be made no later

17   than March 1, 2011.

18         49.    To execute this agreement, KUWAITI OFFICIAL 1, NOVAL, and

19   FRANCO created a series of entities and opened bank accounts in the

20   name of certain of these entities, including:

21         a.    In or about February 2012, KUWAITI OFFICIAL 1 created

22   AWAL under the laws of California, naming himself as the trustee.

23   KUWAITI OFFICIAL 1 named FRANCO as his authorized agent with respect

24   to AWAL.

25         b.    In or about December 2012, NOVAL and/or FRANCO created

26   BHREH under the laws of California, naming FRANCO as the sole

27   manager.

28

1          c.    On or about January 1, 2013, FRANCO executed an

2    Operating Agreement for BHREH as an "authorized agent" of KUWAITI

3    OFFICIAL 1, himself acting as trustee of AWAL. AWAL, in turn, was

4    identified in the Operating Agreement as a 50% beneficial owner of

5    BHREH.

6          d.    On or about January 1, 2015, FRANCO executed a

7    certification on behalf of BHREH, certifying that AWAL held a 50%

8    interest in BHREH.

9          e.    On or about January 1, 2015, FRANCO, as manager of

10   BHREH, executed a promissory note addressed to KUWAITI OFFICIAL 1,

11   acting as trustee of AWAL, promising to pay AWAL $69,962,881.00 upon

12   demand, and entitling AWAL to 50% of the profits on any sale of the

13   MOUNTAIN, in return for unspecified value previously received.

14      50.   Concurrent to these agreements between KUWAITI OFFICIAL 1,

15   NOVAL, and FRANCO, between January 2012 and April 2015, KUWAITI

16   OFFICIAL 1 directed the transfer of no less than $104,380,000.00 from

17   the AUB MAO Accounts to bank accounts held in the State of California

18   designated by NOVAL and FRANCO (the "AUB MAO Transfers"):

19         a.    Beginning on or about January 13, 2012, at least

20   $8,200,000.00 was transferred from the AUB MAO Accounts to an account

21   in the name of Fullerton, Lemann, Schaefer, and Dominick, LLP

22   ("FLSD")[2] at Wells Fargo Bank, in Los Angeles, California (the "FLSD

23   Account"). Specifically:

24         i.    On or about January 13, 2012, $1,800,000.00 was

25   transferred from AUB MAO Account x3470 to the FLSD Account.

26   _____

27      [2] FLSD is a law firm based in San Bernardino, California which
     represented NOVAL and/or entities NOVAL controlled, including LA
28   STARS. D.C., a partner at FLSD, was identified as the agent for
     service on BHREH's articles of incorporation.

1     ii.  On or about January 13, 2012, $2,400,000.00 was

2  transferred from AUB MAO Account x3470 to the FLSD Account.

3     iii. On or about February 14, 2012, $2,000,000.00 was

4  transferred from AUB MAO Account x3470 to the FLSD Account.

5     iv.  On or about May 1, 2012, $2,000,000.00 was

6  transferred from AUB MAO Account x3470 to the FLSD Account.

7     b.   On or about August 8, 2012, $1,000,000.00 was

8  transferred from AUB MAO Account x3470 to a bank account in the name

9  of SCP.

10     c.   Beginning on or about September 21, 2012, at least

11  $95,180,000.00 was transferred from the AUB MAO Accounts to two

12  accounts at Comerica Bank ("Comerica") in Los Angeles, California, as

13  follows: (1) an account in the name of "8484 Wilshire Blvd LLC -

14  Levene Neale Bender Yoo Brill, LLP TTEE," with account number ending

15  in x7075 (the "Comerica 8484 Wilshire TTEE x7075 Account"); and (2)

16  an account in the name of "8484 Wilshire Blvd LLC" with account

17  number ending in x6559 (the "Comerica 8484 Wilshire x6559 Account").

18  Specifically:

19     i.   On or about September 21, 2012, $9,500,000.00 was

20  transferred from AUB MAO Account x3470 to the Comerica 8484 Wilshire

21  TTEE x7075 Account.

22     ii.  On or about September 28, 2012, $5,500,000.00 was

23  transferred from AUB MAO Account x3470 to the Comerica 8484 Wilshire

24  TTEE x7075 Account.

25     iii. On or about December 5, 2012, $5,000,000.00 was

26  transferred from AUB MAO Account x3470 to the Comerica 8484 Wilshire

27  TTEE x7075 Account.

28     iv.  On or about May 20, 2014, $13,000,000.00 was

1 transferred from AUB MAO Account x6496 to the Comerica 8484 Wilshire

2 TTEE x7075 Account.

3       v.   On or about October 14, 2014, $4,680,000.00 was

4 transferred from AUB MAO Account x6496 to the Comerica 8484 Wilshire

5 x6559 Account.

6       vi.  On or about April 9, 2015, $57,500,000.00 was

7 transferred from AUB MAO Account x6496 to the Comerica 8484 Wilshire

8 x6559 Account.

9    51.  None of the AUB MAO Transfers were reported to MOF, MODFAD,

10 or any other Kuwaiti state audit authority in any biannual reports.

11    52.  None of the AUB MAO Transfers were recorded in the MAO's

12 books and records in accordance with Kuwaiti law

13    53.  In order to disguise the nature of the AUB MAO Transfers,

14 some of the transfers were falsely described as for military

15 purposes. In one instance, a transfer to the Comerica 8484 Wilshire

16 x6559 Account was identified as for the "technical development at the

17 new Kuwait military academy under construction," but in truth,

18 neither the MOD nor MAO had any contractual or business relationship

19 with FLSD, SCP, or 8484 Wilshire, nor is there any Kuwaiti military

20 academy either in Beverly Hills or anywhere else in California.

21 Funds from the AUB MAO Transfers Were Laundered Through Banks in the

22 State of California

23    54.  On October 3, 2012, $7,700,000.00 was transferred from the

24 Comerica 8484 Wilshire TTEE x7075 Account to a Comerica account in

25 the name of 8484 Wilshire, with an account ending in x7356 (the

26 "Comerica 8484 Wilshire x7356 Account"). All or substantially all of

27 this $7,700,000.00 is traceable to the AUB MAO Transfers.

28

55.  On October 31, 2012, $500,000.00 was transferred from the Comerica 8484 Wilshire x7356 Account to a Comerica account in the name of SCP, with an account ending in x7315 (the "Comerica SCP x7315 Account"). Between December 17, 2012 and April 29, 2013, a further $1,904,235.69 was transferred from the Comerica 8484 Wilshire x7356 Account into the Comerica SCP x7315 Account through sixteen transfers. On November 28, 2012, $1,000,000.00 was transferred from the Comerica 8484 Wilshire TTEE x7075 Account to the Comerica SCP x7315 Account. On May 22, 2014, Comerica cashier's check #246569 in the amount of $2,200,000.00 was purchased from the Comerica 8484 Wilshire TTEE x7075 Account, and then deposited in full into the Comerica SCP x7315 Account. On March 23, 2015, a further $940,455.17 was transferred from the Comerica 8484 Wilshire x6559 Account into the Comerica SCP x7315 Account. All or substantially all of this $6,544,690.86 is traceable to the AUB MAO Transfers.

56.  On August 15, 2013, $900,000.00 was transferred from the Comerica 8484 Wilshire x6559 Account to a Comerica account in the name of SCP, subtitled "Creditor Buyout Account," ending in x6567 (the "Comerica SCP Buyout x6567 Account"). On May 21, 2014, Comerica cashier's check #246570 in the amount of $800,000.00 was purchased from the Comerica 8484 Wilshire TTEE x7075 Account, and then deposited in full into the Comerica SCP Buyout x6567 Account. On April 2, 2015, a further $200,000.00 was transferred from the Comerica SCP x7315 Account into the Comerica SCP Buyout x6567 Account. All or substantially all of this $1,900,000.00 is traceable to the AUB MAO Transfers.

57.  On October 16, 2014, $10,019,166.68 was withdrawn by cashier's check from the Comerica 8484 Wilshire TTEE x7075 Account

16

1  and deposited into the Comerica 8484 Wilshire x6559 Account, and the

2  Comerica 8484 Wilshire TTEE x7075 Account was closed. All or

3  substantially all of this $10,019,166.68 is traceable to the AUB MAO

4  Transfers.

5      58.   Between October 31, 2012 and June 6, 2013, eight transfers,

6  totaling $1,793,580.00, were made from the Comerica 8484 Wilshire

7  x7356 Account to an account at Comerica in the name of SCP, subtitled

8  "Construction Account," with account number ending x7331 (the

9  "Comerica SCP Construction x7331 Account"). On November 29, 2012,

10  $1,000,000.00 was transferred from the Comerica SCP x7315 Account to

11  the Comerica SCP Construction x7331 Account. On August 12, 2013,

12  $3,000,000.00 was transferred from the Comerica 8484 Wilshire x6559

13  Account to the Comerica SCP Construction x7331 Account. On May 22,

14  2014, a further $640,000.00 was transferred from the Comerica SCP

15  x7315 Account to the Comerica SCP Construction x7331 Account. All or

16  substantially all of this $6,433,580.00 is traceable to the AUB MAO

17  Transfers.

18      59.   On April 21, 2015, $57,500,000.00 was transferred from the

19  Comerica 8484 Wilshire x6559 Account to an account at Comerica in the

20  name of "Beverly Hills Real Estate Holdings LLC", account number

21  ending x6373 ("Comerica BHREH x6373 Account") All or substantially

22  all of this $57,500,000.00 is traceable to the AUB MAO Transfers.

23      60.   Following the final AUB MAO Transfer of $57,500,000.00,

24  Comerica opened a compliance investigation into NOVAL, FRANCO, 8484

25  Wilshire, and BHREH based on an unrelated wire transfer request made

26  by FRANCO.

27      61.   Following its investigation, Comerica closed the Comerica

28  8484 Wilshire x6559 Account, the Comerica SCP x6567 Account, and the

1  Comerica BHREH x6373 Account on or about July 2, 2015, and issued

2  FRANCO a cashier's check, numbered #322217, for $57,500,000.00. All

3  or substantially all of this $57,500,000.00 is traceable to the AUB

4  MAO Transfers.

5      62.  FRANCO then attempted to open an account in the name of

6  BHREH with First Choice Bank ("FCB"), a financial institution located

7  in Cerritos, California.

8      63.  On or about July 10, 2015, FCB opened an account for BHREH

9  on a provisional basis, pending completion of due diligence on BHREH

10  (the "BHREH FCB Provisional Account"). During FCB's due diligence

11  process, FRANCO represented to FCB's compliance personnel that he was

12  an authorized agent of KUWAITI OFFICIAL 1 and AWAL.

13      64.  FRANCO deposited cashier's check #322217 in the BHREH FCB

14  Provisional Account.

15      65.  FCB returned the full amount of cashier's check #322217,

16  however, after KUWAITI OFFICIAL 1 failed to appear in person and

17  execute an authorization confirming both that FRANCO was authorized

18  to act on behalf of AWAL, and FRANCO's representations to FCB as to

19  the source of the funds deposited in the BHREH FCB Provisional

20  Account.

21      66.  FCB then issued FRANCO cashier's check #9800692 for

22  $57,500,000.00 and closed the BHREH FCB Provisional Account. All or

23  substantially all of this $57,500,000.00 was traceable to the AUB MAO

24  Transfers.

25      67.  Following the closure of the BHREH FCB Provisional Account,

26  FRANCO attempted to open an account for BHREH with another Los

27  Angeles-based financial institution, Banc of California ("BOC").

28

38

68.  In order to open an account for BHREH with BOC, FRANCO represented to BOC that funds to be deposited belonged to KUWAITI OFFICIAL 1 personally, when in fact, these funds had been misappropriated from Kuwait.

69.  On January 7, 2016, FRANCO deposited cashier's check #9800692 in the amount of $57,500,000.00 in an account at BOC held by BHREH, account number ending in x6481 ("BOC BHREH x6481 Account"). All or substantially all of this $57,500,000.00 is traceable to the AUB MAO Transfers.

70.  On January 21, 2016, $8,000,000.00 was transferred from BOC BHREH x6481 Account to an account at BOC in the name of FRANCO, with account number ending in x4459 ("BOC FRANCO x4459 Account"). All or substantially all of this $8,000,000.00 is traceable to the AUB MAO Transfers.

71.  On January 21, 2016, $8,000,000.00 was wired from the BOC FRANCO x4459 Account to Alta Standard One, LLC ("ASO") for the purchase of the ALTA PROPERTY, but that property was ultimately purchased with other funds.

72.  On or about February 4, 2016, $8,002,410.96 was wired from the ASO account at First American Title Company to an account at BOC in the name of SCP, with account number ending in x6580 ("BOC SCP x6580 Account"). All or substantially all of this $8,002,410.96 is traceable to the AUB MAO Transfers.

73.  On September 30, 2016, $27,424,902.98 was transferred from BOC BHREH x6481 Account to BOC SCP x6580 Account. All or substantially all of this $27,424,902.98 is traceable to the AUB MAO Transfers.

74.   On September 30, 2016, $30,000,000.00 was transferred from the BOC SCP x6580 Account to an account at Morgan Stanley Smith Barney Wealth Management ("MSWM") in the name of "Rexford Trust TTEE Victor Franco Noval," with account number ending in x7996-053 (the "MSWM Rexford Trust x7996-053 Account"). All or substantially all of this $30,000,000.00 is traceable to the AUB MAO Transfers. These funds were used as collateral for a line of credit at MSWM in the name of "The Rexford Trust," with account number ending in x8035-053 ("MSWM Rexford Trust x8035-053 Account").

75.   On November 29, 2016, $21,590,755.41 was transferred from the MSWM Rexford Trust x7996-053 Account to an account at Wells Fargo Advisors ("WFA") in the name of "Rexford Tr Victor Franco Noval TTEE U/A DTD 10/20/2009," with account number ending in x6591 ("WFA Franco Rexford Tr x6591 Account"). All or substantially all of this $21,590,755.41 was traceable to the AUB MAO Transfers.

## KUWAITI OFFICIAL 1 and AWAL Sue NOVAL, FRANCO, SCP and Others in California Superior Court for Fraud

76.   In or about September 2019, KUWAITI OFFICIAL 1, in his individual capacity as well as on behalf of AWAL, filed suit in the Superior Court of California against NOVAL, FRANCO, DICKENS, SCP, LA STARS, and others, alleging that NOVAL and the other defendants in that action had defrauded KUWAITI OFFICIAL 1 into transferring at least $160 million to entities directed by NOVAL but nominally controlled by FRANCO, based on his agreement with NOVAL to purchase and interest in the MOUNTAIN.

<u>THE DEFENDANT ASSET WAS INVOLVED IN AND/OR TRACEABLE TO THE PROCEEDS</u>

<u>OF THE FOREGOING CRIMINAL CONDUCT</u>

77.   The MOUNTAIN was involved in and/or improved and maintained using funds traceable to the AUB MAO Transfers. Specifically:

a.   As explained above in paragraphs 50-75, substantially all of the funds in each of the Comerica SCP Buyout x6567 Account, the Comerica SCP Construction x7331 Account, and the BOC SCP x6580 Account are traceable to the AUB MAO Transfers.

b.   On August 16, 2013, $100,000.00 was transferred from the Comerica SCP Buyout x6567 Account to Great Expectations LLC, an entity owned and controlled by DICKENS, the manager of TPP.

c.   On October 24, 2014, $40,000.00 was transferred from the Comerica SCP Buyout x6567 Account to DICKENS, the manager of TPP, described as payment for an "Assignment of Claim".

d.   Between November 1, 2012 and March 18, 2015, no less than $[4,507,694.38] was transferred from the Comerica SCP Construction x7331 Account for the maintenance, taxes, and improvement of the MOUNTAIN, including:

i.   In four transfers between November 1, 2012 and May 22, 2014, $220,463.00 was transferred from the Comerica SCP Construction x7331 Account to third-party Freeman Group / Metro Properties LLC as a "Retainer Tower Park Properties";

ii.   In seventeen transfers between November 2, 2012 and March 18, 2015, $681,555.10 was transferred from the Comerica SCP Construction x7331 Account to third-party AR Pipeline for "Tower Park/Vineyard Construction" and similar services;

iii. In fourteen transfers between November 2, 2012 and May 27, 2014, $2,063,411.75 was transferred from the Comerica SCP

1  Construction x7331 Account to third-party Valley Crest Tree Company
2  for "Vineyard Construction" and similar services;

3          iv.   In two transfers dated September 24, 2013 and
4  September 25, 2014, $37,840.00 was transferred from the Comerica SCP
5  Construction x7331 Account to third party Arthur J Gallagher and Co.
6  for "General Improvement and Grading Permit Bond Tower Park Prop
7  LLC";

8          v.   In three transfers between December 15, 2014 and
9  February 23, 2015, $191,672.45 was transferred from the Comerica SCP
10  Construction x7331 Account to third-party Pierre Landscaping, Inc.
11  for "Tower Park 4 Months Maintenance/Upgrades" and similar services;

12          vi.   In five transfers between January 15, 2013 and
13  April 18, 2013, $1,067,357.45 was transferred from the Comerica SCP
14  Construction x7331 Account to third-party Powerful Electric, Inc. for
15  "Vineyard Electrical/Construction" and similar services;

16          vii. In two transfers dated September 24, 2013 and
17  September 25, 2014, $245,395.08 was transferred from the Comerica SCP
18  Construction x7331 Account to third-party Soli Stone, Inc. for
19  "Payment on Stone Purchase Vineyard" and similar services;

20          e.   Between November 2, 2016 and July 2, 2018, no less
21  than $1,076,411.52 was transferred from the BOC SCP x6580 Account for
22  the maintenance, taxes, and improvement of the MOUNTAIN, including:

23          i.   On December 18, 2016, $704,934.55 was transferred
24  from the BOC SCP x6580 Account to the Los Angeles County Tax
25  Collector for the "Delinquent Taxes APR #4384 034 014";

26          ii.   In forty-seven transfers between November 2, 2016
27  and July 2, 2018, $248,270.00 was transferred from the BOC SCP x6580

28

1  Account to third-party M.G. for "1652 Tower Grove Landscaping" and

2  similar services;

3      78.   The WILSHIRE 402 PROPERTY was purchased using funds

4  traceable to the AUB MAO Transfers. Specifically:

5        a.   As explained above in paragraphs 50-75, substantially

6  all of the funds in the Comerica 8484 Wilshire x7356 Account are

7  traceable to the AUB MAO Transfers.

8        b.   On or about October 19, 2012, $1,244,171.92 was

9  transferred from the Comerica 8484 Wilshire x7356 Account to Canon

10  Hills Closing for the purchase of the WILSHIRE 402 PROPERTY, with

11  associated escrow number CH12-7156-ML.

12        c.   This property was titled in the name of 8484 Wilshire.

13      79.   The WILSHIRE PENTHOUSE PROPERTY was purchased using funds

14  traceable to the AUB MAO Transfers. Specifically:

15        a.   As explained above in paragraphs 50-75, substantially

16  all of the funds in the Comerica 8484 Wilshire TTEE x7075 Account are

17  traceable to the AUB MAO Transfers.

18        b.   On or about October 10, 2012, $6,287,600 was

19  transferred from the Comerica 8484 Wilshire TTEE x7075 Account to

20  West Coast Escrow for the purchase of the WILSHIRE PENTHOUSE

21  PROPERTY, with associated escrow number BH-11710-MN.

22        c.   This property was titled in the name of 8484 Wilshire.

23      80.   The ALTA PROPERTY was purchased using funds traceable to

24  the AUB MAO Transfers. Specifically:

25        a.   As explained above in paragraphs 50-75, substantially

26  all of the funds in the BOC BHREH x6481 Account are traceable to the

27  AUB MAO Transfers.

28

1       b.   On or about February 1, 2016, $12,611,141.55 was

2  transferred from the BOC BHREH x6481 Account to Commerce Escrow

3  Company ("Commerce Escrow") for the purchase of the ALTA PROPERTY.

4  The total purchase price was $13,000,000.00 and the property was

5  purchased outright without any liens. The remainder of the purchase

6  price for the ALTA PROPERTY was paid by an October 29, 2015 transfer

7  of $390,000.00 to Commerce Escrow from an account in the name of SCP

8  at California Republic Bank with account number ending x0561 (the

9  "CRB SCP x0561 Account"). The CRB SCP x0561 Account was funded by a

10  transfer of $2,400,000.00 on or about June 19, 2015 from the Comerica

11  8484 Wilshire x6559 Account. As explained above in paragraphs 50-75,

12  substantially all of the funds in the Comerica 8484 Wilshire x6559

13  Account are traceable to the AUB MAO Transfers.

14    81.  The MARILYN PROPERTY was purchased using funds traceable to

15  the AUB MAO Transfers. Specifically:

16       a.   As explained above in paragraphs 50-75, substantially

17  all of the funds in the BOC BHREH x6481 Account are traceable to the

18  AUB MAO Transfers.

19       b.   On or about July 6, 2012, the Rexford Trust purchased

20  the MARILYN PROPERTY for $6,100,000.00, with a loan from East West

21  Bank in the amount of $4,100,000.00.

22       c.   The property was titled 50% in the name of Rexford

23  Trust, with FRANCO as trustee, and 50% in FRANCO's name.

24       d.   On January 28, 2016, $3,894,628.50 was wired from BOC

25  BHREH x6481 Account to East West Bank to pay off the mortgage on the

26  MARILYN PROPERTY in full.

27    82.  The SUMMIT PROPERTY was purchased using funds traceable to

28  the AUB MAO Transfers. Specifically:

1          a.    1141 Summit, LLC was created in Los Angeles County on

2     or about December 1, 2016.

3          b.    On or about November 23, 2016, 1141 Summit, LLC

4     purchased the SUMMIT PROPERTY for $20,400,000.00 with a mortgage of

5     $12,000,000.00 from Private Mortgage Fund, LLC.

6          c.    As explained above in paragraphs 50-75, substantially

7     all of the funds in the MSWM Rexford Trust x7996-053 Account and the

8     MSWM Rexford Trust x8035-053 Account are traceable to the AUB MAO

9     Transfers.

10          d.    On November 29, 2016, $21,590,755.41 was transferred

11     from the MSWM Rexford Trust x7996-053 Account to the WFA Franco

12     Rexford Tr x6591 Account. All or substantially all of this

13     $21,590,755.41 are traceable to the AUB MAO Transfers.

14          e.    The balance of the purchase price was from two wire

15     transfers. The first wire was from a priority credit line related to

16     the WFA Franco Rexford Tr x6591 Account on November 29, 2016 in the

17     amount of $6,200,000.00. The priority credit line was collateralized

18     by funds on deposit at WFA Franco Rexford Tr x6591 Account. The

19     second wire came from the WFA Franco Rexford Tr x6591 Account on or

20     about January 30, 2017 in the amount of $2,661,683.19.

21     83.    The BAE125 JET was purchased using funds traceable to the

22     AUB MAO Transfers. Specifically:

23          a.    As explained above in paragraphs 50-75, substantially

24     all of the funds in the BOC SCP x6580 Account are traceable to the

25     AUB MAO Transfers.

26          b.    On or about August 17, 2016, $660,000.00 was wired

27     from the BOC SCP x6580 Account to Insured Aircraft Title Company for

28     the purchase of the BAE125 JET. The funds were initially wired to

1  purchase another plane, but the deal did not close and the funds were

2  used to purchase the BAE125 JET for $627,000.00. The deal was

3  negotiated by T.T., a known associate of NOVAL. The BAE125 JET was

4  titled in the name Beverly Hills Exotic Collection, LLC, ("BHEC")

5  which was created in the State of Montana.

6           c.    Per documents provided to escrow for the transaction,

7  Jon Hunter Noval, NOVAL'S son and FRANCO'S brother, is the sole

8  member/owner of BHEC.

9           d.    Per a due diligence document for the transaction,

10 FRANCO and NOVAL are the beneficial owners of the BAE125 JET, in

11 addition to BHEC and Jon Hunter Noval.

12          e.    In an August 8, 2016 email to the aircraft title

13 company, FRANCO stated that T.T. was authorized to disburse funds

14 from SCP for the purchase of the aircraft.

15          f.    Per documents provided by the escrow agent, the BAE125

16 JET aircraft title was filed with the FAA on or about August 22,

17 2016.

18      84.  The AZIMUT YACHT was purchased using funds traceable to the

19 AUB MAO Transfers. Specifically:

20          a.    As explained above in paragraphs 50-75, substantially

21 all of the funds in the BOC SCP x6580 Account are traceable to the

22 AUB MAO Transfers.

23          b.    On or about August 19, 2016, BHEC purchased the AZIMUT

24 YACHT from National Liquidators. The purchase price was $820,434.00

25 and on or about August 10, 2016 $820,035.00 was transferred from BOC

26 SCP x6580 Account to National Liquidators for the purchase of the

27 AZIMUT YACHT.

28          c.    The AZIMUT YACHT was titled in the name BHEC.

85. The HERTZ INVESTMENT was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a. As explained above in paragraphs 50-75, substantially all of the funds in the MSWM Rexford Trust x7996-053 Account are traceable to the AUB MAO Transfers. These funds were used as collateral for a line of credit in the MSWM Rexford Trust x8035-053 Account.

b. On or about October 28, 2016, $4,500,000.00 was wired from the MSWM Rexford Trust x8035-053 Account to the Hertz Investment Group, LLC, with the note, "To fund Noval Hertz Midwest Portfolio from Rexford Trust line of credit."

86. The 2014 LAMBORGHINI was purchased using funds traceable to the AUB MAO Transfers. Specifically:

a. As explained above in paragraphs 50-75, substantially all of the funds in the MSWM Rexford Trust x7996-053 Account are traceable to the AUB MAO Transfers. These funds were used as collateral for a line of credit in the MSWM Rexford Trust x8035-053 Account.

b. On or about October 19, 2016, $3,893,684.00 was wired from the MSWM Rexford Trust x8035-053 Account for the purchase of 1087 Marilyn Drive, Beverly Hills, California. This real property was subsequently sold, and the proceeds of the sale, $4,162,040.14, were deposited into the BOC SCP x6580 Account from Chartwell Escrow, Inc. in April and May 2017.

c. On or about August 25, 2017, Beverly Hills Royal Embassy, LLC purchased the 2014 LAMBORGHINI from Evan Paul Motorcars. The purchase price was $324,900.00 and on or about August 25, 2017 a cashier's check #1477230246 for $324,900.00 was purchased with funds

1  from the BOC SCP x6580 Account. The vehicle was titled in the name

2  Beverly Hills Royal Embassy, LLC, which was created in the State of

3  Montana. The transaction was conducted by T.T., an associate of

4  NOVAL's.

5      87.   The PACQUIAO MEMORABILIA PROPERTY was purchased using funds

6  traceable to the AUB MAO Transfers. Specifically:

7          a.   As explained above in paragraphs 50-75, substantially

8  all of the funds in the Comerica SCP x7315 Account are traceable to

9  the AUB MAO Transfers.

10         b.   During March and April of 2015, $40,000.00 was paid to

11  an individual, Cliff Sawyer, towards the purchase of a replica Manny

12  Pacquiao Prize Fighter belt and boots. Payment was made by means of

13  two checks for $20,000.00 each drawn on the Comerica SCP x7315

14  Account: Check #2070, dated March 4, 2015; and Check #2115, dated

15  April 9, 2015.

16                      **FIRST CLAIM FOR RELIEF**

17                      18 U.S.C. § 981(a)(1)(A)

18     88.   Based on the facts set out above, Plaintiff alleges that

19  the Defendant Asset is involved in, and is traceable to property

20  involved in, one or more transactions or attempted transactions in

21  violation of section 18 U.S.C. §§ 1956(a)(1)(B)(i) (Concealment Money

22  Laundering), (a)(1)(A)(i) (Promotional Money Laundering), and a

23  conspiracy to commit such offenses, in violation of section 18 U.S.C.

24  § 1956(h). Specifically, the Defendant Asset is involved in and

25  traceable to property involved in one or more financial transactions,

26  attempted transactions, and a conspiracy to conduct or attempt to

27  conduct such transactions involving the proceeds of specified

28  unlawful activity; specifically, the misappropriation, theft, or

1   embezzlement of public funds by or for the benefit of a public

2   official, which is a specified unlawful activity under 18 U.S.C.

3   § 1956(c)(7)(B)(iv), and a conspiracy to commit such offenses. The

4   Defendant Asset is therefore subject to forfeiture to the United

5   States pursuant to 18 U.S.C. § 981(a)(1)(A).

6                      **SECOND CLAIM FOR RELIEF**

7                        18 U.S.C. § 981(a)(1)(C)

8        89.   Based on the facts set out above, Plaintiff alleges that

9   the Defendant Asset is derived from proceeds traceable to a violation

10  of section 18 U.S.C. § 2314 (International Transportation of Stolen

11  or Fraudulently Obtained Property), and a conspiracy to commit such

12  an offense in violation of section 18 U.S.C. § 371, which constitute

13  specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A),

14  incorporating by reference 18 U.S.C. § 1961(1). The Defendant Asset

15  is therefore subject to forfeiture to the United States pursuant to

16  18 U.S.C. § 981(a)(1)(C).

17  //

18  //

19  //

20

21

22

23

24

25

26

27

28

1    WHEREFORE, plaintiff United States of America prays:

2    (a)  that due process issue to enforce the forfeiture of the

3    Defendant Asset;

4    (b)  that due notice be given to all interested parties to

5    appear and show cause why forfeiture should not be decreed;

6    (c)  that this Court decree forfeiture of the Defendant Asset to

7    the United States of America for disposition according to law; and

8    (d)  for such other and further relief as this Court may deem

9    just and proper, together with the costs and disbursements of this

10    action.

11    Dated: July 16, 2020                NICOLA T. HANNA
                                         United States Attorney
12                                       BRANDON D. FOX
                                         Assistant United States Attorney
13                                       Chief, Criminal Division
                                         STEVEN R. WELK
14                                       Assistant United States Attorney
                                         Chief, Asset Forfeiture Section
15

16                                            /s/ Dan G. Boyle
                                         _____
17                                       MICHAEL R. SEW HOY
                                         DAN G. BOYLE
18                                       Assistant United States Attorneys

19                                       Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

20

21

22

23

24

25

26

27

28

50    30

<u>VERIFICATION</u>

I, NOLAN FULLER, hereby declare that:

1.    I am a Special Agent with Internal Revenue Service –
Criminal Investigations, and the case agent for the forfeiture matter
entitled *United States of America v. All Right and Title to the
Mountain of Beverly Hills.*

2.    I have read the above Verified Complaint for Forfeiture and
know its contents. It is based upon my own personal knowledge and
reports provided to me by other law enforcement agents.

3.    Everything contained in the Complaint is true and correct,
to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true
and correct.

Executed July _16_, 2020 in _El Monte_, California.

NOLAN FULLER
Special Agent
IRS-CI

31

**EXHIBIT A**

Legal Description:

    PARCEL 1:


    LOTS 1 TO 13, INCLUSIVE, OF TRACT NO. 51034, IN THE CITY OF

LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS

PER MAP RECORDED IN BOOK 1292 PAGES 75 THRU 84 OF MAPS, IN

THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AS

AMENDED BY THOSE CERTAIN CERTIFICATES OF CORRECTION,

RECORDED AUGUST 5, 2009 AS INSTRUMENT NO. 20091201068 OF

OFFICIAL RECORDS.


    PARCEL 2:


THAT PORTION OF THE SOUTHWEST ONE QUARTER OF SECTION 2 AND

THE NORTH ONE HALF OF THE NORTHWEST ONE QUARTER OF SECTION

11, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO

MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS

ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL

PLAT OF SAID LAND ON FILE IN THE OFFICE OF THE BUREAU OF

LAND MANAGEMENT, BEING MORE FULLY DESCRIBED AS FOLLOWS:


BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER

OF THE SOUTHWEST QUARTER OF SAID SECTION 2, SAID CORNER

ALSO BEING THE SOUTHWEST CORNER OF TRACT NO. 20668, BOOK

671 PAGES 39 TO 42 INCLUSIVE OF MAPS, IN THE CITY OF LOS

ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA;

1     THENCE ALONG THE NORTHERLY LINE OF SAID SOUTHWEST QUARTER

2     OF SECTION 2 SOUTH 89° 15' 35" WEST 971.17 FEET TO THE

3     SOUTHWEST CORNER OF LOT 9, TRACT NO. 11358, BOOK 239 PAGES

4     16 AND 17 INCLUSIVE OF MAPS, IN SAID CITY AND COUNTY;

5

6     THENCE ALONG THE SOUTHERLY LINE OF SAID TRACT NO. 11358,

7     SOUTH 48° 56' 40" WEST 222.01 FEET;

8

9     THENCE SOUTH 0° 13' 28" WEST 71.14 FEET;

10

11     THENCE NORTH 89° 49' 32" WEST 190.22 FEET TO A POINT IN THE

12     WESTERLY LINE IN SAID SECTION 2, SAID LINE ALSO BEING THE

13     EASTERLY LINE OF TRACT NO. 4311 BOOK 47 PAGE 18 INCLUSIVE

14     OF MAPS, IN SAID CITY AND COUNTY;

15

16     THENCE SOUTHERLY ALONG SAID LINE SOUTH 0° 09' 42" WEST

17     770.70 FEET;

18     THENCE NORTH 89° 26' 33" 663.18 FEET;

19

20     THENCE SOUTH 0° 12' 40" WEST 328.19 FEET;

21

22     THENCE SOUTH 89° 30' 13" WEST 662.89 FEET MORE OR LESS TO A

23     POINT ON THE AFOREMENTIONED WESTERLY LINE OF SECTION 2;

24

25     THENCE SOUTHERLY ALONG SAID LINE SOUTH 0° 9' 26" WEST

26     1311.14 FEET TO THE SOUTHWESTERLY CORNER OF SAID SECTION 2;

27

28     THENCE EASTERLY ALONG THE NORTHERLY LINE OF THE

1  FOREMENTIONED SECTION 11 AND ALONG THE NORTHEASTERLY AND

2  SOUTHERLY BOUNDARIES OF LAND CONVEYED TO RICHARD MICHAEL

3  ROSS BY DEED RECORDED DECEMBER 7, 1976 AS DOCUMENT NO. 374

4  OF OFFICIAL RECORDS OF SAID COUNTY, NORTH 89° 43' 20" EAST

5  340 FEET;

6

7  THENCE SOUTH 0° 27' 59" EAST 321 FEET;

8

9  THENCE SOUTH 89° 43' 20" WEST 340 FEET TO A POINT IN THE

10  WESTERLY LINE OF SAID SECTION 11, SAID POINT BEING SOUTH 0°

11  27' 59" EAST 321.00 FEET FROM THE NORTHWESTERLY CORNER OF

12  SAID SECTION 11, SAID POINT ALSO BEING ON THE EASTERLY LINE

13  OF TRACT NO. 13002, BOOK 655 PAGES 36 TO 38 INCLUSIVE OF

14  MAPS, OF SAID COUNTY;

15

16  THENCE SOUTHERLY ALONG SAID LINE SOUTH 0° 27' 59" EAST

17  990.81 FEET TO THE SOUTHWEST CORNER OF THE NORTH HALF OF

18  THE NORTHWEST QUARTER OF SAID SECTION 11;

19

20  THENCE ALONG THE SOUTH LINE OF SAID NORTH HALF OF THE

21  NORTHWEST ONE QUARTER NORTH 89° 59' 14" EAST 2,641.97 FEET

22  PLUS OR MINUS TO A POINT IN THE EAST LINE OF THE NORTHWEST

23  QUARTER OF SAID SECTION 11;

24

25  THENCE NORTH 0° 15' 26" WEST, 1,323.46 FEET PLUS OR MINUS

26  TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID

27  SECTION 11;

28

EY   3

1    THENCE NORTHERLY ALONG THE EASTERLY LINE OF THE SOUTHWEST

2    QUARTER OF THE AFOREMENTIONED SECTION 2, NORTH 0° 16' 32"

3    WEST 2,642.56 FEET MORE OR LESS TO THE CENTER OF SAID

4    SECTION 2;

5

6    THENCE SOUTH 89° 15' 35" WEST 1,328.21 FEET MORE OR LESS TO

7    THE POINT OF BEGINNING.

8

9    EXCEPT THEREFROM ALL LANDS LYING EASTERLY OF THE WESTERLY

10   LINE OF TRACT NO. 18064, BOOK 473 PAGES 27 TO 30 INCLUSIVE

11   OF MAPS, OF SAID COUNTY AND TRACT NO. 20002, BOOK 597 PAGES

12   23 TO 25 INCLUSIVE OF SAID COUNTY AND PARCEL MAP NO 1660,

13   BOOK 22 PAGE 88 OF PARCEL MAPS, IN THE CITY OF LOS ANGELES,

14   COUNTY OF LOS ANGELES, ALSO EXCEPT THAT PORTION OF LAND

15   LYING EASTERLY

16   OF THE FOLLOWING DESCRIBED LINE:

17

18   BEGINNING AT THE WESTERLY CORNER OF LOT 23, OF SAID TRACT

19   NO. 20002, THENCE NORTH 79° 32' 22" WEST 12.00 FEET;

20

21   THENCE NORTH 1° 40' 21" WEST 83.60 FEET TO A POINT IN THE

22   WESTERLY LINE OF SAID TRACT NO. 20002, SAID POINT BEING THE

23   SOUTHERLY TERMINUS OF THAT CERTAIN COURSE OF THE WESTERLY

24   TERMINUS OF BEESON DRIVE, RECITED AS NORTH 1 DEGREES 40'

25   21" WEST 42.40 FEET.

26

27   ALSO EXCEPT THAT PORTION OF SAID SOUTHWEST QUARTER

28   DESCRIBED AS FOLLOWS: BEGINNING AT THE MOST NORTHERLY

.4

55

1    CORNER OF LOT 30 OF SAID TRACT NO. 4311; THENCE SOUTH 11°

2    49' 42" EAST 168.64 FEET;

3

4    THENCE SOUTH 78° 10' 18" WEST 35.81 FEET TO A POINT IN THE

5    SOUTHERLY PROLONGATION OF THE EASTERLY LINE OF SAID LOT 30;

6

7    THENCE ALONG SAID SOUTHERLY PROLONGATION AND EASTERLY LINE

8    NORTH 00° 09' 42" EAST 172.40 FEET TO THE POINT OF

9    BEGINNING.

10    SAID LAND IS SHOWN AS ADJUSTED PARCEL 2 IN A CERTIFICATE OF

11    COMPLIANCE FOR LOT LINE ADJUSTMENT RECORDED JUNE 27, 2002

12    AS INSTRUMENT NO. 02-1460665, OF OFFICIAL RECORDS.

13

14    ALSO EXCEPTING THEREFROM THAT PORTION SITUATED WITHIN THE

15    BOUNDARIES OF TRACT NO. 51034, RECORDED IN BOOK 1292 PAGES

16    75 TO 84 OF MAPS, RECORDS OF SAID COUNTY.

17

18    SAID LAND IS ALSO SHOWN AS NOT A PART OF TRACT NO. 51034,

19    RECORDED IN BOOK 1292 PAGES 75 TO 84 OF MAPS, RECORDS OF

20    SAID COUNTY.

21

22    Assessor's Parcel Number 4384-034-002.

23

24

25

26

27

28

1    **DECLARATION OF MADISON MACDONALD**

2    I, Madison MacDonald, declare as follows:

3    1.    I am a Special Agent with the Federal Bureau of

4    Investigation ("FBI") and have been so employed since March 2018.

5    I am currently assigned to the Los Angeles Field Division, White

6    Collar Crimes Squad, which is responsible for investigating financial

7    institution fraud, including bank fraud, wire fraud, and money

8    laundering.

9    2.    I make this declaration in support of the government's

10   motion for a limited stay of discovery in this action, or

11   alternatively, a stay of this action.

12   3.    On July 31, 2020, the Hon. Karen L. Stevenson, United

13   States Magistrate Judge, issued a federal search warrant for the

14   residence of non-party "T.T." (the "Warrant"). The Warrant authorized

15   the seizure of evidence, fruits, or instrumentalities of violations

16   of 16 U.S.C. § 1538(a)(1)(E) (Transportation of an Endangered Species

17   in Commerce), including, but not limited to, two ring-tailed lemurs,

18   which are designated as an endangered species.

19   4.    The Warrant was executed on August 3, 2020 by agents of the

20   United States Fish and Wildlife Service, assisted by agents of the

21   FBI. During the execution of the Warrant, agents discovered one ring-

22   tailed lemur, as well as a substantial amount of jewelry, some of

23   which was individually bagged and tagged and placed in a larger

24   plastic bag, located in a safe (the "Subject Jewelry").

25   5.    The Subject Jewelry included five miscellaneous bracelets;

26   one Rolex Watch; one flower pin; one diamond necklace; twelve

27   miscellaneous rings; and eleven pairs of miscellaneous earrings.

28

1      6.     After being alerted to the discovery of the Subject

2  Jewelry, I reviewed images of the Subject Jewelry and personally

3  inspected the Subject Jewelry. Of note, several of the items had tags

4  affixed identifying what appeared to be lot numbers, item

5  descriptions, and in some instances, prices.

6      7.     True and correct photographs of one piece are included

7  below:

 

8

9

10

11

12

13      8.     Based on my own investigation and my review of other law

14  enforcement reports, I am aware that, in or around February of 2020,

15  law enforcement received a report from an individual (hereinafter "V-

16  1") regarding an alleged theft and/or taking by fraud of a

17  substantial amount of jewelry. V-1 stated that jewelry had been on

18  consignment with alleged-debtor Jadelle Jewelry & Diamonds, LLC

19  ("Jadelle"), and provided law enforcement with a detailed list,

20  photographs, and estimated values for the jewelry which V-1 believed

21  to have been stolen and/or taken by fraud.

22      9.     On or about August 3, 2020, I compared the Subject Jewelry

23  to the materials and information provided to law enforcement by V-1.

24  Based on my review of the images and descriptions provided by V-1,

25  the Subject Jewelry appears to contain several of the items listed in

26  the index provided to law enforcement by V-1.

27      10.    The items identified by V-1 appear substantially unique in

28  design. For example, V-1 provided a description of an item on

1  consignment with Jadelle, identified as: Lot Number - LR01922, Item

2  Description - 6.94 TW CLUSTER RING, and Memo Total - $68,500.00, and

3  provided the following photograph:

4

5

6

7

8

9      11.  The Subject jewelry is currently being held as evidence

10  pending a continuing criminal investigation.

11      I declare under penalty of perjury under the laws of the United

12  States of America that the foregoing is true and correct and that

13  this declaration is executed at Los Angeles, California, on August

14  24, 2020.

                    Madison MacDonald
15                      2020.08.24 10:29:31 -07'00'

16                      S.A. MADISON MACDONALD
                    FEDERAL BUREAU OF INVESTIGATION

17

18

19

20

21

22

23

24

25

26

27

28