1  Daniel A. Lev (CA Bar No. 129622)
     dlev@sulmeyerlaw.com
2  **Sulmeyer**Kupetz
   A Professional Corporation
3  333 South Grand Avenue, Suite 3400
   Los Angeles, California 90071-1406
4  Telephone: 213.626.2311
   Facsimile: 213.629.4520
5
6  Attorneys for Victor Franco Noval, Peter Marco, LLC, and First International Diamond, Inc.

7  Ronald Richards (CA Bar No. 176246)
     ron@ronaldrichards.com
8  Law Offices of Ronald Richards & Associates, APC
   P.O. Box 11480
9  Beverly Hills, California 90213
   Telephone:  310.556.1001
10 Facsimile:  310.277.3325

11 Attorneys for Victor Franco Noval

12 Baruch C. Cohen (CA Bar No. 159455)
     baruchcohen@baruchcohenesq.com
13 Law Office of Baruch C. Cohen, APLC
   4929 Wilshire Boulevard, Suite 940
14 Los Angeles, California 90010
   Telephone: 323.937.4501
15 Facsimile: 888.316.6107

16 Attorneys for Peter Marco, LLC and First International Diamond, Inc.

17 **UNITED STATES BANKRUPTCY COURT**

18 **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

| 19 | In re | Case No. 2:20-bk-13530-BR |
|---|---|---|
| 20 | JADELLE JEWELRY AND DIAMONDS, LLC, | Chapter 7 |
| 21 | | **OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER APPROVING DISMISSAL OF CHAPTER 7 CASE AND FOR PAYMENT IN COMPROMISE AND SETTLEMENT OF ADMINISTRATIVE FEES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF BARUCH C. COHEN IN SUPPORT THEREOF** |
| 22 | | |
| 23 | Debtor. | |
| 24 | | |
| 25 | | |
| 26 | | DATE:   June 15, 2021 |
| 27 | | TIME:    10:00 a.m. |
| | | PLACE: Courtroom "1668" |
| 28 | | |

1       Creditors, Victor Franco Noval ("Noval"), Peter Marco, LLC ("Marco"), and

2 First International Diamond, Inc. ("First International" and together with Noval and Marco,

3 the "Creditors"), hereby submit their "Opposition to Trustee's Motion for An Order

4 Approving Dismissal of Chapter 7 Case and for Payment in Compromise and Settlement

5 of Administrative Fees; Memorandum of Points and Authorities; Declaration of Baruch C.

6 Cohen in Support Thereof" (the "Opposition"), in response to the "Trustee's Motion for An

7 Order Approving Dismissal of Chapter 7 Case and for Payment in Compromise and

8 Settlement of Administrative Fees; Memorandum of Points and Authorities; Declaration of

9 Sam S. Leslie in Support Thereof" (the "Motion"), filed by Sam S  Leslie (the "Trustee"),

10 the duly appointed, qualified, and acting chapter 7 trustee for the estate of the debtor

11 Jadelle Jewelry and Diamonds, LLC (the "Debtor"), and represent as follows:

**I.**

**<u>PREFATORY STATEMENT</u>**

14       In order to avoid the limitations on the voluntary dismissal of non-individual

15 cases codified in 11 U.S.C. § 707(a), the Trustee has disguised his dismissal motion as a

16 motion to compromise under Rule 9019(a), when, in fact, there is no pending dispute or

17 claim being compromised.  Inexplicably, rather than proceed with the pursuit of tens of

18 millions of dollars of potentially avoidable and recoverable transfers, the Trustee instead

19 has capitulated and decided to do a deal with the devil, in the process allowing Jona

20 Rechnitz, the perpetrator of this massive fraud, to buy his way out of this case.

21       More troubling (to Creditors, that is) is Trustee's representation that the

22 funds for this so-called compromise (which only will inure to the benefit of the Trustee

23 and his professionals) are not being paid by Jona or Rachel Rechnitz (they "have no

24 funds of their own, they have procured funds from third party sources, family and

25 friends"), but instead are coming from JSR Capital, LLC ("JSR") and McCadden Property

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  Group ("McCadden").[1]  This revelation, which the Creditors learned not from the Trustee,

2  but from the Rechnitz's counsel, is particularly concerning, especially when the Trustee

3  relies on the "Rechnitz's have no money" charade as further justification for the

4  dismissal.[2]

5      Incredibly, the source of the $215,000 payoff is nowhere to be found in the

6  Motion or the operative settlement agreement.  In other words, the Rechnitz's almost

7  certainly are using fraudulently procured funds transferred to these two entities to

8  convince the Trustee to cut his losses to the extreme prejudice of Creditors and other

9  potential creditors, who the Trustee has not even attempted to contact.

10      In fact, despite proclaiming that "no creditors other than Petitioning

11  Creditors have surfaced or filed proofs of claim," the Trustee remarkably has not set a

12  notice of claims bar date and did not even bother to serve the Motion on the multitude of

13  potential creditors, including the recipients of avoidable transfers who would become

14  creditors to the extent that any portion of the transfers were returned to the estate

15  pursuant to 11 U.S.C. 502(h).  At a minimum, the Trustee should have noticed the Motion

16  to each potential creditor of the estate.

17      In short, the Court should be as shocked as Creditors are that the Trustee

18  is simply walking away and abandoning this case just weeks after demand letters were

19  sent to countless recipients of potentially avoidable transfers.  The Trustee's own

20  financial advisor - CBIZ Valuation Group - identified nearly $50 million in potentially

21  avoidable transfers.  Abandoning these valuable claims, without even identifying the

22  _____

23  [1] Creditors were further advised that the payment allocation of the $215,000 is 86% (JSR Capital, LLC) and
24  14% (McCadden Property Group).  JSR is Jona Rechnitz's private real estate development and
    management company.  Further, the Debtor's produced Signature Bank records reveal that in a brief six
25  month period between February 8, 2018, and August 20, 2018, the Debtor transferred at least $590,000 to
    JSR.  McCadden is also one of Jona's or his family's entitles.  See declaration of Baruch C. Cohen, affixed
    hereto.

26  [2] Creditors dispute the insinuation that the Rechnitz's are cash poor or do not have the resources to satisfy
    any judgment or even contribute to this settlement.  Creditors are presently aware of numerous recent
27  instances of Jona Rechnitz flashing his wealth to others in other less than honest schemes, which further
    undermines the reasons supporting this Motion.

28

1    universe of demands or the initial responses, is appalling.  At a minimum, Creditors

2    should be afforded the opportunity to conduct discovery on the Trustee on this and other

3    relevant issues.

4    Simply put, the Rechnitz's are being rewarded for the criminal acts, their

5    failure to comply with the Trustee's document requests, and their failure to testify under

6    oath by asserting their Fifth Amendment privilege.[3]  Granting the Motion would set a

7    dangerous precedent; recalcitrant and fraudulent debtors would be given the green light

8    to stonewall trustees, refuse to comply with their statutory duties to provide testimony and

9    documents, and then use the ill-gotten gains of their criminal acts to secure dismissal of a

10   case by only paying a portion of the claims of the trustee and his professionals.

11   The Court cannot countenance this highly prejudicial result, especially

12   based on the paltry evidentiary record supplied by the Trustee.  If the Trustee is no longer

13   vested in this case, then he should resign and allow the United States Trustee to

14   interview and appoint a new trustee who will pursue the Debtor, the Rechnitz's, and the

15   recipients of these improper transfers to pay off the claims of the true victims of the

16   Debtor's and the Rechnitz's fraud.

17   **II.**

18   <u>**THE EVENTS LEADING TO THE ENTRY OF THE ORDER FOR RELIEF WARRANTS**</u>

19   <u>**A MORE VIGOROUS AND TRANSPARENT ADMINISTRATION OF THIS ESTATE**</u>

20   Although the Trustee pay little homage to the events which led this Court to

21   enter an order for relief, it bears repeating that this Court came to realize that the Debtor

22   was, in fact, a criminal enterprise being used as a front by a convicted felon and his wife

23   to defraud legitimate creditors out of millions of dollars of cash and precious gems.

24

25   _____

26   [3] To draw an analogy to the legislative comments to 11 U.S.C. § 727, debtors cannot buy their discharge,
     which, in essence, is what the Rechnitz's are doing here.  See In re Smith, 207 B.R. 177, 178 (Bankr. N.D.

27   Ind. 1997) (regardless of lack of objections of other parties, if successful prosecution of Section 727
     proceeding will benefit entire creditor body, action may not be settled in return for private benefit).

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX 213.629.4520

**A.** **Events Leading to Entry of Order for Relief and Appointment of Trustee**

As a reminder, the Debtor was incorporated in December 2017.  Like its predecessor Jadelle, Inc. ("Jadelle Inc." and together with the Debtor, the "Jadelle Entities"), the Debtor was formed for the sole purpose of giving its controlling principals and insiders, Jona and Rachel Rechnitz an air of legitimacy.  Both Jona and Rachel advertised political and powerful celebrity connections to create a false sense of credibility about themselves and their business, posting photos on their social media of Kylie Jenner and Kim Kardashian, among others.  However, once the veil was lifted, it became apparent that the Debtor was nothing more than a sham entity for Jona to run his fraudulent enterprise, even following being sentenced after pleading guilty to numerous fraud and bribery related charges.

Although the Rechnitz's tried to cajole this Court into believing that the Debtor was a legitimate business enterprise which was conducting jewelry shows, selling merchandise, and paying its creditors, nothing could be further from the truth.  In fact, the Debtor was the model case for why 11 U.S.C. § 303 was enacted; to allow aggrieved creditors to force a non-paying entity into chapter 7 so an independent trustee can recover and liquidate property and recover unauthorized transfers for the benefit of the estate.

As a result, on April 6, 2020, Creditors commenced an involuntary chapter 7 petition against the Debtor.  The Debtor then filed a Rule 12(b)(6) motion to dismiss the involuntary petition, arguing that Creditors' claims were the subject of bona fide disputes as to amount and, therefore, they could not qualify as petitioning creditors.  Over Creditors' objection, this Court found that there were, indeed, disputes as to the amount of Creditors' claims, such that they did not qualify as petitioning creditors under 11 U.S.C. § 303(b).  However, seeing the Debtor for what it was, the Court followed Ninth Circuit law and ordered the Debtor, through Jona and Rachel, to provide sworn testimony regarding the Debtor's creditors so Creditors could locate additional victims willing to join

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   the involuntary petition.  The Debtor was warned that if it failed to comply, an order for

2   relief would be entered.

3          As such, on June 10, 2020, the Court entered its "Order: (1) Directing

4   Rachel Rechnitz and Jona Rechnitz to File Joint Declaration Under Penalty of Perjury; (2)

5   Setting Date By Which Petitioning Creditors May Contact Creditors Identified in Joint

6   Declaration and Conduct Certain Discovery; (3) Setting Date for Hearing On Status

7   Conference; and (4) Setting Date for Filing of Joint Status Report Prior to Status

8   Conference" (the "June 10 Order") requiring the Debtor, through its sole member Rachel,

9   and her felon husband Jona, to do the following:

10         •      File a joint declaration, sworn under penalty of perjury, which

11  identifies each and every one of the Debtor's creditors as of the date of the filing of the

12  involuntary petition on April 6, 2020.  The joint declaration was to include, without

13  limitation, the following information with respect to each creditor identified therein:

14                a.      name of the creditor;

15                b.      the nature of the debt owed to the creditor (e.g., consigned

16  jewelry, rent due and owing, etc.);

17                c.      the amount of the creditor's claim;

18                d.      whether the creditor's claim is disputed and, if so, the nature

19  of the dispute; and

20                e.      complete contact information for each creditor including, but

21  not limited to, the creditor's address, telephone number, cell phone number (if known),

22  fax number (if applicable), and email address (if known); and

23         •      File a joint declaration no later than 3:00 p.m. on Tuesday, June 16,

24  2020, with the Court and serve the declaration on counsel for the petitioning creditors.

25         The June 10 Order also provided that if the Rechnitz's failed to file the joint

26  declaration by June 16, 2020, the Court would deny the debtor's Rule 12(b)(6) motion

27  and immediately enter an order for relief in this case.

28         It came as no surprise, since Jona is a felon and a fraudster, and his wife

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX 213.629.4520

1    was wholly complicit as the managing member of this criminal organization which preyed

2    on the Orthodox Jewish community and other residents in Beverly Hills area, that the

3    Debtor and the Rechnitz's ignored the Court's June 10 Order.  The sinister nature of this

4    case is further evidenced by Jona repeatedly using his false adherence to Orthodox

5    Judaism as a way to get the victims to trust him to steal their money and their

6    merchandise.

7                    In fact, repeatedly during the June 9, 2020, hearing on the Debtor's Rule

8    12(b)(6) motion, the Court admonished the Debtor's counsel that it was not concerned

9    with any issue other than compliance with the Court's orders.  The Court was clear that if

10   the Rechnitz's, who were the undisputed owners and operators of the Debtor, refused to

11   provide the creditor lists, no matter the reason, the Court would enter an order for relief.

12   This is exactly what occurred, and the Trustee was appointed.

13                  **B.**        <u>**The Trustee's Attempted Administration of the Estate**</u>

14                  The false narrative running throughout the Motion is that the Trustee

15   basically is without recourse since the Debtor, the Rechnitz's, and Levin Prado ("Prado")

16   (one of the Debtor's employees and the signatory on numerous checks) have refused to

17   comply with court orders due to their Fifth Amendment concerns.  To state the obvious,

18   the corporate-debtor has no Fifth Amendment rights, and the Trustee has more than

19   sufficient ammunition or remedies at his disposal to administer this case despite the

20   Rechnitz's and Prado's recalcitrance.

21                  The Court need look no further than the related cases of <u>In re Girardi</u>

22   <u>Keese</u>, bearing Case No. 2:20-bk-21022-BR, and <u>In re Thomas Vincent Girardi</u>, bearing

23   Case No. 2:20-bk-21020-BR, where each of the trustees have encountered similar

24   obstacles, including the invocation of the Fifth Amendment privilege, but are continuing to

25   pursue assets.  Debtors attempting to shield assets and thwart trustee's recoveries is

26   nothing new, and should not be a roadblock here.

27                  To reiterate, the Trustee's own financial advisor identified $50 million in

28   potentially avoidable transfers, as well as transfers exceeding $2,300,000 from the Wells

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   Fargo Bank account to the Signature Bank account.  Although the Motion references that

2   "demand letters to certain of the persons identified who received large payments from the

3   Debtor" were sent, there is nothing more.  No list of demands, no amount of demands, no

4   identity of the recipients of demands, and no summary of responses to demands.  How

5   can this Court weigh whether the demands have been given any chance of success

6   when the Trustee refuses to disclose these most basic and crucial facts.  And if current

7   counsel is unwilling to continue with their representation, has the Trustee attempted to

8   locate contingency counsel who may be interested in taking on $50 million worth of

9   avoidance power claims?  Again, there is no information showing what alternate efforts

10  the Trustee has made to secure contingency counsel for these valuable claims.

11          In addition, the Trustee references a $19,000,000 restitution judgment

12  against Jona entered in a New York court in favor of the United States as evidence of a

13  further obstacle to his efforts to effectively administer this estate.  Frankly, this is

14  nonsensical.  First, the criminal restitution order that the Trustee misstates has priority

15  over the Trustee is on appeal and is not a final order.  Second, the judgment was capped

16  at $10 million to be paid at a rate of $500,000 per year, not $19 million.  See declaration

17  of Baruch C. Cohen, affixed hereto.  Finally, and most importantly, what claims against

18  Jona is the Trustee even pursuing?  He certainly failed to identify any pending or

19  threatened claims that this appealed judgment would impair.  In other words, this non-

20  final judgment has no bearing at all on potential avoidance power actions against third

21  parties who received payments from the Rechnitz's or the Debtor, or direct claims against

22  the Rechnitz's.

23          Also irrelevant is whether Marco has dismissed his civil case or the

24  contentions regarding investigations of Noval.  Each of these parties possess valid claims

25  that the Trustee has made no attempt to review or investigate before casting aspersions

26  on their allowability.  Instead, the Trustee takes the word of Jona, which is the ultimate

27  act of irony.

28          These are simply phantom and uncredible issues for the Trustee to hide

behind while he lets the Rechnitz's and scores of recipients of avoidable transfers off the

hook.  To cavalierly state that once the case is dismissed Creditors can now do the job

the Trustee was appointed to do is insulting, and cannot form the basis for dismissal.

**III.**

**DISMISSAL IS EXTREMELY PREJUDICIAL TO CREDITORS**

**AND MUST BE DENIED**

Generally, dismissal of a non-individual chapter 7 case is governed by 11

U.S.C. § 707(a), which provides that:

> The court may dismiss a case under this chapter only after
>
> notice and a hearing and only for cause, including –
>
> (1)    unreasonable delay by the debtor that is prejudicial to
>
> creditors;
>
> (2)    nonpayment of any fees or charges required under
>
> chapter 123 of title 28; and
>
> (3)    failure of the debtor in a voluntary case to file, within
>
> fifteen days or such additional time as the court may allow
>
> after the filing of the petition commencing such case, the
>
> information required by paragraph (1) of section 521(a), but
>
> only on a motion by the United States trustee.

The next question involves what constitutes dismissal for "cause" under

Section 707(a).  As illustrated, the statute contains three examples of "cause":

unreasonable delay by the debtor, failure to pay statutory fees, and failure to file the

required schedules, statement of financial affairs, or other statutorily prescribed

documents.  These examples are illustrative rather than exhaustive.  See In re Tallman,

417 B.R. 568, 575 (N.D. Ind. 2009).  While courts seem to agree that the list of what

constitutes cause for dismissal under Section 707(a) is longer than the three items

enumerated in the statute, there is a broad divergence of opinion as to what items belong

on that list.  See In re Bushyhead, 525 B.R. 136 (Bankr. N.D. Okla. 2015).  To establish

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX 213.629.4520

1    "cause," the bankruptcy court must balance the equities and consider the benefit and

2    prejudice of dismissal, such as loss of assets to creditors.  See In re Marra, 179 B.R. 782,

3    785 (M.D. Pa. 1995).  At all times, the burden of proof is on the party seeking dismissal.

4    In re McDaniel, 350 B.R. 616 (Bankr. M.D. Fla. 2006); In re Stephenson, 262 B.R. 871

5    (Bankr. W.D. Okla. 2001).

6         The Trustee, however, is not moving to dismiss under Section 707(a),

7    perhaps realizing that, since he has been able to construct a general ledger and was able

8    to identify $50 million in potentially avoidable transfers, he likely has no ability to satisfy

9    the "cause" requirement of this section.  For instance, the Trustee certainly has not

10   shown that he is unable to effectively and adequately administer the estate, since he has

11   not made a showing that information about the Debtor is not available from other

12   sources.  In fact, the opposite is true; the Trustee successfully obtained scores of bank

13   records (often with the Creditors' assistance and guidance) and, as noted, was able to

14   construct a general ledger and send out demand letters.

15        The fact that the Rechnitz's and Prado have invoked their Fifth Amendment

16   privilege also does not support dismissal.  Generally, dismissal of a case is an

17   impermissible penalty for the proper invocation of rights under the Fifth Amendment.  See

18   Lefkowitz v. Cunningham, 431 U.S. 801, 97 S. Ct. 2132, 53 L. Ed. 2d 1 (1977) (party may

19   not be punished for invoking the Fifth Amendment privilege against self-incrimination).

20   There simply is no basis for this Court to conclude that the Rechnitz's or Prado's refusal

21   to testify precludes a fair and effective administration of the Debtor's estate.

22        In In re Romany, 2006 Bankr. LEXIS 3807, 2006 WL 3898376 (Bankr.

23   D.P.R. 2006), for example, after it was discovered that the debtor failed to disclose

24   significant assets and had, post-petition, transferred over $1,000,000 without court

25   authorization, and, at a 11 U.S.C. § 341(a) creditors meeting, the debtor invoked his Fifth

26   Amendment rights and refused to answer questions relating to his assets, the debtor then

27   moved to dismiss the chapter 7 pursuant to Section 707(a).  Noting that the burden was

28   on the debtor to demonstrate "cause" and that "cause" was not defined in the Code, the

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX 213.629.4520

1   court held that cause had not been shown and the motion was denied.

2   　　　　First, the court rejected as meritless the debtor's claims that since he could

3   not be forced to testify, estate administration was not feasible, noting that the chapter 7

4   trustee had already advised that he could administer the estate without debtor's

5   testimony.  Nor was the existence of an ongoing criminal inquiry a reason for dismissal.

6   Finally, the totality of the circumstances did not favor dismissal.  Similarly here, the

7   Trustee is more than capable, but simply is unwilling, to administer the Debtor's estate.

8   There is no evidence indicating, let alone proving, that the Trustee has been impaired in

9   any manner in administering this estate.

10   　　　　The Court, therefore, should reject the Trustee's assertion that "cause"

11   exists to dismiss this case merely because the Debtor, the Rechnitz's, and Prado have

12   been less than forthcoming.  See also In re Buffington, 2007 Bankr. LEXIS 3910, 2007

13   WL 4125985 (Bankr. S.D. Tex. 2007) (debtor's motion to dismiss case was denied under

14   Section 707(a) where debtor invoked his Fifth Amendment privilege since debtor

15   continued to retain property of bankruptcy estate and the debtor's willingness to repay a

16   portion of administrative expenses of bankruptcy estate began to address only

17   administrative expenses of the bankruptcy and not claims of creditors).

18   　　　　Even if the Motion is viewed under the lens of Rule 9019(a), the request for

19   dismissal must be denied.

20   　　　　When a bankruptcy trustee seeks authority to compromise a single claim or

21   dispute, the criteria by which this request is reviewed is well established:

22   　　　　This particular process of bankruptcy court approval [of the

23   　　　　trustee's motion to settle] requires a bankruptcy judge to

24   　　　　assess and balance the value of the claim that is being

25   　　　　compromised against the value to the estate of the

26   　　　　acceptance of the compromise proposal.  Taking our cue

27   　　　　from Protective Committee Stockholders of TMT Trailer

28   　　　　Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25, 88 S. Ct.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1157, 20 L. Ed. 2d 1 (1968), we recognize four criteria that a

bankruptcy court should consider in striking this balance: (1)

the probability of success in litigation; (2) the likely difficulties

in collection; (3) the complexity of the litigation involved, and

the expense, inconvenience and delay necessarily attending

it; and (4) the paramount interest of the creditors.  See In re

Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa.

1986).

In re Martin, 91 F.3d 389, 395 (3d Cir. 1996).  See also In re A&C Properties, 784 F.2d

1377, 1381 (9th Cir. 1986), cert. denied, 479 U.S. 854, 107 S. Ct. 189, 93 L. Ed. 2d 122

(1986); Port O'Call Investment Co. v. Blair (In re Blair), 538 F.2d 849, 851 (9th Cir. 1976).

Although the judgment of a bankruptcy fiduciary may be given some

deference, nevertheless, a court cannot simply approve a settlement because the trustee

so moves.  In re American Reserve Corp., 841 F.2d 159 (7th Cir. 1987).  The trustee

must demonstrate that the proposed settlement is in the best interest of the estate.  See

In re Hydronic Enterprise, Inc., 58 B.R. 363, 366 (Bankr. D.R.I. 1986) ("even if it is

concluded that the settlement is above the lowest level of reasonableness, in our

discretion we may still deny approval, if not in the best interest of the estate").

Here, the first question which must be answered is what is being

compromised?  The settlement agreement (the "Agreement") attached to the Motion

contains no information suggesting that there is any pending or contemplated claim

against the Debtor, Prado, or either of the Rechnitz's.  Indeed, the Agreement's recitals

merely recount the history of events leading to entry of the order for relief, and

summarize the litany of made-up excuses for the Trustee's wholesale abandonment of

this case.  There clearly is no claim that is being compromised by this so-called

settlement, and the Trustee cannot circumvent Section 707(a) by cloaking his dismissal

in the context of a settlement and Rule 9019(a) motion.

Truth be told, the Trustee is settling nearly $50 million of potential

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

avoidance power claims for a mere $215,000.  So even if the <u>A&C Properties</u> standard

for judging Rule 9019(a) motions is applied, this settlement cannot survive scrutiny.  The

Trustee fails to demonstrate with any evidence, much less credible or admissible

evidence, the probability of success in litigation, the likely difficulties in collection, the

complexity of the litigation involved, and the expense, inconvenience and delay

necessarily attending it, and whether the paramount interest of the creditors favors

settlement.

　　　　　This settlement is unlike any of the compromises with which the Court is

usually presented in a Rule 9019 motion. That is because there is no complex, protracted

or expensive litigation between these parties; in actuality, there is no litigation at all

between the Trustee and the Rechnitz's.  Thus, the final <u>A&C Properties</u> factor is

dispositive here, in other words, the paramount interests of creditors.  Since the

Agreement only serves the interests of the Debtor, the Rechnitz's, the Trustee, and the

Trustee's professionals, it provides no benefit to creditors and, to be sure, by abandoning

this case and the valuable claims, it constitutes an overall detriment to this estate.  See

<u>Fort v. Tryon Clear View Grp., LLC (In re AuditHead, LLC)</u>, 625 B.R. 319 (Bankr. D.S.C.

2021) (if creditor opposes settlement terms by asserting the estate is giving up more than

it should, or that creditor's rights are being impaired, then creditor's protest should be

seriously considered and evidence will guide the court in considering approval of the

settlement).

　　　　　At a bare minimum, the Court should defer ruling on the Motion until

Creditors have been afforded the opportunity to conduct discovery and present the Court

with a more accurate picture of this case, and why dismissal is extremely prejudicial and

not in the best interests of creditors.

*[Remainder of page intentionally left blank]*

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX 213.629.4520

# IV.

## **CONCLUSION**

There is a complete absence of "cause" warranting dismissal of the Debtor's case.  The Trustee's frustration, or his professionals' reluctance to continue working, does not justify this highly prejudicial Motion.  Ultimately, whether fashioned as a Section 707(a) or Rule 919(a) motion, dismissal only should be approved when it is in the best interests of creditors.  Here, the only parties benefitting from dismissal are the Rechnitz's, the Trustee, and his professionals.  Creditors are left holding the bag, and telling them they are now free to fend for themselves is of little comfort.  The Motion must be denied.

DATED: June 1, 2021                 **Sulmeyer**Kupetz
                                    A Professional Corporation


                                    By: /s/ *Daniel A. Lev*
                                       Daniel A. Lev
                                       Attorneys for Victor Franco Noval, Peter
                                       Marco, LLC, and First International Diamond,
                                       Inc.

DATED: June 1, 2021                 Law Offices of Ronald Richards & Associates, APC



                                    By: /s/ *Ronald Richards*
                                       Ronald Richards
                                       Attorneys for Victor Franco Noval

DATED: June 1, 2021                 Law Office of Baruch C. Cohen, APLC



                                    By: /s/ *Baruch C. Cohen*
                                       Baruch C. Cohen
                                       Attorneys for Peter Marco, LLC and First
                                       International Diamond, Inc.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1

## **DECLARATION OF BARUCH C. COHEN**

2          I, Baruch C. Cohen, declare and state:

3          1.      I am a member of the State Bar of California and am duly authorized

4    to practice before this Court.  I am the principal shareholder and President of The Law

5    Office of Baruch C. Cohen, A Professional Law Corporation, and I am one of the

6    attorneys principally responsible for the representation of Peter Marco, LLC ("Marco") and

7    First International Diamond, Inc. ("First International") in the above-captioned case.  Each

8    of the facts contained in this declaration is based on my personal knowledge and, if

9    called as a witness, I could and would competently testify thereto.

10          2.      I make this declaration in support of the "Opposition to Trustee's

11   Motion for An Order Approving Dismissal of Chapter 7 Case and for Payment in

12   Compromise and Settlement of Administrative Fees; Memorandum of Points and

13   Authorities; Declaration of Baruch C. Cohen in Support Thereof" (the "Opposition"), filed

14   in response to the "Trustee's Motion for An Order Approving Dismissal of Chapter 7 Case

15   and for Payment in Compromise and Settlement of Administrative Fees; Memorandum of

16   Points and Authorities; Declaration of Sam S. Leslie in Support Thereof" (the "Motion"),

17   filed by Sam S  Leslie (the "Trustee"), the duly appointed, qualified, and acting chapter 7

18   trustee for the estate of the debtor Jadelle Jewelry and Diamonds, LLC (the "Debtor").

19          3.      As noted, I represent both Marco and First International, who are

20   owed approximately $6,950,444.40 and $1,976,225.00, respectively, by the Debtor.  I

21   also represent other creditors of the Debtor and the Rechnitz's, including, without

22   limitation, Julius Klein Diamonds, LLC (owed at least $4,766,019), TIME Design LLC

23   (owed at least $243,800 - LASC Case No. 20STCV27119), and H&T Goldman

24   Corporation (owed at least $670,000).  Thus, so far I represent approximately

25   $14,606,488 in claims against the debtor and the Rechnitz's.  None of my clients have

26   filed proofs of claim against the Debtor's estate since, as of this date, the Trustee has not

27   set a claims bar date or otherwise advised creditors through a Notice of Possible

28   Dividends that proofs of claim should be filed.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL  213.626.2311  •  FAX 213.629.4520

4.    As detailed in the Opposition, the fact that no claims bar date has been set is troubling since, on April 28, 2021, the Trustee's own financial advisor - CBIZ Valuation Group - filed an application with this Court that identified $50 million in potential avoidable transfers.  See Docket No. 200.  Yet, the Trustee's Motion does not provide any facts or details on the Trustee's efforts to collect and recover the $50 million for the benefit of creditors of the estate.

5.    The Trustee's statement that since Marco's civil action was dismissed, Marco either is not a creditor or has no legitimate claims against the Debtor is incorrect.  Although Marco's third party complaint was dismissed, it was dismissed without prejudice due to a pending claim for insurance.  In this regard, on or about March 18, 2020, plaintiff David Rovinsky LLC ("Rovinsky") initiated an action in the United States District Court, Central District of California, bearing Case No. 2:20-cv-02580-ODW-AS, seeking $1,130,000 in damages against Marco, alleging claims for negligence, conversion, fraud, negligent misrepresentation, aiding and abetting conversion, and civil theft based on a ring and necklace that Jona Rechnitz stole (the "Rovinsky Action").

6.    On April 14, 2020, I filed an answer on Marco's behalf in the Rovinsky Action and concurrently filed a third-party complaint (the "Third Party Complaint") against Rechnitz, for, among other things, intentional misrepresentation and fraud, civil theft (Penal Code § 496), embezzlement, civil conspiracy to commit theft, fraud, fraud by concealment, conversion, breach of contract, breach of the implied covenant of good faith and fair dealing, account stated, and unethical business practices in violation of California Business & Professions Code § 17200, alleging that Rechnitz is the real culprit and the one responsible for Rovinsky's claims against Marco.  The facts all relate to the frauds committed by the Debtor, along with its controlling principals and insiders Jona and Rachel Rechnitz.  The Third-Party Complaint sought compensatory damages in the amount of at least $6,950,444.40 for the frauds committed by Jona on behalf of the Debtor.

7.    On August 21, 2020, Marco's insurance company, Lloyd's of London,

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311  •  FAX 213.629.4520

1  commenced an action against Marco styled <u>Those Interested Underwriters at Lloyd's of ,</u>

2  <u>London, Subscribing to Policy Number: B0901EE1905358000; Lazar Diamonds, Inc., v.</u>

3  <u>Peter Marco, LLC, Peter Voutsas</u>, pending in the Superior Court for the State of

4  California, County of Los Angeles, bearing Case No. 20STCV32013 (the "Insurance

5  Action").  A true and correct copy of the complaint filed in the Insurance Action is

6  attached hereto as Exhibit "A" and incorporated herein by reference.  Settlement

7  discussions have commenced and are ongoing regarding the Insurance Action.

8          8.      Because of the ongoing settlement discussions regarding the

9  Insurance Action, on October 20, 2020, Marco stipulated with the Rechnitz third-party

10  defendants to dismiss, without prejudice, Marco's Third Party Complaint in the Rovinsky

11  Action.  A true and correct copy of the October 30, 2020, stipulation for dismissal filed in

12  the Rovinsky Action is attached hereto as Exhibit "B" and incorporated herein by

13  reference.

14          9.      With respect to the source of funds for the settlement, the Motion

15  states that "[r]Representing they have no funds of their own, they have procured funds

16  from third party sources, family and friends to provide the Settlement Amount as defined

17  herein."  The Trustee repeats this in paragraph 10 of his declaration in support of the

18  Motion.  However, this statement has now been proven to be false.  On May 24, 2021,

19  David Zolkin, counsel for the Rechnitz's, confirmed that the wire originators for the

20  $215,000 settlement payment were JSR Capital, LLC ("JSR") and McCadden Property

21  Group ("McCadden").  However, both companies belong to Jona Rechnitz, undermining

22  the Trustee's representations to the Court.

23          10.     Jona Rechnitz is the founder of JSR Capital, LLC, a private real

24  estate development and management company.  A true and correct copy of JSR Capital,

25  LLC's zoom company profile showing that Jona Rechnitz is president and owner is

26  attached hereto as Exhibit "C" and incorporated herein by reference.

27          11.     McCadden also is owned by Jona Rechnitz.  As detailed in the

28  unlawful detainer action styled <u>Wilshire Courtyard, L.P., a Delaware Limited Partnership</u>

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

vs. McCadden Property Group, LLC, a Delaware Limited Liability Company, pending in

the Superior Court for the State of California, County of Los Angeles, bearing Case No.

19STCV20364 (the Unlawful Detainer Action"), the lease in question was signed by Jared

Rechnitz (Jona's brother) and Rachel Rechnitz (maiden name Kahn) on behalf of

McCadden.  Jona and Rachel Rechnitz personally guaranteed the lease in question.  The

lease also provides the addresses to McCadden as follows:  "McCadden Property Group,

LLC, 441 West End Avenue, Apt. No. 12A, New York, New York 10024, Attn: Jona

Rechnitz" and "McCadden Property Group, LLC, 5700 Wilshire Boulevard, Suite 355, Los

Angeles, California 90036, Attn: Jona Rechnitz.".  A true and correct copy of the Unlawful

Detainer Action is attached hereto as Exhibit "D" and incorporated herein by reference.

12.    Further, I reviewed the Debtor's produced Signature Bank records

that reveal that in a brief six month period between February 8, 2018, and August 30,

2018, the Debtor transferred at least $590,000 to JSR.  A summary of the transfers is as

follows:

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 2-8-2018 | wr Fed#00901 Signature Bank /Ftr/Bnf=Jsr Capital Srf#0011642038525692 Trn#180208101422 | $100,000 |
| 3-1-2018 | wr Fed#08070 Signature Bank /Ftr/Bnf=Jsr Capital LLC Srf#0000814059540674 Trn#180301153797 | $20,000 |
| 3-9-2018 | wr Fed#05601 Signature Bank /Ftr/Bnf=Jsr Capital LLC Srf#0000814068831855 Trn#180309140406 | $75,000 |
| 3-22-2018 | wr Fed#06947 Signature Bank /Ftr/Bnf=Jsr Capital | $50,000 |
| 3-23-2018 | wr Fed#05682 Signature Ban/ /Ftr/Bnf=Jsr Capital LLC | $50,000 |
| 3-28-2018 | wr Fed#04437 Signature Bank /Ftr/Bnf=Jsr Capital Srf#0000814087309627 Trn#180328130500 | $20,000 |
| 4-10-2018 | WT Fed#02123 Signature Bank/Org=Jsr Capital LLC Srf#1713 Trn#180410141983 | $20,000 |
| 4-11-2018 | WT Fed#01241 Signature Bank/Org=Jsr Capital LLC Srf#1337 Trn#180411120483 | $65,000 |

| | | | |
|---|---|---|---|
| 4-30-2018 | wr Fed#03956 Signature Bank /Ftr/Bnf=Jsr Capital LLC Srf#0011642120107920 Trn#180430212102 | $10,000 |
| 5-16-2018 | WT Fed#03054 Signature Bank /Ftr/Bnf=Jsr Capital LLC Srf#0000814136582191 Trn#180516101244 | $30,000 |
| 5-24-2018 | WT Fed#01924 Signature Bank /Ftr/Bnf=Jsr Capital LLC Srf#0011642144901282 Trn#180524105465 | $100,000 |
| 5-24-2018 | WT Fed#06760 Signature Bank /Ftr/Bnf=Jsr Capital LLC Srf#0011642144967482 Trn#180524144044 | $20,000 |
| 8-10-2018 | wr Fed#01395 Signature Bank /Org=Jsr Capital LLC Srf#1437 Trn#180810112205 | $20,000 |

13.    Finally, the $19 million criminal restitution order that the Trustee misstates has priority over the Trustee is on appeal and is not final. A true and correct copy of Jona Rechnitz's March 17, 2020, Notice of Appeal in the action styled United States of America vs. Jona Rechnitz, bearing Case No. 1:16-cr-00389-AKH, is attached hereto as Exhibit "E" and incorporated herein by reference. Further, Judge Hellerstein capped any judgment at $10 million to be paid at a rate of $500,000 per year, not at $19 million. A true and correct copy of the March 26, 2020, order is attached hereto as Exhibit "F" and incorporated herein by reference.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of June, 2021, at Los Angeles, California.

Baruch C. Cohen

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

# EXHIBIT A

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Michael Stern

1   Alex Tarkian, Esq. (State Bar No. 186492)
    **TARKIAN & ASSOCIATES**
2   1801 Century Park East, 24th Floor
    Los Angeles, CA  90067
3   Telephone:  (310) 556-9616
    Facsimile:  (323) 798-4712
4   E-Mail: ATarkian@Tarkianandassociates.com

5   Attorneys for Plaintiff
    THOSE INTERESTED UNDERWRITERS AT LLOYD'S OF
6   LONDON SUBSCRIBING TO POLICY NUMBER
    B0901EE1905358000 and LAZAR DIAMONDS, INC.
7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9          **FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

10

| | |
|---|---|
| 11  THOSE INTERESTED UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO POLICY NUMBER B0901EE1905358000, an incorporated association; and LAZAR DIAMONDS, INC., a California Corporation, | Case No.   20STCV32013 |
| 12 13 | **PLAINTIFFS' COMPLAINT FOR DAMAGES** |
| 14 | |
| 15                             Plaintiffs, | **1)  BREACH OF CONTRACT;** |
| 16                        v. | **2)  UNJUST ENRICHMENT;** |
| 17  PETER MARCO, LLC, a California Limited Liability Company; PETER VOUTSAS, an Individual; and DOES 1 through 100, Inclusive, | **3)  CONVERSION;** |
| 18 | **4)  NEGLIGENCE;** |
| 19                           Defendants. | **5)  OPEN BOOK ACCOUNT;** |
| 20 | **6)  ACCOUNT STATED;** AND |
| | **7)  QUANTUM MERUIT** |

21         TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

22         Plaintiff Those Interested Underwriters at Lloyd's of London Subscribing to Policy

23   Number B0901EE1905358000 ("Underwriters") and Plaintiff Lazar Diamonds, Inc. ("Lazar")

24   allege as follows:

25   **GENERAL ALLEGATIONS**

26         1.   Underwriters are comprised of foreign unincorporated associations authorized to

27   operate under the name of "Lloyd's of London" that are domiciled outside California with their

28

---

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1    principal place of business in London, England and authorized to conduct insurance business in

2    California on a non-admitted basis pursuant to the California Insurance Code and the regulations

3    of the California Department of Insurance.

4        2.    Underwriters are the names and underwriters that comprise the following subscribing

5    Lloyd's Syndicate Numbers:  (a) Lloyd's Syndicate 2003; (b) Lloyd's Syndicate 1414;

6    (c) Lloyd's Syndicate 1274; (d) Lloyd's Syndicate 1301; (e) Lloyd's Syndicate 382; (f) Lloyd's

7    Syndicate 4444; (g) Lloyd's Syndicate1861; (h) Lloyd's Syndicate 3000; (i) Lloyd's Syndicate

8    1084; (j) Lloyd's Syndicate 2012; (k) Lloyd's Syndicate 609; (l) Lloyd's Syndicate 2232;

9    (m) Lloyd's Syndicate 1969; (n) Lloyd's Syndicate 3623; (o) Lloyd's Syndicate 4711;

10   (p) Lloyd's Syndicate 2001; (q) Lloyd's Syndicate 2488; and (r) Lloyd's Syndicate 1686.

11       3.    Lazar is a wholesale jeweler that is a California Corporation and authorized to do

12   business in the County of Los Angeles and State of California.

13       4.    Underwriters and Lazar (collectively, "Plaintiffs") are informed and believe and

14   thereon allege that Defendant Peter Marco, LLC is a retail jeweler that is a California Limited

15   Liability Company and authorized to do business in the County of Los Angeles and State of

16   California.

17       5.    Plaintiffs are informed and believe and thereon allege that Defendant Peter Voutsas is

18   the sole Member of Peter Marco, LLC who resides and/or works in the County of Los Angeles

19   and State of California.

20       6.    Defendant DOES 1 through 100, inclusive, are sued in this Complaint under fictitious

21   names.  Their true names and capacities are unknown to Plaintiffs.  When their true names and

22   capacities are ascertained, Plaintiffs will seek leave to amend this Complaint to insert their true

23   names and capacities.  Plaintiffs are informed and believe and thereon allege that each of the

24   fictitiously named defendants is responsible in some manner for the occurrences alleged in this

25   Complaint, and that Plaintiffs' injuries and damages as alleged were proximately caused by such

26   defendants.

27       7.    Plaintiffs are informed and believe and thereon allege that Defendant Peter Marco,

28   LLC, Defendant Peter Voutsas, and DOES 1 through 100, inclusive, (collectively, the

-2-

PLAINTIFFS' COMPLAINT FOR DAMAGES

EXHIBIT A   0021

1  "Defendants") were the agents of each other and in doing the things alleged, were acting within

2  the course and scope of such agency and with the permission and consent of the other defendants.

3  **FACTUAL ALLEGATIONS**

4       8.    Underwriters issued a Jewelers Block insurance policy to Lazar under Policy Number

5  B0901EE1905358000 (the "Policy") for the effective period of May 8, 2019 to May 8, 2020 that

6  covered Lazar's jewelry stock.

7       9.    Lazar submitted a jewelry loss in the amount of $793,049.00 under the Policy to

8  Underwriters in relation to an unpaid and unreturned consignment of jewelry items to the

9  Defendants pursuant to a December 13, 2019 written consignment agreement wherein said

10 jewelry stock was stolen from Defendants' business premises by reason of a fraudulent scheme,

11 trick, or false pretense by Mr. Jona Rechnitz of Jadelle Jewelry and Diamonds LLC and/or Jadelle

12 Inc. which violated California Penal Code Section 532(a) (the "Loss").

13      10. A true and correct copy of the December 13, 2019 written consignment agreement

14 entered into by and between Lazar and Defendants, bearing Consignment Memorandum No.

15 26229 in the amount of $793,049.00 (the "Agreement"), is attached to this Complaint as Exhibit

16 "A."

17      11. As a further condition to agree to consign the subject jewelry items to the Defendants,

18 Lazar obtained written confirmation from the Defendants and the Defendants' insurer that Lazar

19 was added to the Defendants' jewelry insurance policy as a Loss Payee.

20      12. A true and correct copy of the November 6, 2019 Certificate of Property Insurance

21 wherein Lazar was added to Defendants' jewelry insurance policy as a Loss Payee is attached to

22 this Complaint as Exhibit "B."

23      13. Underwriters paid a compromised sum of $500,000 to Lazar in relation to the Loss and

24 under the Policy to which Plaintiffs are now jointly permitted to seek their collective rights

25 against the Defendants for the full amount of the Loss ($793,049.00) in relation to the Loss.

26      14. Pursuant to the Agreement, the Defendants were required to either return the jewelry

27 stock depicted on the Agreement to Plaintiffs or paying the consignment value of $793,049.00 to

28 Plaintiffs.

-3-

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

15. Despite Plaintiffs' several requests, Defendants (and Defendants' jewelry insurer) failed and refused to either returning the jewelry stock depicted on the Agreement to Plaintiffs or paying any portion of the consignment value to Plaintiffs thereby causing Plaintiffs to be deprived of their property, including its loss of use, and sustaining property damage.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against All Defendants)

16. Plaintiffs reallege and repeat all above-referenced paragraphs of this Complaint as if set forth in full herein and incorporate said paragraphs by reference.

17. Lazar and the Defendants voluntarily entered into the Agreement. (See Exhibit "A").

18. Lazar performed all of the terms, conditions, and obligations required of it under the terms of the Agreement.

19. The Agreement required the Defendants to either return the jewelry stock to Lazar or pay the agreed upon consigned value to Lazar.

20. Despite Plaintiffs' repeated requests, the Defendants breached the Agreement by failing to either return the jewelry stock to Plaintiffs or paying the agreed upon consigned value to Plaintiffs.

21. As a direct, proximate, and legal result of Defendants' breaches as alleged herein, Plaintiffs seek to recover $793,049.00 from the Defendants, plus interest and costs incurred in this litigation.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment Against All Defendants)

22. Plaintiffs reallege and repeat all above-referenced paragraphs of this Complaint as if set forth in full herein and incorporate said paragraphs by reference.

23. Lazar has performed all obligations pursuant to the terms and conditions of the Agreement.

24. Despite Plaintiffs' repeated requests, the Defendants have failed and refuse to either return the jewelry stock to Plaintiffs or pay the agreed upon consigned value to Plaintiffs.

-4-

25. As a direct, proximate, and legal result of the foregoing, Defendants have been unjustly enriched in the amount of $793,049.00 plus interest and costs incurred in this litigation.

### THIRD CAUSE OF ACTION

#### (Conversion Against All Defendants)

26. Plaintiffs reallege and repeat all above-referenced paragraphs of this Complaint as if set forth in full herein and incorporate said paragraphs by reference.

27. Pursuant to the Agreement and the terms and conditions of the Policy, Plaintiffs are joint legal owners of the jewelry stock that was consigned to the Defendants.

28. Despite Plaintiffs' repeated requests, the Defendants have failed and refuse to either return the jewelry stock to Plaintiffs or pay the agreed upon consigned value to Plaintiffs.

29. In committing conversion, the Defendants have acted with malice, fraud, and/or oppression in violation of California Civil Code Section 3294 due to their failure and refusal to either return the jewelry stock or pay its consigned value.

30. All of the conduct of the Defendants alleged herein was done with the advance knowledge or ratification or authority of management level agents or employees of the Defendants and/or with their subsequent ratification and approval.

31. As a direct, proximate, and legal result of the foregoing, the Defendants are liable for punitive damages in an amount sufficient to punish them, make an example of them, and deter them from similar conduct in the future.

32. As a further direct, proximate, and legal result of the foregoing, Plaintiffs have been damaged in the amount of $793,049.00 plus interest and costs incurred in this litigation.

### FOURTH CAUSE OF ACTION

#### (Negligence Against All Defendants)

33. Plaintiffs reallege and repeat all above-referenced paragraphs of this Complaint as if set forth in full herein and incorporate said paragraphs by reference.

34. At all relevant times, the Defendants had a duty to exercise reasonable skill and care while carrying Lazar's consigned jewelry stock.

-5-

EXHIBIT A   0024

35. The Defendants breached their respective duties to exercise reasonable skill and care when Lazar's consigned jewelry stock was not returned to nor paid to Plaintiffs.

36. As a direct, proximate, and legal result of the foregoing, Plaintiffs have been damaged in the amount of $793,049.00 plus interest and costs incurred in this litigation.

## FIFTH CAUSE OF ACTION

### (Open Book Account Against All Defendants)

37. Plaintiffs reallege and repeat all above-referenced paragraphs of this Complaint as if set forth in full herein and incorporate said paragraphs by reference.

38. On or about December 13, 2019, the Defendants became indebted to Plaintiffs on an open book account for the sum of $793,049.00 for Lazar's consigned jewelry stock.

39. As a direct, proximate, and legal result of the foregoing, Plaintiffs have been damaged in the amount of $793,049.00 plus interest and costs incurred in this litigation.

## SIXTH CAUSE OF ACTION

### (Account Stated Against All Defendants)

40. Plaintiffs reallege and repeat all above-referenced paragraphs of this Complaint as if set forth in full herein and incorporate said paragraphs by reference.

41. On or about December 13, 2019, the Defendants became indebted to Plaintiffs on an open book account for the sum of $793,049.00 for Lazar's consigned jewelry stock.

42. Accounts were stated in writing by and between Plaintiffs and the Defendants showing that the jewelry was consigned to the Defendants.

43. As a direct, proximate, and legal result of the foregoing, Plaintiffs have been damaged in the amount of $793,049.00 plus interest and costs incurred in this litigation.

## SEVENTH CAUSE OF ACTION

### (Quantum Meruit Against All Defendants)

44. Plaintiffs reallege and repeat all above-referenced paragraphs of this Complaint as if set forth in full herein and incorporate said paragraphs by reference.

45. Pursuant to the Agreement, the Defendants agreed to either return the jewelry stock to Lazar or pay the agreed upon consigned value to Lazar.

-6-

EXHIBIT A   0025

46.   Lazar consigned the jewelry to the Defendants in reasonable reliance upon Defendants' express promise to either return the jewelry stock to Lazar or pay the agreed upon consigned value to Lazar.

47.   Despite Plaintiffs' repeated requests, the Defendants failed to either return the jewelry stock to Plaintiffs or pay the agreed upon consigned value to Plaintiffs.

48.   As a direct, proximate, and legal result of Defendants' breaches as alleged herein, Plaintiffs seek to recover $793,049.00 from the Defendants, plus interest and costs incurred in this litigation.

WHEREFORE, Plaintiffs pray for Judgment against all Defendants as follows:

1.   Damages in the amount of $793,049.00;

2.   Punitive damages pursuant to Plaintiff's Third Cause of Action for Conversion according to proof;

3.   Interest at the legal rate;

4.   Costs of suit; and

5.   For such other relief as this Court may deem just and proper.

Dated:  August 21, 2020

TARKIAN & ASSOCIATES

By: _____
        Alex Tarkian, Esq.
Attorneys for Plaintiffs
THOSE INTERESTED UNDERWRITERS AT
LLOYD'S OF LONDON SUBSCRIBING TO
POLICY NUMBER B0901EE1905358000 and
LAZAR DIAMONDS, INC.

-7-

PLAINTIFFS' COMPLAINT FOR DAMAGES

# EXHIBIT "A"

EXHIBIT A   0027

# Lazar Diamonds, Inc 

550 S Hill St., Suite 1175   Free: 800-553-5133
Los Angeles, CA 90013   Tel: 213-629-9036
mail@lazardiamonds.com   Fax: 213-488-0678

## MEMORANDUM

Memo No:   **26229**
Date:   **12/13/2019**

**M E M O   T O**   **PETER MARCO JEWELS LLC**
252 N.RODEO DR.
BEVERLY HILLS, CA 90210
310-278-5353

**S H I P   T O**   **PETER MARCO JEWELS LLC**
252 N.RODEO DR.
BEVERLY HILLS , CA 90210

The merchandise described herein is given to you on memorandum at your risk of all hazards, regardless of the cause of the loss or damage, only for examination and inspection by prospective purchasers, upon the express condition that all such merchandise shall remain the property of Lazar Diamonds, Inc. and shall be returned on demand, in full in its original form. Until the merchandise is returned and actually received by us, you are fully responsible therefore, and in the event of damage or loss, whether caused by you or by another, whether or not under your control, you will indemnify us immediately by payment of the stated value, which represents the extent of the actual loss and is not intended to constitute a price for sale of the merchandise. You acquire no right or authority to sell, hypothecate or otherwise dispose of the merchandise, or any other part thereof, by memorandum or otherwise it being expressly understood that regardless of other transactions or prior trade customs, no credit is extended with respect to this merchandise. A sale of all or any portion of the merchandise shall occur only if and when we agree and you shall have received from us a separate invoice. A subsequent sale or any specific part of the merchandise shall not affect the terms hereof with respect to the balance hereof. Receipt of the merchandise constitutes your agreement to the foregoing terms which represent the entire contract with respect to the merchandise herein described and which cannot be varied by oral statements, dealings with respect to other merchandise or any contrary custom of trade. This is not an invoice or a bill of sale.

| CUSTOMER | TERMS | SHIP VIA | PURCHASE ORDER | SP | DUE DATE |
|---|---|---|---|---|---|
| 3418 | NET 5 DAYS | | | RM | 12/18/2019 |

| NO | LOT NUMBER | CARAT | UNITS | DESCRIPTION | % | PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|
| 1 | 52342 | 20.54 | 1 | DIAM OV H VVS2 GIA 6204485119 | 17.0 | $38,610.00 | $793,049.40 |

| COMMENTS | | | |
|---|---|---|---|
| | SUB TOTAL | $793,049.40 |
| | SHIPPING | $0.00 |
| | MEMO TOTAL | $793,049.40 |

Page 1 of 1

SIGNATURE: _____

EXHIBIT A  0028

# EXHIBIT "B"

EXHIBIT A    0029

**ACORD**

# CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY)
11/26/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: Amanda Schaeffer |
|---|---|
| Wasserman & Wexler LLC dba WB | PHONE (A/C, No, Ext): (813) 601-2131  FAX (A/C, No): (813) 601-2132 |
| 1120 Ponce De Leon Blvd | E-MAIL ADDRESS: aschaeffer@wb-usa.com |
| | PRODUCER CUSTOMER ID: CCCS920 |
| Coral Gables                FL 33134 | INSURER(S) AFFORDING COVERAGE |
| INSURED | INSURER A: LLOYD OF LONDON |
| Peter Marco LLC | INSURER B: |
| 232 North Rodeo Drive | INSURER C: |
| | INSURER D: |
| Beverly Hills              CA 90210 | INSURER E: |
| | INSURER F: |

| COVERAGES | CERTIFICATE NUMBER: CPB1180458 | REVISION NUMBER: |
|---|---|---|

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|
| PROPERTY | | | | BUILDING | |
| CAUSES OF LOSS | DEDUCTIBLES | | | PERSONAL PROPERTY | |
| BASIC | | | | BUSINESS INCOME | |
| BROAD | | | | EXTRA EXPENSE | |
| SPECIAL | | | | RENTAL VALUE | |
| EARTHQUAKE | | | | BLANKET BUILDING | |
| WIND | | | | BLANKET PERS PROP | |
| FLOOD | | | | BLANKET BLDG & PP | |
| ☒ INLAND MARINE | TYPE OF POLICY | | | ☒ STOCK | 40,000,000 |
| CAUSES OF LOSS | JEWELERS BLOCK | | | | |
| NAMED PERILS | POLICY NUMBER | 07/19/2019 | 07/19/2020 | | |
| CABLE | SS014041B4346 | | | | |
| | | | | | |
| CRIME | | | | | |
| BOILER & MACHINERY | | | | | |
| EQUIPMENT BREAKDOWN | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
CERTIFICATE HOLDER IS LOSS PAYEE AS THEIR INTEREST MAY APPEAR

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| AZAR DIAMONDS | |
| 550 S HILL STREET #1010 | AUTHORIZED REPRESENTATIVE |
| LOS ANGELES                CA 90013 | |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)          The ACORD name and logo are registered marks of ACORD

EXHIBIT A   0030

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
Rizalinda Miua

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE LOS ANGELES SUPERIOR COURT ) <br> – MANDATORY ELECTRONIC FILING ) <br> FOR CIVIL ) <br> ) <br> ) <br> ) <br> _____ ) | FIRST AMENDED GENERAL ORDER |

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) **DEFINITIONS**

   a) **"Bookmark"**  A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**  The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**  A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**  Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

---

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

2019-GEN-014-00

e) **"Electronic Filing Service Provider"**  An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**  For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**  An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**  A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a)  Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b)  Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c)  Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

2
FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

2019-GEN-014-00

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) **EXEMPT LITIGANTS**

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) **EXEMPT FILINGS**

a) The following documents shall not be filed electronically:

i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

ii) Bonds/Undertaking documents;

iii) Trial and Evidentiary Hearing Exhibits

iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

3

**FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL**

EXHIBIT A   0033

2019-GEN-014-00

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format when technologically feasible without impairment of the document's image.

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

    i)   Depositions;

    ii)   Declarations;

    iii)   Exhibits (including exhibits to declarations);

    iv)   Transcripts (including excerpts within transcripts);

    v)   Points and Authorities;

    vi)   Citations; and

    vii)   Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a separate digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

4

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

2019-GEN-014-00

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.   (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of:  (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

EXHIBIT A   0035

2019-GEN-014-00

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i)    Any printed document required pursuant to a Standing or General Order;

   ii)   Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii)  Pleadings and motions that include points and authorities;

   iv)   Demurrers;

   v)    Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi)   Motions for Summary Judgment/Adjudication; and

   vii)  Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents.  Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

6

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

2019-GEN-014-00

1    11) SIGNATURES ON ELECTRONIC FILING

2       For purposes of this General Order, all electronic filings must be in compliance with California

3       Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil

4       Division of the Los Angeles County Superior Court.

5

6       This First Amended General Order supersedes any previous order related to electronic filing,

7   and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8   Supervising Judge and/or Presiding Judge.

9

10   DATED: May 3, 2019

11                                  KEVIN C. BRAZILE

12                                  Presiding Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

EXHIBIT A   0037

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions In Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: | |

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department.

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

---

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 1 of 3

EXHIBIT A    0039

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

    iii.  Be filed within two (2) court days of receipt of the Request; and

    iv.  Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

EXHIBIT A    0040

| SHORT TITLE | CASE NUMBER |
|---|---|
|  |  |

**The following parties stipulate:**

Date:

_____    ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR PLAINTIFF)

Date:

_____    ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR DEFENDANT)

Date:

_____    ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR DEFENDANT)

Date:

_____    ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR DEFENDANT)

Date:

_____    ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR _____)

Date:

_____    ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR _____)

Date:

_____    ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR _____)

EXHIBIT A    0041

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: | FAX NO. (Optional): | |
| E-MAIL ADDRESS (Optional): | | |
| ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | CASE NUMBER: |
|---|---|

This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.

The parties agree that:

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

EXHIBIT A    0042

| SHORT TITLE | | CASE NUMBER |
|---|---|---|
| | | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
   (INSERT DATE)                                    (INSERT DATE)
   complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

**The following parties stipulate:**

Date:

_____        >    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR PLAINTIFF)

Date:

_____        >    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR DEFENDANT)

Date:

_____        >    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR DEFENDANT)

Date:

_____        >    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR DEFENDANT)

Date:

_____        >    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR _____)

Date:

_____        >    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR _____)

_____        >    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:  FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT.

| INFORMAL DISCOVERY CONFERENCE (pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER |
|---|---|

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request)

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. For a Request for Informal Discovery Conference, _briefly_ describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, _briefly_ describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.

EXHIBIT A   0044

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

LACIV 075 (new)
LASC Approved 04/11        **STIPULATION AND ORDER – MOTIONS IN LIMINE**
For Optional Use                                                                    Page 1 of 2

| SHORT TITLE | | CASE NUMBER |
|---|---|---|
| | | |

**The following parties stipulate:**

Date:

_____          ›—————————————————————
(TYPE OR PRINT NAME)                          (ATTORNEY FOR PLAINTIFF)

Date:

_____          ›—————————————————————
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____          ›—————————————————————
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____          ›—————————————————————
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____          ›——————————————
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

Date:

_____          ›——————————————
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

Date:

_____          ›——————————————
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date: _____

                                          _____
                                          JUDICIAL OFFICER

LACIV 075 (new)
LASC Approved 04/11        **STIPULATION AND ORDER – MOTIONS IN LIMINE**        Page 2 of 2

EXHIBIT A    0046

## Superior Court of California, County of Los Angeles

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

### What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

### Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:**  ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR:

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

      **Mediation may be appropriate when the parties**
      - want to work out a solution but need help from a neutral person.
      - have communication problems or strong emotions that interfere with resolution.
      **Mediation may <u>not</u> be appropriate when the parties**
      - want a public trial and want a judge or jury to decide the outcome.
      - lack equal bargaining power or have a history of physical/emotional abuse.

LASC CIV 271 Rev. 01/20
For Mandatory Use

1

## How to arrange mediation in Los Angeles County

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a.  **The Civil Mediation Vendor Resource List**

    If all parties agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases):

    - **ADR Services, Inc.** Case Manager patricia@adrservices.com (310) 201-0010 (Ext. 261)
    - **JAMS, Inc.** Senior Case Manager mbinder@jamsadr.com (310) 309-6204
    - **Mediation Center of Los Angeles (MCLA)** Program Manager info@mediationLA.org (833) 476-9145
        o  Only MCLA provides mediation in person, by phone and by videoconference.

    These organizations cannot accept every case and they may decline cases at their discretion. Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them. NOTE: This program does not accept family law, probate, or small claims cases.

b.  **Los Angeles County Dispute Resolution Programs**
    https://wdacs.lacounty.gov/programs/drp/
    - Small claims, unlawful detainers (evictions) and, at the Spring Street Courthouse, limited civil:
        o  Free, day- of- trial mediations at the courthouse. No appointment needed.
        o  Free or low-cost mediations before the day of trial.
        o  For free or low-cost Online Dispute Resolution (ODR) by phone or computer before the day of trial visit http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

c.  **Mediators and ADR and Bar organizations** that provide mediation may be found on the Internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/CI0047.aspx

**Los Angeles Superior Court ADR website:** http://www.lacourt.org/division/civil/CI0109.aspx
**For general information and videos about ADR, visit** http://www.courts.ca.gov/programs-adr.htm

LASC CIV 271 Rev. 01/20
For Mandatory Use

2

EXHIBIT A   0048

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012<br><br>NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**08/21/2020**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ R. Perez _____ Deputy |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>20STCV32013 |

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Michael L. Stern | 62 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 08/24/2020
   (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By R. Perez _____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

EXHIBIT A   0049

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

EXHIBIT A    0050

# EXHIBIT B

1   Baruch C. Cohen, Esq. (SBN 159455)
    **LAW OFFICE OF BARUCH C. COHEN**
2       A Professional Law Corporation
    4929 Wilshire Boulevard, Suite 940
3   Los Angeles, California 90010
    (323) 937-4501    Fax (888) 316-6107
4   e-mail: baruchcohen@baruchcohenesq.com

5   Attorney for Third Party Plaintiffs PETER VOUTSAS aka PETER MARCO aka
    PETER MARCO EXTRAORDINARY JEWELS OF BEVERLY HILLS, dba
6   PETER MARCO LLC

7                **IN THE UNITED STATES DISTRICT COURT**

8            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

10  PETER VOUTSAS aka PETER          USDC # 2:20-cv-02580-ODW-AS
    MARCO aka PETER VOUTSAS, aka
11  PETER MARCO EXTRAORDINARY        **STIPULATION OF DISMISSAL**
    JEWELS OF BEVERLY HILLS, dba     **WITHOUT PREJUDICE OF**
12  PETER MARCO LLC,                 **SECOND AMENDED CROSS-**
                                     **COMPLAINT - [FRCP**
13       Third Party Plaintiffs,     **41(a)(1)(A)(ii)]**

14  vs.

15  JONA S. RECHNITZ, an individual;
    RACHEL RECHNITZ, an individual;
16  LEVIN PRADO aka LEVON PRADO,
    an individual,
17
         Third Party Defendants.
18

19        Third Party Plaintiffs PETER VOUTSAS aka PETER MARCO aka PETER

20  MARCO EXTRAORDINARY JEWELS OF BEVERLY HILLS, dba PETER

21  MARCO LLC., ("Third Party Plaintiffs"), and Third Party Defendants JONA S.

22  RECHNITZ, RACHEL RECHNITZ, & LEVIN PRADO aka LEVON PRADO

23  ("Third Party Defendants"), hereby stipulate under FRCP 41(a)(1)(A)(ii)[1] that Third

24  Party Plaintiff's Second Amended Third Party Complaint [Doc-99] be dismissed

25  _____

26  [1] **FRCP 41(a)(1)(A)(ii):** (a) Voluntary Dismissal (1) By the Plaintiff (A) Without a Court
    Order. Subject to Rules 23(e), 23.1(c), 23.2, and 66 and any applicable federal statute, the plaintiff
27  may dismiss an action without a court order by filing... (ii) a stipulation of dismissal signed by all
    parties who have appeared.
28
        **STIPULATION OF DISMISSAL WITHOUT PREJUDICE OF SECOND AMENDED CROSS-COMPLAINT**

10/30-1:38pm

1    *without prejudice* as to all claims, causes of action, and parties.

2

3         **IT IS SO STIPULATED**:

4

5    DATED:        October 30, 2020        LAW OFFICE OF BARUCH C. COHEN
                                          A Professional Law Corporation
6
                                          By _____
7                                              Baruch C. Cohen, Esq.
                                          Attorney for Third Party Plaintiffs PETER
8                                          VOUTSAS aka PETER MARCO aka PETER
                                          MARCO EXTRAORDINARY JEWELS OF
9                                          BEVERLY HILLS, dba PETER MARCO
                                          LLC
10

11   DATED:        October 30, 2020        COHEN WILLIAMS LLP

12                                         By _____
                                               Marc S. Williams, Esq.
13                                         Attorney for Third Party Defendants JONA
                                           S. RECHNITZ, RACHEL RECHNITZ
14

15   DATED:        October 30, 2020        FISCHER, ZISBLATT & KISS, LLP

16                                         By _____
                                           Benjamin Kiss, Esq.
17                                         Attorney for Third Party Defendant  LEVIN
                                           PRADO aka LEVON PRADO
18

19

20

21

22

23

24

25

26

27

28

STIPULATION OF DISMISSAL WITHOUT PREJUDICE OF SECOND AMENDED CROSS-COMPLAINT

-2-

10/30-1:38pm

**CERTIFICATE OF SERVICE**

I declare that I am a citizen of the United States and I am a resident and employed in Los Angeles, California; that my business address is 4929 Wilshire Boulevard, Suite 940, Los Angeles, California 90010; that I am over the age of 18 and not a party to the above-entitled action.

I am employed by a member of the United States District Court for the Central District of California, and at whose direction I caused service of the foregoing document entitled **STIPULATION OF DISMISSAL WITHOUT PREJUDICE OF SECOND AMENDED CROSS-COMPLAINT - [FRCP 41(a)(1)(A)(ii)]** on all interested parties in this action by the method indicated below at the address stated below:

Marc S. Williams, Esq.
Cohen Williams, LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Email: mwilliams@cohen-williams.com
*Attorney for Third-Party Defendants Jona S. & Rachel Rechnitz*

Benjamin Kiss, Esq.
Fischer, Zisblatt & Kiss
1901 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Email: kisslaw@aol.com
*Attorney for Third-Party Defendant Levin Prado aka Levon Prado*

Stephen G. Larson, Esq.
Hilary Potashner, Esq.
Jen C. Won, Esq.
LARSON O'BRIEN LLP
555 Flower St #4400
Los Angeles, CA 90071
Email: slarson@larsonllp.com
Email: hpotashner@larsonllp.com
Email: jwon@larsonllp.com
*Attorneys for Plaintiff, David Rovinsky LLC*

**[X]    BY ELECTRONIC TRANSMISSION**: by electronically filing the foregoing with the Clerk of the District Court using its CM/ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies all parties in this case. A pdf version of this document was also transmitted to counsel via electronic mail at the mail address indicated above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 30, 2020 at Los Angeles, California.

By:  /s/  Baruch C. Cohen  Baruch C. Cohen
Baruch C. Cohen

STIPULATION OF DISMISSAL WITHOUT PREJUDICE OF SECOND AMENDED CROSS-COMPLAINT

10/30-1:38pm

EXHIBIT B   0053

# EXHIBIT C

5/25/2021                          JSR Capital - Overview, News & Competitors | ZoomInfo.com

zoominfo    Leads by Industry    Top Companies    Pricing    Solutions    Our Data    About Us        Sign Up

Overview    Org Chart    Company Insights    [Search for a contact or company]    Advanced Search

# JSR Capital

### View Employees

**Jim Klunder**
Phone    Email

**Jona Rechnitz**
Founder & President
Phone    Email

### Description

Founded in 2010, JSR Capital is a private real estate development and management
company that focuses primarily in the New York area as well as other major mark...
Read More

📍 **Headquarters:** 745 5th Ave, Ste 500, New York City, New York, 10151, United
States

📞 **Phone:** (212) 308-2432

🌐 **Website:** www.jsrcap.com

👥 **Employees:** 26

💲 **Revenue:** $5 Million

Update Company    View contact profiles from JSR Capital

SIC Code 67,679    NAICS Code 523,5239    Show More

**Popular Searches:**
JSR Capital LLC    JSR Capital    JSR Capital, All    jsrcap.com
JSR Construction and Management Services LLC

Real Estate

Find more contacts

## JSR Capital's Org-Chart



EXHIBIT C    0054

5/25/2021                                    JSR Capital - Overview, News & Competitors | ZoomInfo.com



| | Leads by Industry | Top Companies | Pricing | Solutions | Our Data | About Us | Sign Up |

Overview    Org Chart    Company Insights    Search for a contact or company    Advanced Search

See Full Org-Chart

## JSR Capital Company Metrics

Company Insights                                    Employee Growth Rate



Revenue

$10M
$8M
$6M
$4M

'19 – Q4    '20 – Q1    '20 – Q2    '20 – Q3    '20 – Q4    '21 – Q1

## JSR Capital's Tech Stack

Intermedia Exchange Email            Apache HTTP Server            Rackspace

By                                    By                            By

Intermedia                           Apache Corporation            Rackspace Technology

See more technologies

## Frequently Asked Questions regarding JSR Capital

**Where are JSR Capital's headquarters?**

JSR Capital's headquarters are in 745 5th Ave, Ste 500, New York City, New York, 10151, United States



**What is JSR Capital's phone number?**

EXHIBIT C    0055

5/25/2021                                    JSR Capital - Overview, News & Competitors | ZoomInfo.com



| zoominfo | Leads by Industry | Top Companies | Pricing | Solutions | Our Data | About Us | Sign Up |

Overview    Org Chart    Company Insights         Search for a contact or company 🔍    Advanced Search

**What is JSR Capital's Revenue?**

JSR Capital's revenue is $5 Million

**What is JSR Capital's SIC code?**

JSR Capital's SIC: 67,679

**What is JSR Capital's NAICS code?**

JSR Capital's NAICS: 523,5239

**How many employees are working in JSR Capital?**

JSR Capital has 26 employees

**What is JSR Capital's industry?**

JSR Capital is in the industry of: Real Estate

**What is JSR Capital's tech stack?**

The technologies that are used by JSR Capital are: Intermedia
Exchange Email, Apache HTTP Server, Rackspace

See more information about JSR Capital

# Browse ZoomInfo's Directories

**Find Contacts**          **Find Companies**

Boston  |  New York City  |  Houston  |  Chicago  |  Los Angeles  |  Atlanta

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

POPULAR FEATURES          COMPANY          B2B DATABASE          MORE RESOURCES          Free Trial

EXHIBIT C    0056

5/25/2021                                    JSR Capital - Overview, News & Competitors | ZoomInfo.com





EXHIBIT C    0057

# EXHIBIT D

Electronically FILED by Superior Court of California, County of Los Angeles on 06/12/2019 10:34 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Stephanie Bowick

1  ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
2  TODD E. WHITMAN (BAR NO. 173878)
   1901 Avenue of the Stars, Suite 1800
3  Los Angeles, California 90067-6019
   Phone: (310) 788-2400
4  Fax: (310) 788-2410
   E-Mail: twhitman@allenmatkins.com
5
   Attorneys for Plaintiff
6  WILSHIRE COURTYARD, L.P., a Delaware limited
   partnership
7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF LOS ANGELES

10                       CENTRAL DISTRICT

11 | WILSHIRE COURTYARD, L.P., a          | Case No.  19STCV20364
   | Delaware limited partnership,        |
12 |                                      | UNLIMITED JURISDICTION
   |            Plaintiff,                 | AMOUNT EXCEEDS $25,000
13 |                                      |
   |      v.                              | **VERIFIED COMPLAINT FOR**
14 |                                      | **UNLAWFUL DETAINER**
   | MCCADDEN PROPERTY GROUP, LLC,        |
15 | a Delaware limited liability company; and |
   | DOES 1 through 10, inclusive,        |
16 |                                      |
   |            Defendants.               |
17

18

19         Plaintiff Wilshire Courtyard, L.P., a Delaware limited partnership hereby alleges

20 and complains as follows:

21                         **GENERAL ALLEGATIONS**

22 **The Parties**

23         1.     At all times mentioned herein Plaintiff Wilshire Courtyard, L.P. ("Plaintiff"),

24 was and is a  Delaware limited partnership authorized to do and doing business in the State

25 of California, County of Los Angeles.

26         2.     Plaintiff is informed and believes and on that basis alleges that Defendant

27 Mccadden Property Group ("Mccadden" or "Defendant"), was and is a Delaware limited

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

802256.01/WLA          VERIFIED AMENDED COMPLAINT FOR UNLAWFUL DETAINER
                                                        EXHIBIT D   0058

1   liability company authorized to do and doing business in the State of California, County of

2   Los Angeles.

3        3.      Plaintiff does not know the true names or capacities of defendants sued

4   herein as DOES 1 through 10, some of whom may currently be in possession of the

5   premises at issue in this case and some of whom may be legally responsible for the

6   damages and injuries sustained by Plaintiff as alleged herein.  Plaintiff will amend this

7   complaint to show the true names and capacities of DOES 1 through 10 when and if they

8   are ascertained.

9        4.      Each of the defendants identified as DOES 1 through 10 was the agent,

10   principal, employee or representative of the other defendants herein, participated in and/or

11   ratified the acts complained of herein, provided knowing and substantial assistance to the

12   other defendants, or is in some other way responsible and liable for the actions of each

13   other defendant.

14   **The Lease Agreement**

15        5.      Plaintiff, as landlord, and Mccadden, as tenant, are parties to the Lease dated

16   June 14, 2017, whereby Defendant currently leases certain premises known as Suite 355,

17   located at 5700 Wilshire Boulevard, Los Angeles, CA  90036 (the "Premises").  A true and

18   correct copy of the Lease is attached hereto as **Exhibit  "A"** and incorporated herein in full

19   by this reference.

20   **The Default**

21        6.      As a result of Mccadden's failure to pay rent and other charges when due, on

22   June 4, 2019, Landlord served Mccadden with a Three Day Notice to Pay Rent or Quit in

23   accordance with the terms of the Lease and California law.  A true and correct copy of the

24   Three Day Notice to Pay Rent or Quit, along with the Proof of Service, is attached hereto

25   as **Exhibit  "B"**  and incorporated herein in full by this reference.  Per the terms of the

26   Three Day Notice to Pay Rent or Quit, Mccadden was in default for failing to pay the sum

27   of $28,077.47.

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

802256.01/WLA

-2-
VERIFIED AMENDED COMPLAINT FOR UNLAWFUL DETAINER
EXHIBIT D  0059

7.     Notwithstanding the service of the Notice to Pay Rent or Quit, Mccadden failed to cure the default set forth in the Notice to Pay Rent or Quit and also failed to return possession of the Premises to Plaintiff.

8.     Mccadden remains in possession of the Premises without Plaintiff's consent and Plaintiff is entitled to immediate possession of the Premises.

9.     As of July 1, 2019, Plaintiff has been sustaining damages in the estimated amount of $225.74 per day, the reasonable rental value of the Premises, by reason of Mccadden's and/or DOES 1 through 10's unlawful detention of the Premises and will continue to sustain damages at this rate for so long as defendants remain in possession of the Premises, up to the time of judgment.

10.     The Lease provides that the prevailing party in any action between the parties is entitled to recover its reasonable attorneys' fees and court costs.

11.     Plaintiff has retained the law firm of Allen Matkins Leck Gamble Mallory & Natsis LLP to enforce its rights under the Lease and to recover possession of the Premises, and accordingly has incurred as yet unascertained costs and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, jointly and severally, as follows:

1.     For past due rent less the partial payments tendered.

2.     For restitution and possession of the Premises;

3.     For forfeiture of the Lease;

4.     For damages as of July 1, 2019, in the amount of $225.74 per day for each day Defendants continue in possession of the Premises;

5.     For costs of suit herein incurred, including reasonable attorneys' fees; and

6.     For such other and further relief as the Court may deem just and proper.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

802256.01/WLA

-3-
VERIFIED AMENDED COMPLAINT FOR UNLAWFUL DETAINER

EXHIBIT D   0060

1    Dated:  June 12, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
TODD E. WHITMAN

By: _____
TODD E. WHITMAN
Attorneys for Plaintiff WILSHIRE
COURTYARD, L.P.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

802256.01/WLA

-4-

VERIFIED AMENDED COMPLAINT FOR UNLAWFUL DETAINER

EXHIBIT D   0061

## **VERIFICATION**

I am a General Manager of Plaintiff and I am authorized by Plaintiff to make this Verification on its behalf.

I have read the foregoing Complaint For Unlawful Detainer and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true..

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June __11__, 2019, at Los Angeles, California.

Patricia Costopoulos

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

802256.01/WLA

-5-

VERIFIED AMENDED COMPLAINT FOR UNLAWFUL DETAINER

EXHIBIT D    0062

# EXHIBIT A

EXHIBIT D   0063

**LEASE**

**WILSHIRE COURTYARD, L.P.,**

**a Delaware limited partnership,**

**Landlord**

**and**

**MCCADDEN PROPERTY GROUP, LLC,**

**a Delaware limited liability company,**

**Tenant**

**for**

**Wilshire Courtyard**

**5700 Wilshire Boulevard, Suite 355**

**Los Angeles, California**

**June 14, 2017**

769489.04/WLA
372895-00001/sb/sb

## TABLE OF CONTENTS

Page

ARTICLE 1     BASIC LEASE PROVISIONS ...................................................................... 1

ARTICLE 2     PREMISES; TERM; RENT ......................................................................... 3

ARTICLE 3     USE AND OCCUPANCY ............................................................................ 4

ARTICLE 4     CONDITION OF THE PREMISES ............................................................... 5

ARTICLE 5     ALTERATIONS .......................................................................................... 5

ARTICLE 6     REPAIRS ................................................................................................... 7

ARTICLE 7     INCREASES IN TAXES AND OPERATING EXPENSES ............................ 8

ARTICLE 8     REQUIREMENTS OF LAW ...................................................................... 12

ARTICLE 9     SUBORDINATION ................................................................................... 14

ARTICLE 10    SERVICES .............................................................................................. 15

ARTICLE 11    INSURANCE; PROPERTY LOSS OR DAMAGE ....................................... 17

ARTICLE 12    EMINENT DOMAIN ................................................................................ 21

ARTICLE 13    ASSIGNMENT AND SUBLETTING .......................................................... 22

ARTICLE 14    ACCESS TO PREMISES .......................................................................... 27

ARTICLE 15    DEFAULT ................................................................................................ 28

ARTICLE 16    LANDLORD'S RIGHT TO CURE; FEES AND EXPENSES ........................ 31

ARTICLE 17    NO REPRESENTATIONS BY LANDLORD; LANDLORD'S APPROVAL ..... 31

ARTICLE 18    END OF TERM ........................................................................................ 32

ARTICLE 19    QUIET ENJOYMENT ............................................................................... 32

ARTICLE 20    NO SURRENDER; NO WAIVER ............................................................... 33

ARTICLE 21    WAIVER OF TRIAL BY JURY; COUNTERCLAIM ..................................... 33

ARTICLE 22    NOTICES ................................................................................................ 33

ARTICLE 23    RULES AND REGULATIONS ................................................................... 34

ARTICLE 24    BROKER .................................................................................................. 34

ARTICLE 25    INDEMNITY ............................................................................................ 34

ARTICLE 26    MISCELLANEOUS .................................................................................. 35

ARTICLE 27    SECURITY DEPOSIT ............................................................................... 41

ARTICLE 28    PARKING ................................................................................................ 41

## Schedule of Exhibits

Exhibit A        Floor Plan

Exhibit B        Definitions

Exhibit C        Intentionally Deleted

Exhibit D        Design Standards

Exhibit E        Cleaning Specifications

Exhibit F        Rules and Regulations

Exhibit G        Form of Commencement Letter

Exhibit H        Form of Guaranty

EXHIBIT D   0066

# LEASE

THIS LEASE is made as of the 14th day of June, 2017 ("**Effective Date**"), between WILSHIRE COURTYARD, L.P., a Delaware limited partnership ("**Landlord**"), and MCCADDEN PROPERTY GROUP, LLC, a Delaware limited liability company ("**Tenant**").

Landlord and Tenant hereby agree as follows:

## ARTICLE 1

## BASIC LEASE PROVISIONS

| | |
|---|---|
| **PREMISES** | A portion of the third (3rd) floor of the Building, commonly known as Suite 355, as more particularly shown on **Exhibit A.** |
| **BUILDING** | The building, fixtures, equipment and other improvements and appurtenances now located or hereafter erected, located or placed upon the land known as 5700 Wilshire Boulevard, Los Angeles, California. |
| **PROJECT** | That office building complex which is comprised collectively of the Building and that certain building located at 5750 Wilshire Boulevard, the land upon which such buildings are located, a subterranean parking garage located on such land, and all buildings and other improvements and plazas now or hereafter constructed on such land. |
| **COMMENCEMENT DATE** | June 19, 2017. |
| **EXPIRATION DATE** | The date which is the last day of the month in which the day immediately preceding the second (2nd) anniversary of the Commencement Date occurs. |
| **TERM** | The period commencing on the Commencement Date and ending on the Expiration Date. |
| **PERMITTED USES** | Executive and general offices, consistent with the character of the Building as a first-class office building. |
| **BASE YEAR** | Calendar year 2017. |
| **TENANT'S PROPORTIONATE SHARE** | 0.2803% |
| **AGREED AREA OF PROJECT** | 1,007,987 rentable square feet |
| **AGREED AREA OF BUILDING** | 542,015 rentable square feet, as mutually agreed by Landlord and Tenant. |
| **AGREED AREA OF PREMISES** | 1,519 rentable square feet, as mutually agreed by Landlord and Tenant. |

**FIXED RENT**

| Lease Months | Per Annum | Per Month | Annual Fixed Rent Per Rentable Square Foot* |
|---|---|---|---|
| 1-12** | $77,469.00 | $6,455.75 | $4.25 |
| 13-Expiration Date | $79,793.07 | $6,649.42 | $4.38 |

*The calculations of the monthly Fixed Rent per rentable square foot set forth above are approximate calculations based on a three percent (3%) increase per annum.

**Subject to the terms of Section 2.3(b), below.

**ADDITIONAL RENT**       All sums other than Fixed Rent payable by Tenant to Landlord under this Lease, including Tenant's Tax Payment, Tenant's Operating Payment, late charges, overtime or excess service charges, parking fees, damages, and interest and other costs related to Tenant's failure to perform any of its obligations under this Lease.

**RENT**       Fixed Rent and Additional Rent, collectively.

**INTEREST RATE**       The lesser of (i) four percent (4%) per annum above the then-current Base Rate, and (ii) the maximum rate permitted by applicable Requirements.

**SECURITY DEPOSIT**       $6,649.43.

**TENANT'S ADDRESS FOR NOTICES**       Until Tenant commences business operations from the Premises:

McCadden Property Group, LLC
441 West End Avenue, Apt. No. 12A
New York, New York  10024
Attn:  Jona Rechnitz

Thereafter:

McCadden Property Group, LLC
5700 Wilshire Boulevard, Suite 355
Los Angeles, California  90036
Attn:  Jona Rechnitz

**LANDLORD'S ADDRESS FOR NOTICES**       Wilshire Courtyard, L.P.
5700 Wilshire Boulevard, Suite 365
Los Angeles, California  90036
Attn:  Property Manager

EXHIBIT D   0068

With copies to:

Tishman Speyer Properties, L.P.
45 Rockefeller Plaza
New York, New York 10111
Attn:  Chief Legal Officer

and:

Tishman Speyer Properties, L.P.
45 Rockefeller Plaza
New York, New York 10111
Attn:  Chief Financial Officer

| | |
|---|---|
| **GUARANTORS** | Jona Rechnitz, an individual and Rachel Kahn, an individual |
| **TENANT'S BROKER** | Travers Cresa. |
| **LANDLORD'S AGENT** | Tishman Speyer Properties, L.P. or any other person or entity designated at any time and from time to time by Landlord as Landlord's Agent. |

**All capitalized terms used in this Lease without definition are defined in Exhibit B.**

## ARTICLE 2

### PREMISES; TERM; RENT

**Section 2.1    Lease of Premises.**  Subject to the terms of this Lease, Landlord leases to Tenant and Tenant leases from Landlord the Premises for the Term.  Landlord and Tenant hereby agree that the rentable square feet of the Premises, the rentable square feet of the office area of the Building and the rentable square feet of the Project have been agreed to by Landlord and Tenant and are as stipulated in Article 1 above.  In addition, Landlord grants to Tenant the right to use, on a non-exclusive basis and in common with others, the Common Areas.

**Section 2.2    Commencement Date.**  Upon the Effective Date, the terms and provisions hereof shall be fully binding on Landlord and Tenant.  The Term of this Lease shall commence on the Commencement Date.  Unless sooner terminated or extended as may be hereinafter provided, the Term shall end on the Expiration Date.  Landlord shall deliver the Premises to Tenant following the full execution and delivery of this Lease.  Landlord shall be deemed to have tendered possession of the Premises to Tenant upon the giving of notice by Landlord to Tenant stating that the Premises are vacant, in the condition required by this Lease and available for Tenant's occupancy.  Landlord shall allow Tenant access to the Premises prior to the Commencement Date for the purpose of Tenant installing overstandard equipment or fixtures (including Tenant's data and telephone equipment) in the Premises.  Prior to Tenant's entry into the Premises as permitted by the terms of this Section 2.2, (i) Tenant shall submit a schedule to Landlord, for its approval, which schedule shall detail the timing and purpose of Tenant's entry and (ii) Tenant shall deliver to Landlord the policies or certificates evidencing Tenant's insurance as required under the terms of Article 11 of this Lease.  Tenant shall hold Landlord harmless from and indemnify, protect and defend Landlord against any loss or damage to the Building or Premises and against injury to any persons caused by Tenant's actions pursuant to this Section 2.2.  No failure to tender possession of the Premises to Tenant on or before any particular date shall affect any other obligations of Tenant hereunder.  There shall be no postponement of the Commencement Date for any delay in the tender of possession to Tenant which results from any Tenant Delay.  At any time during the Term, Landlord may deliver to Tenant a notice in the form as set forth in **Exhibit G**, attached hereto, as a confirmation only of the information set forth therein, which Tenant shall execute and return to Landlord within five (5) business days of receipt thereof; provided,

however, Tenant's failure to execute and return such notice to Landlord within such time shall be conclusive upon Tenant that the information set forth in such notice is as specified therein.

**Section 2.3    Payment of Rent.**

**(a)    In General.**  Tenant shall pay to Landlord, without notice or demand, and without any set-off, counterclaim, abatement or deduction whatsoever, except as may be expressly set forth in this Lease, in lawful money of the United States by wire transfer of funds, (i) Fixed Rent in equal monthly installments, in advance, on the first (1st) day of each month during the Term, commencing on the Commencement Date, and (ii) Additional Rent, at the times and in the manner set forth in this Lease.

**(b)    Abated Fixed Rent.**  Notwithstanding any provision to the contrary contained in the Lease, Tenant shall be entitled to an abatement of the entirety of the Fixed Rent due for the second (2nd) through the fifth (5th) full calendar months of the Term.  The period during which Tenant shall be entitled to an abatement of Fixed Rent pursuant to the terms of this Section 2.3(b) shall be referred to herein as the "**Fixed Rent Abatement Period**".  Landlord and Tenant acknowledge that Tenant's right (the "**Fixed Rent Abatement Right**") to receive Fixed Rent abatement during the Fixed Rent Abatement Period has been granted to Tenant as additional consideration for Tenant's agreement to enter into this Lease and comply with the terms and conditions otherwise required under this Lease.  If there is an Event of Default or if this Lease is terminated for any reason other than in connection with a Landlord default, casualty or condemnation, then, in addition to any other remedies Landlord may have under this Lease, Landlord, at its option, may elect any or all of the following remedies: (i) Tenant's right to receive Fixed Rent abatement under this paragraph shall automatically be deemed terminated and of no further force or effect; (ii) Tenant shall immediately become obligated to pay to Landlord the amount of all Fixed Rent previously abated hereunder during the Fixed Rent Abatement Period or (iii) the unexpired portion of the Fixed Rent Abatement Period as of such default or termination shall be moved to the end of the Lease Term, and Tenant shall immediately be obligated to begin paying Fixed Rent at the full amounts of the monthly installments therefor set forth above.  The Fixed Rent Abatement Right set forth in this Section 2.3(b) shall be personal to the originally named Tenant hereunder (the "**Original Tenant**") and shall not inure to the benefit of any assignee, sublessee or other transferee of the Original Tenant's interest in this Lease.

**Section 2.4    Advance Rent.**  Tenant shall pay the Fixed Rent attributable to the Premises for the first (1st) and sixth (6th) through twelfth (12th) months of the Term upon the execution of this Lease (collectively, the "**Advance Rent**") (i.e., an amount equal to $51,646.00).  The Advance Rent shall be credited towards the first (1st) and sixth (6th) through twelfth (12th) months' Fixed Rent payments.  With respect to the Fixed Rent payment for the first (1st) month of the Term, if the Commencement Date is not the first (1st) day of a month, then on the Commencement Date Tenant shall pay Fixed Rent for the period from the Commencement Date through the last day of such month, and the Advance Rent shall be credited towards Fixed Rent for the next succeeding calendar month.

**Section 2.5    Access.**  Except in the event of an emergency or as otherwise specifically required pursuant to applicable Requirements or the terms of this Lease, Tenant shall be granted access to the Premises, the Building and the Building parking facility twenty-four (24) hours per day, seven (7) days per week, every day of the year, during the Term, subject to all applicable Requirements, Landlord's reasonable access control procedures, the Rules and Regulations and the terms of this Lease.

**ARTICLE 3**

**USE AND OCCUPANCY**

Tenant shall use and occupy the Premises for the Permitted Uses and for no other purpose.  Tenant shall not use or occupy or permit the use or occupancy of any part of the Premises in a manner constituting a Prohibited Use.  Tenant further covenants and agrees that Tenant shall not use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose contrary to the provisions of the Rules and Regulations set forth in **Exhibit F**, attached hereto, or in violation of any applicable Requirements.  Tenant shall not do or permit anything to be done in or about the Premises, (including,

without limitation, the installation or use of any Alterations (defined in Section 5.1, below), Equipment defined in Section 5.7, below) or any other furniture, fixture and equipment, or Supplemental HVAC Systems (defined in Section 10.12, below) in the Premises), which will in any way damage the reputation of the Building, be offensive or objectionable to Landlord or other occupants of the Building, or obstruct or interfere with the rights of other tenants or occupants of the Building, or injure or annoy them by reason of noise, odors, or vibrations.  If Tenant uses the Premises for a purpose constituting a Prohibited Use, violating any Requirement or the terms of this Article 3, or causing the Building or Project to be in violation of any Requirement or the terms of this Article 3, then Tenant shall promptly discontinue such use upon notice of such violation.  Tenant, at its expense, shall procure and at all times maintain and comply with the terms and conditions of all licenses and permits required for the lawful conduct of the Permitted Uses in the Premises.

## ARTICLE 4

## CONDITION OF THE PREMISES

Tenant has inspected the Premises and agrees (a) to accept possession of the Premises in the condition existing on the Commencement Date "as is", and (b) that Landlord has no obligation to perform any work, supply any materials, incur any expense or make any alterations or improvements to prepare the Premises for Tenant's occupancy.  Tenant's occupancy of any part of the Premises shall be conclusive evidence, as against Tenant, that Tenant has accepted possession of the Premises in its then current condition and at the time such possession was taken, the Premises, the Building and the Project were in a good and satisfactory condition as required by this Lease.

## ARTICLE 5

## ALTERATIONS

**Section 5.1    Tenant's Alterations.  (a)** Tenant shall have the right, without Landlord's prior written consent, but upon five (5) Business Days prior written notice to Landlord (which notice shall contain a description of the contemplated work), to make strictly cosmetic, non-structural additions and alterations, such as painting, wall coverings and floor coverings to the Premises that (i) do not involve the expenditure of more than Ten Thousand and No/100 Dollars ($10,000.00) in the aggregate in any twelve (12) month period, and (ii) do not contain a Design Problem (defined below) (the foregoing additions and alterations described in this sentence are collectively referred to herein as **"Decorative Alterations"**).  Except in connection with Decorative Alterations, Tenant shall not make any alterations, additions or other physical changes in or about the Premises (collectively, **"Alterations"**) without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that it shall be deemed reasonable for Landlord to withhold its consent to any Alterations that contain a Design Problem. A **"Design Problem"** is defined as and will be deemed to exist if any Alterations (i) are structural and adversely affect any Building Systems, (ii) are visible from outside of the Premises or affect the exterior appearance of the Building, (iii) affect the certificate of occupancy issued for the Building or the Premises, and/or (iv) violate any Requirement.

**(b)    Plans and Specifications.** Prior to making any Alterations (other than Decorative Alterations), Tenant, at its expense, shall (i) submit to Landlord for its approval in accordance with Section 5.1(a) above, detailed plans and specifications (**"Plans"**) of each proposed Alteration (other than Decorative Alterations), and with respect to any Alteration affecting any Building System, evidence that the Alteration has been designed by, or reviewed and approved by, Landlord's designated engineer for the affected Building System, (ii) obtain all permits, approvals and certificates required by any Governmental Authorities, (iii) furnish to Landlord duplicate original policies or certificates of worker's compensation (covering all persons to be employed by Tenant, and Tenant's contractors and subcontractors in connection with such Alteration) and commercial general liability (including property damage coverage) and business auto insurance and Builder's Risk coverage (as described in Article 11) all in such form, with such companies, for such periods and in such amounts as Landlord may reasonably require, naming Landlord, Landlord's Agent, any Lessor and any Mortgagee as additional insureds, and (iv) furnish to Landlord

reasonably satisfactory evidence of Tenant's ability to complete and to fully pay for such Alterations (other than Decorative Alterations).

        **(c)**      **Governmental Approvals.**  Tenant, at its expense, shall, as and when required, promptly obtain certificates of partial and final approval of such Alterations required by any Governmental Authority and shall furnish Landlord with copies thereof, together with "as-built" Plans for such Alterations prepared on an AutoCAD Computer Assisted Drafting and Design System (or such other system or medium as Landlord may accept), using naming conventions issued by the American Institute of Architects in June, 1990 (or such other naming conventions as Landlord may accept) and magnetic computer media of such record drawings and specifications translated in DFX format or another format acceptable to Landlord.

        **Section 5.2**      **Manner and Quality of Alterations.**  All Alterations shall be performed (a) in a good and workmanlike manner and free from defects, (b) substantially in accordance with the Plans, and by contractors designated by Landlord, (c) in compliance with all Requirements, the terms of this Lease and all construction procedures and regulations then prescribed by Landlord, and (d) at Tenant's expense. All materials and equipment shall be of first quality and at least equal to the applicable standards for the Building then established by Landlord, and no such materials or equipment (other than Tenant's Property) shall be subject to any lien or other encumbrance. Upon completion of any Alterations hereunder, Tenant shall provide Landlord with copies of all construction contracts, proof of payment for all labor and materials, and final unconditional waivers of lien from all contractors, subcontractors, materialmen, suppliers and others having lien rights with respect to such Alterations, in the form prescribed by California law. In addition, Tenant shall cause a Notice of Completion to be recorded in the Office of the Recorder of the county in which the Project is located in accordance with Section 8182 of the Civil Code of the State of California or any successor statute.

        **Section 5.3**      **Removal of Tenant's Property.**  Tenant's Property shall remain the property of Tenant and Tenant may remove the same at any time on or before the Expiration Date. On or before the Expiration Date (provided Landlord notified Tenant that Landlord may require the removal of any Specialty Alterations in the Premises at the time Landlord approved or consented to such Specialty Alterations), Tenant shall, unless otherwise directed by Landlord, at Tenant's expense, remove any Specialty Alterations and close up any slab penetrations in the Premises. Tenant shall repair and restore, in a good and workmanlike manner, any damage to the Premises, the Building or the Project caused by Tenant's removal of any Alterations or Tenant's Property or by the closing of any slab penetrations, and upon default thereof, Tenant shall reimburse Landlord for Landlord's cost of repairing and restoring such damage. Any Specialty Alterations or Tenant's Property not so removed shall be deemed abandoned and Landlord may retain or remove and dispose of same, and repair and restore any damage caused thereby, at Tenant's cost and without accountability to Tenant. All other Alterations shall become Landlord's property upon termination of this Lease.

        **Section 5.4**      **Mechanic's Liens.**  Tenant, at its expense, shall discharge any lien or charge recorded or filed against the Project in connection with any work done or claimed to have been done by or on behalf of, or materials furnished or claimed to have been furnished to, Tenant, within ten (10) days after Tenant's receipt of notice thereof by payment, filing the bond required by law or otherwise in accordance with applicable Requirements.

        **Section 5.5**      **Labor Relations.**  Tenant shall not employ, or permit the employment of, any contractor, mechanic or laborer, or permit any materials to be delivered to or used in the Building, if, in Landlord's sole judgment, such employment, delivery or use will interfere or cause any conflict with other contractors, mechanics or laborers engaged in the construction, maintenance or operation of the Building by Landlord, Tenant or others. If such interference or conflict occurs, upon Landlord's request, Tenant shall cause all contractors, mechanics or laborers causing such interference or conflict to leave the Building immediately.

        **Section 5.6**      **Tenant's Costs.**  Tenant shall pay to Landlord, upon demand, all out-of-pocket costs actually incurred by Landlord in connection with Tenant's Alterations, including costs incurred in connection with (a) Landlord's review of the Alterations (including review of requests for approval thereof),

except in connection with Decorative Alterations, and (b) the provision of Building personnel during the performance of any Alteration, to operate elevators or otherwise to facilitate Tenant's Alterations. At Landlord's request, Tenant shall deliver to Landlord reasonable supporting documentation evidencing the hard and soft costs incurred by Tenant in designing and constructing any Alterations.

**Section 5.7    Tenant's Equipment.**  Tenant shall provide notice to Landlord prior to moving any heavy machinery, heavy equipment, freight, bulky matter or fixtures (collectively, **"Equipment"**) into or out of the Building and shall pay to Landlord any costs actually incurred by Landlord in connection therewith. If such Equipment requires special handling, Tenant agrees (a) to employ only persons holding all necessary licenses to perform such work, (b) all work performed in connection therewith shall comply with all applicable Requirements and (c) such work shall be done only during hours designated by Landlord.

**Section 5.8    Compliance.**  The approval of Plans, or consent by Landlord to the making of any Alterations, does not constitute Landlord's representation that such Plans or Alterations comply with any Requirements or the terms of Article 3 of this Lease (i.e., that the same shall not obstruct or interfere with the rights of other tenants or occupants of the Building, or injure or annoy them by reason of noise, odors, or vibrations). Landlord shall not be liable to Tenant or any other party in connection with Landlord's approval of any Plans, or Landlord's consent to Tenant's performing any Alterations, and Tenant's waiver and indemnity set forth in this Lease shall specifically apply to the Plans or Alterations. If any Alterations made by or on behalf of Tenant require Landlord to make any alterations or improvements to any part of the Building or Project in order to comply with any Requirements, Tenant shall pay all costs and expenses incurred by Landlord in connection with such alterations or improvements.

**Section 5.9    Floor Load.**  Tenant shall not place a load upon any floor of the Premises that exceeds 50 pounds per square foot "live load". Landlord reserves the right to reasonably designate the position of all Equipment which Tenant wishes to place within the Premises, and to place limitations on the weight thereof.

### ARTICLE 6

### REPAIRS

**Section 6.1    Landlord's Repair and Maintenance.**  Landlord shall operate, maintain and, except as provided in Section 6.2 hereof, make all necessary repairs (both structural and nonstructural) to (i) the Base Building (defined below) and (ii) the Common Areas, in conformance with standards applicable to Comparable Buildings. For purposes of this Lease, the **"Base Building"** shall include, but not be limited, to the following: (a) roof structure and membrane; (b) exterior walls and glass; (c) floor/ceiling slabs and other structural portions of the Building, including, without limitation, the foundation, curtain wall, exterior glass, and mullions, columns, beams, shafts (including elevator shafts); and (d) Building Systems.

**Section 6.2    Tenant's Repair and Maintenance.**  Tenant shall promptly, at its expense and in compliance with Article 5 including, without limitation, the requirement that any repairs affecting any Building System be reviewed and approved by Landlord's designated engineer for the affected Building System, make all nonstructural repairs to the Premises and the fixtures, equipment and appurtenances therein (including all electrical, plumbing, heating, ventilation and air conditioning, sprinklers and life safety systems in and serving the Premises from the point of connection to the Building Systems) (collectively, **"Tenant Fixtures"**) as and when needed to preserve the Premises in good working order and condition, except for reasonable wear and tear and damage which is Landlord's obligation to repair pursuant to the express provisions of this Lease (but such obligation shall not extend to the Base Building, except to the extent otherwise required pursuant to this Section 6.2 or Section 8.1(a) below). All damage to the Building or to any portion thereof, or to any Tenant Fixtures, requiring structural or nonstructural repair caused by or resulting from any act, omission, neglect or improper conduct of a Tenant Party or the moving of Tenant's Property or Equipment into, within or out of the Premises by a Tenant Party, shall be repaired at Tenant's expense by (i) Tenant, if the required repairs are nonstructural in nature and do not affect any Building System, or (ii) Landlord, if the required repairs are structural in nature, involve replacement of exterior

EXHIBIT D    0073

window glass or affect any Building System. All Tenant repairs shall be of good quality utilizing new construction materials.

Section 6.3    **Reserved Rights.** Landlord reserves the right to make all changes, alterations, additions, improvements, repairs or replacements to the Building and/or the Project, including the Building Systems, including changing the arrangement or location of entrances or passageways, doors and doorways, corridors, elevators, stairs, toilets or other Common Areas (collectively, **"Work of Improvement"**), as Landlord deems necessary or desirable, and to take all materials into the Premises required for the performance of such Work of Improvement, provided that (a) the level of any Building service shall not decrease in any material respect from the level required of Landlord in this Lease as a result thereof (other than temporary changes in the level of such services during the performance of any such Work of Improvement), and (b) Tenant is not deprived of access to the Premises. Landlord shall use reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises during the performance of such Work of Improvement. Subject to the foregoing, there shall be no Rent abatement (except as otherwise provided in Section 26.24 below) or allowance to Tenant for a diminution of rental value, no actual or constructive eviction of Tenant, in whole or in part, no relief from any of Tenant's other obligations under this Lease, and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord, Tenant or others performing, or failing to perform, any Work of Improvement.

## ARTICLE 7

## INCREASES IN TAXES AND OPERATING EXPENSES

Section 7.1    **Definitions.** For the purposes of this Article 7, the following terms shall have the meanings set forth below:

(a)    **"Assessed Valuation"** shall mean the amount for which the Project is assessed by the County Assessor of Los Angeles, California, for the purpose of imposition of Taxes.

(b)    **"Base Operating Expenses"** shall mean the Operating Expenses for the Base Year.

(c)    **"Base Taxes"** shall mean the Taxes payable for the Base Year.

(d)    **"Comparison Year"** shall mean each calendar year commencing subsequent to the Base Year in which all or any portion of the Term falls, through and including the calendar year in which the Term expires.

(e)    **"Operating Expenses"** shall mean the aggregate of all costs and expenses paid or incurred by or on behalf of Landlord in connection with the ownership, operation, repair and maintenance of the Building, including the rental value (at customary market rates) of Landlord's Building office and capital repairs, replacements, improvements and other capital costs (collectively **"Capital Costs"**) incurred after the Base Year only if such Capital Costs either (i) are reasonably intended to result in a reduction in Operating Expenses (as for example, a labor-saving improvement), provided the amount included in Operating Expenses in any Comparison Year shall not exceed an amount equal to the savings reasonably anticipated to result from the installation and operation of such improvement, and/or (ii) is made during any Comparison Year in compliance with applicable Requirements, except for such Capital Costs to remedy a condition existing prior to the Commencement Date, which a federal, state or municipal governmental authority, if it had knowledge of such condition prior to the Commencement Date, would have then required to be remedied pursuant to the then-current applicable Requirements in their form existing as of the Commencement Date. Such Capital Costs shall be amortized (with interest at the Base Rate) on a straight-line basis over such period as Landlord shall reasonably determines in accordance with sound real estate management and accounting principles, consistently applied, and the amount included in Operating Expenses in any Comparison Year shall be equal to the annual amortized amount. Operating Expenses shall not include any Excluded Expenses. If during all or part of the Base Year or any Comparison Year,

Landlord shall not furnish any particular item(s) of work or service (which would otherwise constitute an Operating Expense) to any occupable portions of the Building for any reason, then, for purposes of computing Operating Expenses for such period, the amount included in Operating Expenses for such period shall be increased by an amount equal to the costs and expenses that would have been reasonably incurred by Landlord during such period if Landlord had furnished such item(s) of work or service to such portion of the Building.  Landlord shall exclude from Operating Expenses for the Base Year any non-recurring items. Without limiting the generality of the foregoing, if Landlord eliminates from Operating Expenses for any Comparison Year any particular type of insurance included in Operating Expenses for the Base Year, or if Landlord reduces the level of insurance coverage during any Comparison Year from that carried during the Base Year, then Landlord may adjust the amount of any insurance premium included in Operating Expenses for the Base Year to equal that amount which Landlord reasonably estimates it would have incurred had Landlord maintained similar types and levels of insurance during the Base Year as maintained by Landlord during such Comparison Year.  In determining the amount of Operating Expenses for the Base Year or any Comparison Year, if less than ninety-five percent (95%) of the Building rentable area is occupied by tenants at any time during any such Base Year or Comparison Year, Operating Expenses that vary based on occupancy shall be determined for such Base Year or Comparison Year to be an amount equal to the like expenses which would normally be expected to be incurred had such occupancy been ninety-five percent (95%) throughout the Base Year or such Comparison Year.

        **(f)**    "**Statement**" shall mean a statement containing a comparison of (i) Base Taxes and the Taxes for any Comparison Year, or (ii) Base Operating Expenses and the Operating Expenses for any Comparison Year.

        **(g)**    "**Taxes**" shall mean (i) all real estate taxes, assessments, sewer and water rents, rates and charges and other governmental levies, impositions or charges, whether general, special, ordinary, extraordinary, foreseen or unforeseen (including transit taxes, leasehold taxes or taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent), which may be assessed, levied or imposed upon all or any part of the Project, and (ii) all expenses (including reasonable attorneys' fees and disbursements and experts' and other witnesses' fees) incurred in contesting any of the foregoing or the Assessed Valuation of the Project.  Taxes shall not include (x) interest or penalties incurred by Landlord as a result of Landlord's late payment of Taxes, or (y) franchise, transfer, gift, inheritance, estate or net income taxes imposed upon Landlord.  If Landlord elects to pay any assessment in annual installments, then (i) such assessment shall be deemed to have been so divided and to be payable in the maximum number of installments permitted by law, and (ii) there shall be deemed included in Taxes for each Comparison Year the installments of such assessment becoming payable during such Comparison Year, together with interest payable during such Comparison Year on such installments and on all installments thereafter becoming due as provided by law, all as if such assessment had been so divided.  If at any time the methods of taxation prevailing on the Effective Date shall be altered so that in lieu of or as an addition to the whole or any part of Taxes, there shall be assessed, levied or imposed (1) a tax, assessment, levy, imposition or charge based on the income or rents received from the Project whether or not wholly or partially as a capital levy or otherwise, (2) a tax, assessment, levy, imposition or charge measured by or based in whole or in part upon all or any part of the Project and imposed upon Landlord, (3) a license fee measured by the rents, or (4) any other tax, assessment, levy, imposition, charge or license fee however described or imposed, including business improvement district impositions, then all such taxes, assessments, levies, impositions, charges or license fees or the part thereof so measured or based shall be deemed to be Taxes.

      **Section 7.2**    **Tenant's Tax Payment.**  **(a)**  If the Taxes payable for any Comparison Year exceed the Base Taxes, Tenant shall pay to Landlord Tenant's Proportionate Share of such excess ("**Tenant's Tax Payment**").  For each Comparison Year, Landlord shall furnish to Tenant a statement setting forth Landlord's reasonable estimate of Tenant's Tax Payment for such Comparison Year (the "**Tax Estimate**").  Tenant shall pay to Landlord on the first (1st) day of each month during such Comparison Year an amount equal to 1/12 of the Tax Estimate for such Comparison Year.  If Landlord furnishes a Tax Estimate for a Comparison Year subsequent to the commencement thereof, then (i) until the first (1st) day of the month following the month in which the Tax Estimate is furnished to Tenant, Tenant shall pay to Landlord on the first (1st) day of each month an amount equal to the monthly sum payable by Tenant to

EXHIBIT D   0075

Landlord under this Section 7.2 during the last month of the preceding Comparison Year, (ii) promptly after the Tax Estimate is furnished to Tenant or together therewith, Landlord shall give notice to Tenant stating whether the installments of Tenant's Tax Estimate previously made for such Comparison Year were greater or less than the installments of Tenant's Tax Estimate to be made for such Comparison Year in accordance with the Tax Estimate, and (x) if there shall be a deficiency, Tenant shall pay the amount thereof within 10 Business Days after demand therefor, or (y) if there shall have been an overpayment, Landlord shall credit the amount thereof against subsequent payments of Rent due hereunder, and (iii) on the first (1st) day of the month following the month in which the Tax Estimate is furnished to Tenant, and on the first (1st) day of each month thereafter throughout the remainder of such Comparison Year, Tenant shall pay to Landlord an amount equal to 1/12 of the Tax Estimate.  Landlord shall have the right, upon not less than thirty (30) days prior written notice to Tenant, to reasonably adjust the Tax Estimate from time to time during any Comparison Year.

**(b)**    As soon as reasonably practicable after Landlord has determined the Taxes for a Comparison Year, Landlord shall furnish to Tenant a Statement for such Comparison Year.  If the Statement shall show that the sums paid by Tenant under Section 7.2(a) exceeded the actual amount of Tenant's Tax Payment for such Comparison Year, Landlord shall credit the amount of such excess against subsequent payments of Rent due hereunder, or if no further payments of Rent are due hereunder, Landlord shall refund such amounts directly to Tenant.  If the Statement for such Comparison Year shall show that the sums so paid by Tenant were less than Tenant's Tax Payment for such Comparison Year, Tenant shall pay the amount of such deficiency within ten (10) Business Days after delivery of the Statement to Tenant.  The provisions of this Section 7.2 shall survive the expiration or earlier termination of the Term.

**(c)**    Only Landlord may institute proceedings to reduce the Assessed Valuation of the Project and the filings of any such proceeding by Tenant without Landlord's consent shall constitute an Event of Default.  If the Taxes payable for the Base Year are reduced, the Base Taxes shall be correspondingly revised, the Additional Rent previously paid or payable on account of Tenant's Tax Payment hereunder for all Comparison Years shall be recomputed on the basis of such reduction, and Tenant shall pay to Landlord within ten (10) Business Days after being billed therefor, any deficiency between the amount of such Additional Rent previously computed and paid by Tenant to Landlord, and the amount due as a result of such recomputations.  If Landlord receives a refund of Taxes for any Comparison Year, Landlord shall credit against subsequent payments of Rent due hereunder, an amount equal to Tenant's Proportionate Share of the refund, net of any expenses incurred by Landlord in achieving such refund, which amount shall not exceed Tenant's Tax Payment paid for such Comparison Year.  Landlord shall not be obligated to file any application or institute any proceeding seeking a reduction in Taxes or the Assessed Valuation.  The benefit of any exemption or abatement relating to all or any part of the Project shall accrue solely to the benefit of Landlord and Taxes shall be computed without taking into account any such exemption or abatement.

**(d)**    Tenant shall be responsible for any applicable occupancy or rent tax now in effect or hereafter enacted and, if such tax is payable by Landlord, Tenant shall pay such amounts to Landlord, within thirty (30) days of Landlord's demand therefor.

**(e)**    Tenant shall be obligated to make Tenant's Tax Payment regardless of whether Tenant may be exempt from the payment of any Taxes as the result of any reduction, abatement or exemption from Taxes granted or agreed to by any Governmental Authority, or by reason of Tenant's diplomatic or other tax-exempt status.

**Section 7.3    Tenant's Operating Payment.** **(a)**  If the Operating Expenses payable for any Comparison Year exceed the Base Operating Expenses, Tenant shall pay to Landlord Tenant's Proportionate Share of such excess ("**Tenant's Operating Payment**").  For each Comparison Year, Landlord shall furnish to Tenant a statement setting forth Landlord's reasonable estimate of Tenant's Operating Payment for such Comparison Year (the "**Expense Estimate**").  Tenant shall pay to Landlord on the first (1st) day of each month during such Comparison Year an amount equal to 1/12 of the Expense Estimate.  If Landlord furnishes an Expense Estimate for a Comparison Year subsequent to the commencement thereof, then (i) until the first (1st) day of the month following the month in which the

EXHIBIT D    0076

Expense Estimate is furnished to Tenant, Tenant shall pay to Landlord on the first (1st) day of each month an amount equal to the monthly sum payable by Tenant to Landlord under this Section 7.3 during the last month of the preceding Comparison Year, (ii) promptly after the Expense Estimate is furnished to Tenant or together therewith, Landlord shall give notice to Tenant stating whether the installments of Tenant's Operating Payment previously made for such Comparison Year were greater or less than the installments of Tenant's Operating Payment to be made for such Comparison Year in accordance with the Expense Estimate, and (x) if there shall be a deficiency, Tenant shall pay the amount thereof within ten (10) Business Days after demand therefor, or (y) if there shall have been an overpayment, Landlord shall credit the amount thereof against subsequent payments of Rent due hereunder, and (iii) on the first (1st) day of the month following the month in which the Expense Estimate is furnished to Tenant, and on the first (1st) day of each month thereafter throughout the remainder of such Comparison Year, Tenant shall pay to Landlord an amount equal to 1/12 of the Expense Estimate. Landlord shall have the right, upon not less than thirty (30) days prior written notice to Tenant, to reasonably adjust the Expense Estimate from time to time during any Comparison Year.

      **(b)**      On or before May 1st of each Comparison Year, Landlord shall furnish to Tenant a Statement for the immediately preceding Comparison Year. If the Statement shows that the sums paid by Tenant under Section 7.3(a) exceeded the actual amount of Tenant's Operating Payment for such Comparison Year, Landlord shall credit the amount of such excess against subsequent payments of Rent due hereunder, or if no further payments of Rent are due hereunder, Landlord shall refund such amounts directly to Tenant. If the Statement shows that the sums so paid by Tenant were less than Tenant's Operating Payment for such Comparison Year, Tenant shall pay the amount of such deficiency within ten (10) Business Days after delivery of the Statement to Tenant. The failure of Landlord to timely furnish the Statement for any Comparison Year shall not prejudice Landlord or Tenant from enforcing its rights under this Article 7. The provisions of this Section 7.3 shall survive the expiration or earlier termination of the Term.

      **Section 7.4**      **Non-Waiver; Disputes. (a)** Landlord's failure to render any Statement on a timely basis with respect to any Comparison Year shall not prejudice Landlord's right to thereafter render a Statement with respect to such Comparison Year or any subsequent Comparison Year, nor shall the rendering of a Statement prejudice Landlord's right to thereafter render a corrected Statement for that Comparison Year. Notwithstanding the foregoing, Tenant shall not be responsible for Taxes or Operating Expenses attributable to any Comparison Year which are first billed to Tenant more than one (1) calendar year after the expiration of the Term, provided that in any event Tenant shall be responsible for Taxes and Operating Expenses levied by any governmental authority or by any public utility companies at any time following the expiration of the Term which are attributable to any Comparison Year (provided that Landlord delivers to Tenant any such bill for such amounts within one (1) calendar year following Landlord's receipt of the bill therefor).

      **(b)**      Within one hundred eighty (180) days after receipt of a Statement by Tenant, Tenant or an agent of Tenant may, after reasonable notice to Landlord, inspect Landlord's records at Landlord's offices in Los Angeles. Each Statement sent to Tenant shall be conclusively binding upon Tenant unless Tenant (i) pays to Landlord when due the amount set forth in such Statement, without prejudice to Tenant's right to dispute such Statement, and (ii) within one hundred eighty (180) days after such Statement is sent, sends a notice to Landlord objecting to such Statement and specifying the reasons therefor. Tenant agrees that Tenant will not employ, in connection with any dispute under this Lease, any person or entity who is to be compensated, in whole or in part, on a contingency fee basis. If the parties are unable to resolve any dispute as to the correctness of such Statement within thirty (30) days following such notice of objection, either party may refer the issues raised to a nationally recognized public accounting firm selected by Landlord and reasonably acceptable to Tenant, and the decision of such accountants shall be conclusively binding upon Landlord and Tenant. In connection therewith, Tenant and such accountants shall execute and deliver to Landlord a confidentiality agreement, in form and substance reasonably satisfactory to Landlord, whereby such parties agree not to disclose to any third party any of the information obtained in connection with such review. Tenant shall pay the fees and expenses relating to such procedure, unless such accountants determine that Landlord overstated Operating Expenses by more than five percent (5%) for such Comparison Year, in which case Landlord shall pay such fees and

expenses. Except as provided in this Section 7.4, Tenant shall have no right whatsoever to dispute, by judicial proceeding or otherwise, the accuracy of any Statement.

**Section 7.5        Proration.** If the Commencement Date is not January 1, and provided that the Commencement Date does not occur in the Base Year, Tenant's Tax Payment and Tenant's Operating Payment for the Comparison Year in which the Commencement Date occurs shall be apportioned on the basis of the number of days in the year from the Commencement Date to the following December 31. If the Expiration Date occurs on a date other than December 31st, Tenant's Tax Payment and Tenant's Operating Payment for the Comparison Year in which such Expiration Date occurs shall be apportioned on the basis of the number of days in the period from January 1st to the Expiration Date. Upon the expiration or earlier termination of this Lease, any Additional Rent under this Article 7 shall be adjusted or paid within thirty (30) days after submission of the Statement for the last Comparison Year.

**Section 7.6        No Reduction in Rent.** In no event shall any decrease in Operating Expenses or Taxes in any Comparison Year below the Base Operating Expenses or Base Taxes, as the case may be, result in a reduction in the Fixed Rent or any component of Additional Rent payable hereunder.

**Section 7.7        Allocation of Operating Expenses and Taxes**. Landlord shall have the right, from time to time, to equitably allocate some or all of the Operating Expenses and/or Taxes for the Real Property among different portions or occupants of the Real Property and/or the Building (the "**Cost Pools**"), in Landlord's discretion. Such Cost Pools may include, but shall not be limited to, the office space tenants of the Real Property and/or the Building, and the retail space tenants of the Real Property and/or the Building. The Operating Expenses and/or Taxes allocable to each such Cost Pool shall be allocated to such Cost Pool and charged to the tenants within such Cost Pool in an equitable manner. The parties acknowledge that the Building is a part of a multi-building project and that the costs and expenses incurred in connection with the Project should be shared between the tenants of the Building and the tenants of the other buildings in the Project. Accordingly, Operating Expenses and Taxes are determined annually for the Project as a whole, and a portion of the Operating Expenses and Taxes, which portion shall be determined by Landlord on an equitable basis, shall be allocated to the tenants of the Building (as opposed to the tenants of any other buildings in the Project) and such portion shall be the Operating Expenses and Taxes for purposes of this Lease. Such portion of Operating Expenses and Taxes allocated to the tenants of the Building shall include all Operating Expenses and Taxes attributable solely to the Building and an equitable portion of the Operating Expenses and Taxes attributable to the Project as a whole.

## ARTICLE 8

## REQUIREMENTS OF LAW

Section 8.1        Compliance with Requirements.

(a)        Tenant's Compliance. Except to the extent otherwise specifically provided in this Lease, Tenant, at its expense, shall comply with all Requirements applicable to the Premises and/or Tenant's use or occupancy thereof; provided, however, that Tenant shall not be obligated to comply with any Requirements requiring any alterations to the Base Building or Common Areas unless the application of such Requirements arises from (i) the specific manner and/or nature of Tenant's use or occupancy of the Premises, as distinct from general office use, (ii) Alterations made by Tenant, or (iii) a breach by Tenant of any provisions of this Lease. Any repairs or alterations which are Tenant's responsibility hereunder and are required for compliance with applicable Requirements shall be made at Tenant's expense (1) by Tenant in compliance with Article 5 if such repairs or alterations are nonstructural and do not affect any Building System, and to the extent such repairs or alterations do not affect areas outside the Premises, or (2) by Landlord if such repairs or alterations are structural or affect any Building System, or to the extent such repairs or alterations affect areas outside the Premises. If Tenant obtains knowledge of any failure to comply with any Requirements applicable to the Premises, Tenant shall give Landlord prompt notice thereof.

**(b)    Hazardous Materials.**    Tenant shall not cause or permit (i) any Hazardous Materials to be brought onto the Project, (ii) the storage or use of Hazardous Materials in or about the Building or Premises (subject to the second sentence of this Section 8.1(b)), or (iii) the escape, disposal or release of any Hazardous Materials within or in the vicinity of the Project. Nothing herein shall be deemed to prevent Tenant's use of any Hazardous Materials customarily used in the ordinary course of office work, provided such use is in accordance with all Requirements. Tenant shall be responsible, at its expense, for all matters directly or indirectly based on, or arising or resulting from the presence of Hazardous Materials at the Project which is caused or permitted by a Tenant Party. Tenant shall provide to Landlord copies of all communications received by Tenant with respect to any Requirements relating to Hazardous Materials, and/or any claims made in connection therewith. Landlord or its agents may perform environmental inspections of the Premises at any time.

**(c)    Landlord's Compliance.**    Landlord shall comply with (or cause to be complied with) all Requirements applicable to the Base Building and the Common Areas which are not the obligation of Tenant, to the extent that non-compliance would (i) prohibit Tenant from obtaining or maintaining a certificate of occupancy for the Premises, (ii) unreasonably and materially affect the safety of Tenant's employees or create a significant health hazard for Tenant's employees, or (iii) materially impair Tenant's use and occupancy of the Premises for the Permitted Uses. All costs incurred by Landlord in connection with this Section 8.1(c) shall be included in Operating Expenses to the extent permitted under Section 7.1 of this Lease.

**(d)    Landlord's Insurance.**    Tenant shall not cause or permit any action or condition that would (i) invalidate or conflict with Landlord's insurance policies or be inconsistent with the recommendations of any of the issuers of such policies, (ii) violate applicable rules, regulations and guidelines of the Fire Department, Fire Insurance Rating Organization or any other authority having jurisdiction over the Building or Project, (iii) cause an increase in the premiums of insurance for the Building or Project over that payable with respect to Comparable Buildings, or (iv) result in Landlord's insurance companies' refusing to insure the Building or Project or any property therein in amounts and against risks as reasonably determined by Landlord. If insurance premiums increase as a result of Tenant's failure to comply with the provisions of this Section 8.1, Tenant shall promptly cure such failure and shall reimburse Landlord for the increased insurance premiums paid by Landlord as a result of such failure by Tenant.

**Section 8.2    Fire and Life Safety.**    Tenant shall maintain in good order and repair the sprinkler, fire-alarm and life-safety system in the Premises in accordance with this Lease including, without limitation, the provisions of Section 6.2 respecting any repairs affecting any Building System, the Rules and Regulations and all Requirements. If the Fire Insurance Rating Organization or any Governmental Authority or any of Landlord's insurers requires or recommends any modifications and/or alterations be made or any additional equipment be supplied in connection with the sprinkler system or fire alarm and life-safety system serving the Building by reason of Tenant's business, any Alterations performed by Tenant or the location of the partitions, Tenant's Property, or other contents of the Premises, Landlord (to the extent outside of the Premises) or Tenant (to the extent within the Premises) shall make such modifications and/or Alterations, and supply such additional equipment, in either case at Tenant's expense.

**Section 8.3    Required Disclosures Related to Accessibility Standards**.    For purposes of Section 1938(a) of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Premises have not undergone inspection by a person certified as a Certified Access Specialist (CASp). In addition, the following notice is hereby provided pursuant to Section 1938(e) of the California Civil Code: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." In furtherance of and in connection with such notice: (i) Tenant, having read such notice and

understanding Tenant's right to request and obtain a CASp inspection and with advice of counsel, hereby elects not to obtain such CASp inspection and forever waives its rights to obtain a CASp inspection with respect to the Premises, the Building and/or the Real Property to the extent permitted by applicable Requirements now or hereafter in effect; and (ii) if the waiver set forth in clause (i) hereinabove is not enforceable pursuant to applicable Requirements now or hereafter in effect, then Landlord and Tenant hereby agree as follows (which constitute the mutual agreement of the parties as to the matters described in the last sentence of the foregoing notice):  (A) Tenant shall have the one-time right to request for and obtain a CASp inspection, which request must be made, if at all, in a written notice delivered by Tenant to Landlord within thirty (30) days after the Commencement Date; (B) any CASp inspection timely requested by Tenant shall be conducted (1) between the hours of 9:00 a.m. and 5:00 p.m. on any Business Day, (2) only after ten (10) days' prior written notice to Landlord of the date of such CASp inspection, (3) in a professional manner by a CASp designated by Landlord and without any testing that would damage the Premises, the Building or the Real Property in any way, (4) in accordance with all of the provisions of this Lease applicable to Tenant contracts for construction, and (5) at Tenant's sole cost and expense, including, without limitation, Tenant's payment of the fee for such CASp inspection, the fee for any reports and/or certificates prepared by the CASp in connection with such CASp inspection (collectively, the "**CASp Reports**") and all other costs and expenses in connection therewith; (C) Landlord shall be an express third party beneficiary of Tenant's contract with the CASp, and any CASp Reports shall be addressed to both Landlord and Tenant; (D) Tenant shall deliver a copy of any CASp Reports to Landlord within two (2) Business Days after Tenant's receipt thereof; (E) any information generated by the CASp inspection and/or contained in the CASp Reports shall not be disclosed by Tenant to anyone other than (I) contractors, subcontractors and/or consultants of Tenant, in each instance who have a need to know such information and who agree in writing not to further disclose such information, or (II) any governmental entity, agency or other person, in each instance to whom disclosure is required by applicable Requirements or by regulatory or judicial process; (F) Tenant, at its sole cost and expense, shall be responsible for making any improvements, alterations, modifications and/or repairs to or within the Premises to correct violations of construction-related accessibility standards, including, without limitation, any violations disclosed by such CASp inspection; and (G) if such CASp inspection identifies any improvements, alterations, modifications and/or repairs necessary to correct violations of construction-related accessibility standards relating to those items of the Building and/or the Real Property located outside the Premises, then Tenant shall be responsible for performing any such improvements, alterations, modifications and/or repairs as and to the extent required by applicable Requirements to the extent provided Section 8.1(a) of this Lease and Landlord shall be responsible for performing any such improvements, alterations, modifications and/or repairs as and to the extent required by applicable Requirements to the extent provided in Section 8.1(c) of this Lease.

## ARTICLE 9

### SUBORDINATION

**Section 9.1    In General.**  This Lease shall be subject and subordinate to all Mortgages and Superior Leases, unless any Mortgagee or Lessor of any such Mortgages and/or Superior Leases, as applicable, require in writing that this Lease shall be superior thereto.  Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any Mortgage or deed in lieu thereof (or if any Superior Lease is terminated), to attorn to the lienholder or purchaser or any successors thereto upon any such foreclosure sale or deed in lieu thereof (or to the Lessor), if so requested to do so by such purchaser or lienholder or Lessor, and to recognize such purchaser or lienholder or Lessor as the landlord under this Lease; and upon such attornment, this Lease shall continue in full force and effect as a direct Lease between Tenant and any such lienholder or purchaser or successor.  This Section 9.1 shall be self-operative, but within ten (10) days of request from a Mortgagee (or Lessor), Tenant shall execute a commercially reasonable subordination agreement in favor of the Mortgagee (or Lessor) (i) evidencing such attornment, (ii) setting forth the terms and conditions of Tenant's tenancy, (iii) providing Tenant's tenancy will not be disturbed in the absence of a default hereunder by Tenant which is not cured within applicable periods of notice and cure hereunder, and (iv) containing such other commercially reasonable terms and conditions as may be required by such Mortgagee (or Lessor), provided such terms and conditions do not increase the Rent, materially increase Tenant's other obligations or materially and adversely affect Tenant's rights under this Lease.  Tenant hereby irrevocably authorizes Landlord to execute and deliver in the name

EXHIBIT D    0080

of Tenant any such agreement if Tenant fails to do so, provided that such authorization shall in no way relieve Tenant from the obligation of executing such agreement of subordination or superiority. Landlord's interest herein may be assigned as security at any time to any lienholder. Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

**Section 9.2    Future Condominium Declaration.**  This Lease and Tenant's rights hereunder are and will be subject and subordinate to any condominium declaration, by-laws and other instruments (collectively, the **"Declaration"**) which may be recorded regardless of the reason therefor, in order to permit a condominium form of ownership of the Building pursuant to the California Subdivision Map Act or any successor Requirement, provided that the Declaration does not by its terms increase the Rent, materially increase Tenant's non-Rent obligations or materially and adversely affect Tenant's rights under this Lease. At Landlord's request, and subject to the foregoing proviso, Tenant will execute and deliver to Landlord an amendment of this Lease confirming such subordination and modifying this Lease to conform to such condominium regime.

## ARTICLE 10

## SERVICES

**Section 10.1    Electricity.**  Subject to any Requirements or any public utility rules or regulations governing energy consumption, Landlord shall make or cause to be made, customary arrangements with utility companies and/or other suppliers of electricity to furnish electric current to the Premises for Tenant's use in accordance with the Design Standards. If Landlord reasonably determines by the use of an electrical consumption survey or by other reasonable means that Tenant is using electric current (including overhead fluorescent fixtures) in excess of 4 watts per square foot of rentable area in the Premises per month, as determined on a monthly basis (**"Excess Electrical Usage"**), then Landlord shall have the right to charge Tenant an amount equal to Landlord's reasonable estimate of Tenant's Excess Electrical Usage, and shall have the further right to install an electric current meter, sub-meter or check meter in the Premises (a "**Meter**") to measure the amount of electric current consumed in the Premises. The cost of such Meter, special conduits, wiring and panels needed in connection therewith and the installation, maintenance and repair thereof shall be paid by Tenant. Tenant shall pay to Landlord, from time to time, but no more frequently than monthly, for its Excess Electrical Usage at the Premises, plus Landlord's charge equal to ten percent (10%) of Tenant's Excess Electrical Usage for Landlord's costs of maintaining, repairing and reading such Meter. The rate to be paid by Tenant for submetered electricity shall include any taxes or other charges in connection therewith.

**Section 10.2    Excess Electricity.**  Tenant shall at all times comply with the rules and regulations of the utility company supplying electricity to the Building. Tenant shall not use any electrical equipment which, in Landlord's reasonable judgment, would exceed the capacity of the electrical equipment serving the Premises. If Landlord determines that Tenant's electrical requirements necessitate installation of any additional risers, feeders or other electrical distribution equipment (collectively, "**Electrical Equipment**"), or if Tenant provides Landlord with evidence reasonably satisfactory to Landlord of Tenant's need for excess electricity and requests that additional Electrical Equipment be installed, Landlord shall, at Tenant's expense, install such additional Electrical Equipment, provided that Landlord, in its sole judgment, determines that (a) such installation is practicable and necessary, (b) such additional Electrical Equipment is permissible under applicable Requirements, and (c) the installation of such Electrical Equipment will not cause permanent damage to the Building or the Premises, cause or create a hazardous condition, entail excessive or unreasonable alterations, interfere with or limit electrical usage by other tenants or occupants of the Building or exceed the limits of the switchgear or other facilities serving the Building, or require power in excess of that available from the utility company serving the Building. Any costs incurred by Landlord in connection with therewith shall be paid by Tenant within ten (10) days after the rendition of a bill therefor.

**Section 10.3    Elevators.**  Landlord shall provide passenger elevator service to the Premises twenty-four (24) hours per day, seven (7) days per week; provided, however, Landlord may limit passenger

elevator service during times other than Ordinary Business Hours. Landlord shall provide at least one freight elevator serving the Premises, available upon Tenant's prior request, on a non-exclusive "first come, first serve" basis with other Building tenants, on all Business Days from 7:00 a.m. to 3:30 p.m., which hours of operation are subject to change.

**Section 10.4        Heating, Ventilation and Air Conditioning.**  Landlord shall furnish to the Premises heating, ventilation and air-conditioning ("**HVAC**") in accordance with the Design Standards set forth in **Exhibit D** during Ordinary Business Hours. Landlord shall have access to all air-cooling, fan, ventilating and machine rooms and electrical closets and all other mechanical installations of Landlord (collectively, "**Mechanical Installations**"), and Tenant shall not construct partitions or other obstructions which may interfere with Landlord's access thereto or the moving of Landlord's equipment to and from the Mechanical Installations. No Tenant Party shall at any time enter the Mechanical Installations or tamper with, adjust, or otherwise affect such Mechanical Installations. Landlord shall not be responsible if the HVAC System fails to provide cooled or heated air, as the case may be, to the Premises in accordance with the Design Standards by reason of (i) any equipment installed by, for or on behalf of Tenant, which has an electrical load in excess of the average electrical load and human occupancy factors for the HVAC System as designed, or (ii) any rearrangement of partitioning or other Alterations made or performed by, for or on behalf of Tenant. Tenant agrees that, notwithstanding the proper operation of the HVAC System, Tenant's failure to keep operable windows in the Premises closed, and depending on the position of the sun during daylight hours, to lower the blinds, may affect the HVAC System's ability to meet the Design Standards. Tenant shall cooperate with Landlord and shall abide by the rules and regulations which Landlord may reasonably prescribe for the proper functioning and protection of the HVAC System.

**Section 10.5        Overtime Freight Elevators and HVAC.**  The Fixed Rent does not include any charge to Tenant for the furnishing of any freight elevator service or HVAC to the Premises during any periods other than as set forth in Section 10.3 and Section 10.4 ("**Overtime Periods**"). If Tenant desires any such services during Overtime Periods, Tenant shall deliver notice to the Building office requesting such services at least 24 hours prior to the time Tenant requests such services to be provided; provided, however, that Landlord shall use reasonable efforts to arrange such service on such shorter notice as Tenant shall provide. If Landlord furnishes freight elevator or HVAC service during Overtime Periods, Tenant shall pay to Landlord the cost thereof at the then established rates for such services in the Building.

**Section 10.6        Cleaning.**  Landlord shall cause the Premises (excluding any portions thereof used for the storage, preparation, service or consumption of food or beverages, as an exhibition area or classroom, for storage, as a shipping room, mail room or similar purposes, for private bathrooms, showers or exercise facilities, as a trading floor, or primarily for operation of computer, data processing, reproduction, duplicating or similar equipment) to be cleaned, substantially in accordance with the standards set forth in **Exhibit E**. Any areas of the Premises which Landlord is not required to clean hereunder or which require additional cleaning shall be cleaned, at Tenant's expense, by Landlord's cleaning contractor, at rates which shall be competitive with rates of other cleaning contractors providing comparable services to Comparable Buildings. Landlord's cleaning contractor and its employees shall have access to the Premises at all times except between 8:00 a.m. and 5:30 p.m. on weekdays which are not Observed Holidays.

**Section 10.7        Water.**  Landlord shall provide water in the core lavatories on each floor of the Building. If Tenant requires water for any additional purposes, Tenant shall pay for the cost of bringing water to the Premises and Landlord may install a meter to measure the water. Tenant shall pay the cost of such installation, and for all maintenance, repairs and replacements thereto, and for the reasonable charges of Landlord for the water consumed.

**Section 10.8        Refuse Removal.**  Landlord shall provide refuse removal services at the Building for ordinary office refuse and rubbish. Tenant shall pay to Landlord, Landlord's reasonable charge for such removal to the extent that the refuse generated by Tenant exceeds the refuse customarily generated by general office tenants. Tenant shall not dispose of any refuse in the Common Areas, and if Tenant does so, Tenant shall be liable for Landlord's reasonable charge for such removal.

**Section 10.9        Signage.**

**(a)** **Entry Signage**. If other tenants occupy space on the floor on which the Premises is located, Tenant's identifying signage shall be provided by Landlord, at Landlord's cost, and such signage shall be comparable to that used by Landlord for other similar floors in the Building and shall comply with Landlord's then-current Building standard signage program.

**(b)** **Directory**. The lobby shall contain a directory wherein the Building's tenants shall be listed. Tenant shall be entitled to a proportionate share of such listings, based on the rentable square footage of the Premises. From time to time, but not more frequently than monthly, Landlord shall update the directory to reflect such changes in the listings therein as Tenant shall request.

**Section 10.10** **Telecommunications.** If Tenant requests that Landlord grant access to the Building to a telecommunications service provider designated by Tenant for purposes of providing telecommunications services to Tenant, Landlord shall use its good faith efforts to respond to such request within thirty (30) days. Tenant acknowledges that nothing set forth in this Section 10.10 shall impose any affirmative obligation on Landlord to grant such request and that Landlord, in its sole discretion, shall have the right to determine which telecommunications service providers shall have access to Building facilities.

**Section 10.11** **Service Interruptions.** Landlord reserves the right to suspend any service when necessary, by reason of Unavoidable Delays, accidents or emergencies, or for any Work of Improvement which, in Landlord's reasonable judgment, is necessary or appropriate, until such Unavoidable Delay, accident or emergency shall cease or such Work of Improvement is completed and Landlord shall not be liable for any interruption, curtailment or failure to supply services, except as otherwise provided in Section 26.24 below. Landlord shall use reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises as a result of any such interruption, curtailment or failure of or defect in such service, or change in the supply, character and/or quantity of, electrical service, and to restore any such services, remedy such situation and minimize any interference with Tenant's business. The exercise of any such right or the occurrence of any such failure by Landlord shall not constitute an actual or constructive eviction, in whole or in part, entitle Tenant to any compensation, abatement or diminution of Rent (except as otherwise provided in Section 26.24 below), relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or any Indemnified Party by reason of inconvenience to Tenant, or interruption of Tenant's business, or otherwise. Subject to Section 26.24 below, Landlord shall not be liable in any way to Tenant for any failure, defect or interruption of, or change in the supply, character and/or quantity of, electric service furnished to the Premises for any reason except if attributable to the gross negligence or willful misconduct of Landlord.

## ARTICLE 11

## INSURANCE; PROPERTY LOSS OR DAMAGE

**Section 11.1** **Tenant's Insurance. (a)** Prior to the date Landlord delivers possession of the Premises to Tenant and continuing thereafter throughout the Term, Tenant, at its expense, shall obtain and maintain in full force and effect the following insurance policies throughout the Term:

**(i)** **Commercial General Liability (CGL) Insurance** on an occurrence basis covering liability arising from premises operations, independent contractors, product-completed operations, personal injury, advertising injury, bodily injury, death and/or property damage occurring in or about the Building, under which Tenant is insured and Landlord, Landlord's Agent and any Lessors and any Mortgagees whose names have been furnished to Tenant are named as additional insureds (the "**Insured Parties**"). Such insurance shall provide primary coverage without contribution from any other insurance or self-insurance carried by or for the benefit of the Insured Parties, and such insurance shall include blanket broad-form contractual liability coverage. The minimum limits of liability applying exclusively to the Premises shall be a combined single limit with respect to each occurrence in an amount of not less than Three Million and No/100 Dollars ($3,000,000.00). If CGL contains a general aggregate limit, it shall apply separately to this location. Landlord shall retain the right to require Tenant to increase such coverage from time to time to that amount of insurance which in Landlord's reasonable judgment is then being customarily

EXHIBIT D    0083

required by landlords for similar office space in Comparable Buildings.  There shall be no deductible or self-insurance without the prior written consent of Landlord;

      **(ii)**      **All-Risk Commercial Property Insurance (Including the Perils of Flood and Earthquake)** insuring Tenant's Property (as defined in **Exhibit B**) and the Tenant-Insured Improvements (as defined in **Exhibit B**), for the full replacement cost thereof, having a deductible amount, if any, not in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) without the prior written consent of Landlord.  Flood and earthquake coverage insuring Tenant's Property and the Tenant-Insured Improvements with a limit as close to the full replacement cost of such property covered as is reasonably available shall be provided.  The Insured Parties shall be included as loss payee(s) with respect to the Tenant-Insured Improvements;

      **(iii)**      **Builder's Risk** during the performance of any Alteration, until completion thereof, on an "All Risk" basis, including a permission to complete and occupy, and flood, including resulting water damage, endorsements, for full replacement cost covering the interest of Landlord and Tenant (and their respective contractors and subcontractors) in all work incorporated in the Building and all materials and equipment in or about the Premises, or evidence of such coverage under the property insurance policies set forth in (ii) above.  The Insured Parties shall be named as additional insureds;

      **(iv)**      **Workers' Compensation Benefits Insurance and Employer's Liability Insurance**, with Worker's Compensation Benefits Insurance as required by law and Employer's Liability Insurance with a limit not less than One Million and No/100 Dollars ($1,000,000.00) each accident for bodily injury by accident and One Million and No/100 Dollars ($1,000,000.00) each employee for bodily injury by disease.  A deductible or self-insured retention for such policy shall not exceed Twenty-Five Thousand and No/100 Dollars ($25,000.00) without the prior written consent of Landlord;

      **(v)**      **Business Interruption Insurance** covering a minimum of one (1) year of anticipated gross Rent; and

      **(vi)**      such other insurance in such amounts as the Insured Parties may reasonably require from time to time.

      **(b)**      All insurance required to be carried by Tenant shall contain a provision that the Insured Parties receive thirty (30) days' prior written notice in advance of any termination or material change to the policies that would affect the interest of any of the Insured Parties and shall be effected under valid and enforceable policies issued by reputable insurers authorized to do business in the State of California and rated in AM Best's Insurance Guide, or any successor thereto as having an AM Best's Rating of "A" or better and a Financial Size Category of at least "X" or better, or, if such ratings are not then in effect, the equivalent thereof or such other financial rating as Landlord may at any time consider appropriate.

      **(c)**      On or prior to the Commencement Date, Tenant shall deliver to Landlord appropriate certificates of insurance that evidence insurance required to be covered by this Article 11, the waivers of subrogation required by Section 11.2 below, the Insured Parties are named as additional insureds/loss payees as required pursuant to this Article 11, and the commercial general liability is primary, non-contributory, and not excess of any other valid and collectible insurance.  Evidence of each renewal or replacement policies shall be delivered by Tenant to Landlord at least ten (10) days after the expiration of the policies.

      **(d)**      By requiring insurance herein, Landlord does not represent that coverage and limits will necessarily be adequate to protect Tenant, and such coverage and limits shall not be deemed a limitation on or transfer of Tenant's liability under the indemnities granted to Landlord in this contract.

      **(e)**      All rights that inure to the benefit of the Landlord shall not be prejudiced by the expiration of the Lease.

(f)    Tenant may satisfy the limits of liability required herein with a combination of umbrella and/or excess policies of insurance where applicable, provided that such policies comply with all of the provisions hereof (including, without limitation, with respect to scope of coverage and naming of the Insured Parties as additional insureds).

**Section 11.2    Waiver of Subrogation.**    Landlord and Tenant shall have no liability to one another, or to any insurer, by way of subrogation or otherwise, on account of any loss or damage to their respective property, the Premises or its contents or the Building, regardless of whether such loss or damage is caused by the negligence of Landlord or Tenant, arising out of any of the perils or casualties insured against by the property insurance policies carried, or required to be carried, by the parties pursuant to this Lease, but only to the extent covered by such insurance policies carried, or required to be carried, by the parties pursuant to this Lease.  In addition, Landlord and Tenant shall have no liability to one another for any deductible amount carried under any policy, except with respect to Tenant's reimbursement of deductible amounts to Landlord as a part of Operating Expenses in accordance with Article 7 above.  The insurance policies obtained by Landlord and Tenant pursuant to this Lease, shall permit waivers of subrogation which the insurer may otherwise have against the non-insuring party.  In the event the policy or policies do not include blanket waiver of subrogation prior to loss, either Landlord or Tenant shall, at the request of the other party, arrange and deliver to the requesting party a waiver of subrogation endorsement in such form and content as may reasonably be required by the requesting party or its insurer.  Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for, (i) damage to any Tenant-Insured Improvements, (ii) Tenant's Property, and (iii) any loss suffered by Tenant due to interruption of Tenant's business.

**Section 11.3    Restoration.  (a)** If the Premises are damaged by fire or other casualty, or if the Building is damaged such that Tenant is deprived of reasonable access to the Premises, the damage shall be repaired by Landlord, to substantially the condition of the Premises prior to the damage, subject to the provisions of any Mortgage or Superior Lease and only to the extent that such repairs can be reasonably made from the net proceeds of any insurance actually received by Landlord, but Landlord shall have no obligation to repair or restore (i) Tenant's Property or (ii) except as provided in Section 11.3(b), any Tenant-Insured Improvements.  So long as Tenant is not in default beyond applicable grace or notice provisions in the payment or performance of its obligations under this Section 11.3, and provided Tenant timely delivers to Landlord either Tenant's Restoration Payment (as hereinafter defined) or the Restoration Security (as hereinafter defined) or Tenant expressly waives any obligation of Landlord to repair or restore any of Tenant's Tenant-Insured Improvements, then until the restoration of the Premises is Substantially Completed or would have been Substantially Completed but for Tenant Delay, Fixed Rent, Tenant's Tax Payment and Tenant's Operating Payment shall be reduced in the proportion by which the area of the part of the Premises which is not usable (or accessible ) and is not used by Tenant bears to the total area of the Premises; provided, however, in the event that Tenant is prevented from using, and does not use, a portion of the Premises and the remaining portion of the Premises is not sufficient to allow Tenant to effectively conduct its business therein, and if Tenant does not conduct its business from such remaining portion, then for such time during which Tenant is so prevented from effectively conducting its business therein, the Fixed Rent, Tax Payment and Operating Payment for the entire Premises shall be abated for such time as Tenant continues to be so prevented from using, and does not use, the Premises.  If this Lease is terminated in connection with any fire or casualty and Tenant has obtained and maintained the insurance policies required under Section 11.1 of this Lease, then Tenant shall assign to Landlord all insurance proceeds payable to Tenant in connection with the Tenant-Insured Improvements.  In addition, if this Lease is terminated in connection with any fire or casualty and Tenant has not obtained or maintained the insurance policies required under Section 11.1 of this Lease, then Tenant shall pay to Landlord an amount equal to the amount of the insurance proceeds that otherwise would have been payable to Tenant had Tenant complied with the insurance requirements set forth herein, provided that the foregoing shall not be applicable to Tenant's Property.

(b)    As a condition precedent to Landlord's obligation to repair or restore any Tenant-Insured Improvements, Tenant shall (i) pay to Landlord upon demand a sum ("**Tenant's Restoration Payment**") equal to the amount, if any, by which (A) the cost, as estimated by a reputable independent contractor designated by Landlord, of repairing and restoring all Alterations and improvements in the

EXHIBIT D    0085

Premises to their condition prior to the damage, exceeds (B) the cost of restoring the Premises with Building Standard Installations, or (ii) furnish to Landlord security (the "**Restoration Security**") in form and amount reasonably acceptable to Landlord to secure Tenant's obligation to pay all costs in excess of restoring the Premises with Building Standard Installations.  If Tenant shall fail to deliver to Landlord either (1) Tenant's Restoration Payment or the Restoration Security, as applicable, or (2) a waiver by Tenant, in form satisfactory to Landlord, of all of Landlord's obligations to repair or restore any of the Tenant-Insured Improvements, in either case within fifteen (15) days after Landlord's demand therefor, Landlord shall have no obligation to restore any Tenant-Insured Improvements and Tenant's abatement of Fixed Rent, Tenant's Tax Payment and Tenant's Operating Payment shall cease when the restoration of the Premises (other than any Tenant-Insured Improvements) is Substantially Complete.

Section 11.4    Landlord's Termination Right.    Notwithstanding anything to the contrary contained in Section 11.3, (a) if the Premises are totally damaged or are rendered wholly untenantable, (b) if the Building shall be so damaged that, in Landlord's reasonable opinion, substantial alteration, demolition, or reconstruction of the Building shall be required (whether or not the Premises are so damaged or rendered untenantable), (c) if any Mortgagee shall require that the insurance proceeds or any portion thereof be used to retire the Mortgage debt or any Lessor shall terminate the Superior Lease, as the case may be, or (d) if the damage is not fully covered, except for deductible amounts, by Landlord's insurance policies, then in any of such events, Landlord may, not later than sixty (60) days following the date of the damage, terminate this Lease by notice to Tenant.  If this Lease is so terminated, (a) the Term shall expire upon the thirtieth (30th) day after such notice is given, (b) Tenant shall vacate the Premises and surrender the same to Landlord, (c) Tenant's liability for Rent shall cease as of the date of the damage, and (d) any prepaid Rent for any period after the date of the damage shall be refunded by Landlord to Tenant.

Section 11.5    Tenant's Termination Right. If the Premises are totally damaged and are thereby rendered wholly untenantable, or if the Building shall be so damaged that Tenant is deprived of reasonable access to the Premises, and if Landlord elects to restore the Premises, Landlord shall, within sixty (60) days following the date of the damage, cause a contractor or architect selected by Landlord to give notice (the "**Restoration Notice**") to Tenant of the date by which such contractor or architect estimates the restoration of the Premises (excluding any Tenant-Insured Improvements) shall be Substantially Completed.  If such date, as set forth in the Restoration Notice, is more than twelve (12) months from the date of such damage, then Tenant shall have the right to terminate this Lease by giving notice (the "**Termination Notice**") to Landlord not later than thirty (30) days following delivery of the Restoration Notice to Tenant.  If Tenant delivers a Termination Notice, this Lease shall be deemed to have terminated as of the date of the giving of the Termination Notice, in the manner set forth in the second sentence of Section 11.4.

Section 11.6    Final 18 Months. Notwithstanding anything to the contrary in this Article 11, if any damage during the final eighteen (18) months of the Term renders the Premises wholly untenantable, either Landlord or Tenant may terminate this Lease by notice to the other party within thirty (30) days after the occurrence of such damage and this Lease shall expire on the thirtieth (30th) day after the date of such notice.  For purposes of this Section 11.6, the Premises shall be deemed wholly untenantable if Tenant shall be precluded from using more than fifty percent (50%) of the Premises for the conduct of its business and Tenant's inability to so use the Premises is reasonably expected to continue for more than ninety (90) days.

Section 11.7    Landlord's Liability.    Any Building employee to whom any property shall be entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to such property and neither Landlord nor its agents shall be liable for any damage to such property, or for the loss of or damage to any property of Tenant by theft or otherwise.  None of the Insured Parties shall be liable for any injury or damage to persons or property or interruption of Tenant's business resulting from fire or other casualty, any damage caused by other tenants or persons in the Building or by construction of any private, public or quasi-public work, or any latent defect in the Premises, in the Building or in the Project (except that Landlord shall be required to repair the same to the extent provided in Article 6).  No penalty shall accrue for delays which may arise by reason of adjustment of casualty insurance on the part of Landlord or Tenant, or for any Unavoidable Delays arising from any repair or restoration of any portion of

the Building, provided that Landlord shall use reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises during the performance of any such repair or restoration.

## ARTICLE 12

## EMINENT DOMAIN

### Section 12.1    Taking.

(a)    **Total Taking.**  If all or substantially all of the Project, the Building or the Premises shall be acquired or condemned for any public or quasi-public purpose (a "**Taking**"), this Lease shall terminate and the Term shall end as of the earlier of (i) the date possession is taken or (ii) the date of the vesting of title and Rent shall be prorated and adjusted as of such date.

(b)    **Partial Taking.**  Upon a Taking of only a part of the Project, the Building or the Premises then, except as hereinafter provided in this Article 12, this Lease shall continue in full force and effect, provided that from the earlier of (i) the date possession is taken or (ii) the date of the vesting of title, Fixed Rent and Tenant's Proportionate Share shall be modified to reflect the reduction of the Premises and/or the Building as a result of such Taking.

(c)    **Landlord's Termination Right.**  Whether or not the Premises are affected, Landlord may, be notice to Tenant, terminate this Lease upon a Taking of all or a portion of the Project, the Building or the Premises.

(d)    **Tenant's Termination Right.**  If the part of the Project so Taken contains more than twenty percent (20%) of the total area of the Premises occupied by Tenant immediately prior to such Taking, or if, by reason of such Taking, Tenant no longer has reasonable means of access to the Premises, Tenant may terminate this Lease by notice to Landlord given within thirty (30) days following the date upon which Tenant is given notice of such Taking.  If Tenant so notifies Landlord, this Lease shall end and expire upon the thirtieth (30th) day following the giving of such notice.  If a part of the Premises shall be so Taken and this Lease is not terminated in accordance with this Section 12.1 Landlord, without being required to spend more than it collects as an award, shall, subject to the provisions of any Mortgage or Superior Lease, restore that part of the Premises not so Taken to a self-contained rental unit substantially equivalent (with respect to character, quality, appearance and services) to that which existed immediately prior to such Taking, excluding Tenant's Property and any Tenant-Insured Improvements.

(e)    **Apportionment of Rent.**  Upon any termination of this Lease pursuant to the provisions of this Article 12, Rent shall be apportioned as of, and shall be paid or refunded up to and including, the date of such termination.

### Section 12.2    **Awards.**  Upon any Taking, Landlord shall receive the entire award for any such Taking, and Tenant shall have no claim against Landlord or the condemning authority for the value of any unexpired portion of the Term or Tenant's Alterations; and Tenant hereby assigns to Landlord all of its right in and to such award.  Nothing contained in this Article 12 shall be deemed to prevent Tenant from making a separate claim in any condemnation proceedings for the then value of any Tenant's Property or Tenant-Insured Improvements included in such Taking and for any moving expenses, provided any such award is in addition to, and does not result in a reduction of, the award made to Landlord.

### Section 12.3    **Temporary Taking.**  If all or any part of the Premises is Taken temporarily during the Term for any public or quasi-public use or purpose, Tenant shall give prompt notice to Landlord and the Term shall not be reduced or affected in any way and Tenant shall continue to pay all Rent payable by Tenant without reduction or abatement and to perform all of its other obligations under this Lease, except to the extent prevented from doing so by the condemning authority, and Tenant shall be entitled to receive any award or payment from the condemning authority for such use, which shall be received, held and applied by Tenant as a trust fund for payment of the Rent falling due.

## ARTICLE 13

### ASSIGNMENT AND SUBLETTING

**Section 13.1    Consent Requirements.**

        **(a)    No Transfers.**  Except as expressly set forth herein, Tenant shall not assign, mortgage, pledge, encumber, or otherwise transfer this Lease, whether by operation of law or otherwise, and shall not sublet, or permit, or suffer the Premises or any part thereof to be used or occupied by others (whether for desk space, mailing privileges or otherwise), without Landlord's prior consent in each instance, which consent shall not be unreasonably withheld, conditioned or delayed.  Any assignment, sublease, mortgage, pledge, encumbrance or transfer in contravention of the provisions of this Article 13 shall be void and shall constitute an Event of Default.

        **(b)    Collection of Rent.**  If, without Landlord's consent, this Lease is assigned, or any part of the Premises is sublet or occupied by anyone other than Tenant or this Lease is encumbered (by operation of law or otherwise), Landlord may collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved.  No such collection shall be deemed a waiver of the provisions of this Article 13, an acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the performance of Tenant's covenants hereunder, and in all cases Tenant shall remain fully liable for its obligations under this Lease.

        **(c)    Further Assignment/Subletting.**  Landlord's consent to any assignment or subletting shall not relieve Tenant from the obligation to obtain Landlord's consent to any further assignment or subletting.  In no event shall any permitted subtenant assign or encumber its sublease or further sublet any portion of its sublet space, or otherwise suffer or permit any portion of the sublet space to be used or occupied by others without Landlord's prior written consent.

**Section 13.2    Tenant's Notice.**  If Tenant desires to assign this Lease or sublet all or any portion of the Premises (sometimes referred to herein as a "**Transfer**"), Tenant shall give notice thereof to Landlord, which shall be accompanied by (a) with respect to an assignment of this Lease, the date Tenant desires the assignment to be effective, and (b) with respect to a sublet of all or a part of the Premises, a description of the portion of the Premises to be sublet, the commencement date of such sublease and the rent per rentable square foot Tenant will ask for such portion of the Premises ("**Tenant's Asking Rate**").  If the proposed transaction is an assignment of this Lease or a subletting of the entire Premises, such notice shall be deemed an irrevocable offer from Tenant to Landlord of the right, at Landlord's option, to terminate this Lease with respect to the entire Premises.  Such option may be exercised by notice from Landlord to Tenant within forty-five (45) days after delivery of Tenant's notice.  If Landlord exercises its option to terminate this Lease, (a) this Lease shall end and expire on the date that such assignment or sublease was to commence, provided that such date is in no event earlier than ninety (90) days after the date of the above notice unless Landlord agrees to such earlier date, (b) Rent shall be apportioned, paid or refunded as of such date, (c) Tenant, upon Landlord's request, shall enter into an amendment of this Lease ratifying and confirming such termination, and (d) Landlord shall be free to lease the Premises (or any part thereof) to Tenant's prospective assignee or subtenant or to any other party.

**Section 13.3    Intentionally Omitted.**

**Section 13.4    Conditions to Assignment/Subletting.**

        **(a)**    If Landlord does not exercise either of Landlord's options provided under Section 13.2, Landlord's consent to the proposed assignment or subletting shall not be unreasonably withheld or delayed.  Such consent shall be granted or denied within ten (10) business days after delivery to Landlord of (i) a true and complete statement reasonably detailing the identity of the proposed assignee or subtenant ("**Transferee**"), the nature of its business and its proposed use of the Premises, (ii) current financial information with respect to the Transferee, including its most recent financial statements, (iii) all of the terms of the proposed Transfer and the consideration therefor, together with a copy of all existing executed and/or

proposed documentation pertaining to the proposed Transfer, including the final operative documents executed to evidence such Transfer and such other agreements incidental or related to such Transfer, provided that Landlord shall have the right to require Tenant to utilize Landlord's standard Transfer documents in connection with the documentation of such Transfer, and (iv) any other information Landlord may reasonably request (items (i) through (iv) shall collectively be referred to herein as the "**Transfer Documents**"), provided that:

(i)    in Landlord's reasonable judgment, the Transferee is engaged in a business or activity, and the Premises will be used in a manner, which (1) is in keeping with the then standards of the Project, (2) is for the Permitted Uses, and (3) does not violate any restrictions set forth in this Lease, any Mortgage or Superior Lease or any negative covenant as to use of the Premises required by any other lease in the Project;

(ii)    the Transferee is reputable with sufficient financial means to perform all of its obligations under this Lease or the sublease, as the case may be;

(iii)    if Landlord has, or reasonably expects to have within six (6) months thereafter, comparable space available in the Project, neither the Transferee nor any person or entity which, directly or indirectly, controls, is controlled by, or is under common control with, the Transferee is then an occupant of the Project;

(iv)    the Transferee is not a person or entity (or affiliate of a person or entity) with whom Landlord is then or has been within the prior six (6) months negotiating in connection with the rental of space in the Project;

(v)    there shall be not more than 2 subtenants in each floor of the Premises;

(vi)    Tenant shall, upon demand, reimburse Landlord for all reasonable expenses incurred by Landlord in connection with such assignment or sublease, including any investigations as to the acceptability of the Transferee and all legal costs reasonably incurred in connection with the granting of any requested consent, but in no event in an amount exceeding Two Thousand Five Hundred and No/100 Dollars ($2,500.00) for a Transfer in the ordinary course of business;

(vii)    Tenant shall not list the Premises to be sublet or assigned at a rental rate less than the Market Sub-rent;

(viii)    the proposed Transfer is either a sublease or a non-collateral complete assignment;

(ix)    the proposed Transfer would not cause Landlord to be in violation of any Requirements or any other lease, Mortgage, Superior Lease or agreement to which Landlord is a party and would not give a tenant of the Project a right to cancel its lease;

(x)    the Transferee shall not be either a governmental agency or an instrumentality thereof, nor shall the Transferee be entitled, directly or indirectly, to diplomatic or sovereign immunity, regardless of whether the Transferee agrees to waive such diplomatic or sovereign immunity, and shall be subject to the service of process in, and the jurisdiction of the courts of, the County of Los Angeles, and State of California;

(xi)    the Transferee shall not be an electronic gaming company; and

(xii)    Landlord has received assurances acceptable to Landlord in its sole discretion that all past due amounts owing from Tenant to Landlord, if any, will be paid and all defaults on the part of Tenant, if any, will be cured prior to the effective date of the proposed Transfer.

The parties hereby agree, without limitation as to other reasonable grounds for withholding consent, that it shall be reasonable under this Lease and under applicable Requirements for Landlord to withhold consent to any proposed Transfer based upon any of the foregoing criteria.

In the event that Landlord fails to provide its approval or disapproval of a proposed Transfer within ten (10) Business Days after delivery to Landlord of all of the Transfer Documents, and Tenant's Transfer Documents included the following statement in bold and capital letters: **"THIS IS A REQUEST FOR LANDLORD'S CONSENT PURSUANT TO THE TERMS OF SECTION 13.4: IF LANDLORD FAILS TO GRANT OR DENY ITS CONSENT WITHIN TEN (10) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE, THEN LANDLORD SHALL BE DEEMED TO HAVE CONSENTED TO THE PROPOSED TRANSFER"**, then Tenant's proposed Transfer shall be deemed approved.

**(b)**    With respect to each and every subletting and/or assignment approved by Landlord under the provisions of this Lease:

**(i)**    the form of the proposed assignment or sublease shall be reasonably satisfactory to Landlord;

**(ii)**    no sublease shall be for a term ending later than one (1) day prior to the Expiration Date;

**(iii)**    no Transferee shall take possession of any part of the Premises until an executed counterpart of such sublease or assignment has been delivered to Landlord and approved by Landlord as provided in Section 13.4(a); and

**(iv)**    each sublease shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate; and Tenant and each Transferee shall be deemed to have agreed that upon the occurrence and during the continuation of an Event of Default hereunder, Tenant has hereby assigned to Landlord, and Landlord may, at its option, accept such assignment of, all right, title and interest of Tenant as sublandlord under such sublease, together with all modifications, extensions and renewals thereof then in effect and such Transferee shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be (A) liable for any previous act or omission of Tenant under such sublease, (B) subject to any counterclaim, offset or defense not expressly provided in such sublease or which theretofore accrued to such Transferee against Tenant, (C) bound by any previous modification of such sublease not consented to by Landlord or by any prepayment of more than one (1) month's rent, (D) bound to return such Transferee's security deposit, if any, except to the extent Landlord shall receive actual possession of such deposit and such Transferee shall be entitled to the return of all or any portion of such deposit under the terms of its sublease, or (E) obligated to make any payment to or on behalf of such Transferee, or to perform any work in the sublet space or the Building or Project, or in any way to prepare the subleased space for occupancy, beyond Landlord's obligations under this Lease.  The provisions of this Section 13.4(b)(iv) shall be self-operative, and no further instrument shall be required to give effect to this provision, provided that the Transferee shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such subordination and attornment.

**Section 13.5    Binding on Tenant; Indemnification of Landlord.**    Notwithstanding any assignment or subletting or any acceptance of rent by Landlord from any Transferee, Tenant and any guarantor shall remain fully liable for the payment of all Rent due and for the performance of all the covenants, terms and conditions contained in this Lease on Tenant's part to be observed and performed, and any default under any term, covenant or condition of this Lease by any Transferee or anyone claiming under or through any Transferee shall be deemed to be a default under this Lease by Tenant.  Tenant shall indemnify, defend, protect and hold harmless Landlord from and against any and all Losses resulting from any claims that may be made against Landlord by the Transferee or anyone claiming under or through any Transferee or by any brokers or other persons or entities claiming a commission or similar compensation in connection with the proposed assignment or sublease, irrespective of whether Landlord shall give or

EXHIBIT D   0090

decline to give its consent to any proposed assignment or sublease, or if Landlord shall exercise any of its options under this Article 13.

**Section 13.6    Tenant's Failure to Complete.** If Landlord consents to a proposed assignment or sublease and Tenant fails to execute and deliver to Landlord such assignment or sublease within ninety (90) days after the giving of such consent, or the amount of space subject to any such sublease varies by more than ten (10%) from that specified in the notice given by Tenant to Landlord pursuant to Section 13.2, or the net effective rent payable under such sublease is less than ninety-five percent (95%) of Tenant's Asking Rate, or if there are any changes in the terms and conditions of the proposed assignment or sublease such that Landlord would initially have been entitled to refuse its consent to such Transfer under this Article 13, then Tenant shall again comply with all of the provisions and conditions of Sections 13.2 and 13.4 before assigning this Lease or subletting all or part of the Premises.

**Section 13.7    Profits.** If Tenant enters into any assignment or sublease permitted hereunder or consented to by Landlord, Tenant shall, within sixty (60) days of Landlord's consent to such assignment or sublease (but not as to any assignment or subletting which does not require Landlord's consent under Section 13.8 below), deliver to Landlord a list of Tenant's reasonable third-party brokerage fees, legal fees and architectural fees and improvement costs paid or to be paid in connection with such transaction, reasonable marketing costs and, in the case of any sublease, any actual costs incurred by Tenant in connection with such sublease, including separately demising the sublet space (collectively, "**Transaction Costs**"), together with a list of all of Tenant's Property to be transferred to such Transferee; provided, however, that Transaction Costs shall not include any rent paid by Tenant to Landlord, including with respect to the period Tenant is marketing the premises or any portion thereof for sublease. The Transaction Costs shall be amortized, on a straight-line basis, over the term of any sublease. Tenant shall deliver to Landlord evidence of the payment of such Transaction Costs promptly after the same are paid. In consideration of such assignment or subletting, Tenant shall pay to Landlord:

      **(a)**    In the case of an assignment, on the effective date of the assignment, fifty percent (50%) of all sums and other consideration paid to Tenant by the Transferee for or by reason of such assignment (including key money, bonus money and any sums paid for services rendered by Tenant to the Transferee in excess of fair market value for such services and sums paid for the sale or rental of Tenant's Property, less the then fair market or rental value thereof, as reasonably determined by Landlord) after first deducting the Transaction Costs; or

      **(b)**    In the case of a sublease, fifty percent (50%) of any consideration payable under the sublease to Tenant by the Transferee which exceeds on a per square foot basis the Fixed Rent, Tenant's Tax Payment and Tenant's Operating Payment accruing during the term of the sublease in respect of the sublet space (together with any sums paid for services rendered by Tenant to the Transferee in excess of fair market value for such services and sums paid for the sale or rental of Tenant's Property, less the then fair market or rental value thereof, as reasonably determined by Landlord) after first deducting the monthly amortized amount of Transaction Costs. The sums payable under this clause shall be paid by Tenant to Landlord monthly as and when paid by the subtenant to Tenant.

The amount payable under this Section 13.7 with respect to any particular Transfer is sometimes referred to herein as the "**Transfer Premium.**" Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof. If the Transfer Premium respecting any Transfer shall be found understated, such event shall, at Landlord's option, be deemed to be an uncurable Event of Default (as such term is defined in Section 15.1 below) and Tenant shall, within thirty (30) days after demand, pay the deficiency, and if understated by more than five percent (5%), Tenant shall pay Landlord's costs of such audit.

**Section 13.8    Transfers.**

      **(a)**    **Related Entities.** If Tenant is a legal entity, the transfer (by one or more transfers), directly or indirectly, by operation of law or otherwise, of a majority of the stock or other beneficial ownership

interest in Tenant (collectively, "**Ownership Interests**") or of all or substantially all of the assets of Tenant shall be deemed a voluntary assignment of this Lease; provided, however, that the provisions of this Article 13 shall not apply to the transfer of Ownership Interests in Tenant if and so long as Tenant is publicly traded on a nationally recognized stock exchange.  For purposes of this Article the term "transfers" shall be deemed to include (x) the issuance of new Ownership Interests which results in a majority of the Ownership Interests in Tenant being held by a person or entity which does not hold a majority of the Ownership Interests in Tenant on the Effective Date (y) the sale, mortgage, hypothecation or pledge of more than an aggregate of fifty percent (50%) of Tenant's net assets, and (z) except as provided below, the sale or transfer of all or substantially all of the assets of Tenant in one or more transactions or the merger, consolidation or conversion of Tenant into or with another business entity.  The provisions of Section 13.1 shall not apply to transactions with a business entity into or with which Tenant is merged, consolidated or converted or to which all or substantially all of Tenant's assets are transferred so long as (i) such transfer was made for a legitimate independent business purpose and not for the purpose of transferring this Lease, (ii) the successor to Tenant has a tangible net worth computed in accordance with generally accepted accounting principles consistently applied (and excluding goodwill, organization costs and other intangible assets) that is sufficient to meet the obligations of Tenant under this Lease and is at least equal to the net worth of Tenant (1) immediately prior to such merger, consolidation, conversion or transfer, or (2) on the Effective Date, whichever is greater, (iii) proof satisfactory to Landlord of such net worth is delivered to Landlord at least ten (10) days prior to the effective date of any such transaction, (iv) any such transfer shall be subject and subordinate to all of the terms and provisions of this Lease, and the transferee shall assume, in a written document reasonably satisfactory to Landlord and delivered to Landlord upon or prior to the effective date of such transfer, all the obligations of Tenant under this Lease, (v) Tenant and any guarantor shall remain fully liable for all obligations to be performed by Tenant under this Lease, and (vi) such transfer does not cause Landlord to be in default under any existing lease at the Project.  Tenant may also, upon prior notice to Landlord, permit any business entity which controls, is controlled by, or is under common control with the original Tenant (a "**Related Entity**") to sublet all or part of the Premises for any Permitted Uses for so long as such entity remains a Related Entity, provided the Related Entity is in Landlord's reasonable judgment of a character and engaged in a business which is in keeping with the standards for the Building.  Such sublease shall not be deemed to vest in any such Related Entity any right or interest in this Lease nor shall it relieve, release, impair or discharge any of Tenant's obligations hereunder.  For the purposes hereof, "control" shall be deemed to mean ownership of not less than fifty percent (50%) of all of the Ownership Interests of such corporation or other business entity.  Notwithstanding the foregoing, Tenant shall have no right to assign this Lease or sublease all or any portion of the Premises without Landlord's consent pursuant to this Section 13.8 if Tenant is not the initial Tenant herein named or a person or entity who acquired Tenant's interest in this Lease in a transaction approved by Landlord, or if an Event of Default by Tenant exists under this Lease.

       **(b)**     **Applicability.**   The limitations set forth in this Section 13.8 shall apply to Transferee(s) and guarantor(s) of this Lease, if any, and any transfer by any such entity in violation of this Section 13.8 shall be a transfer in violation of Section 13.1.

       **(c)**     **Modifications, Takeover Agreements.**   Any modification, amendment or extension of a sublease and/or any other agreement by which a landlord of a building other than the Building, or its affiliate, agrees to assume the obligations of Tenant under this Lease shall be deemed a sublease for the purposes of Section 13.1 hereof.

       **Section 13.9    Assumption of Obligations.**  No assignment or transfer shall be effective unless and until the Transferee executes, acknowledges and delivers to Landlord an agreement in form and substance reasonably satisfactory to Landlord whereby the Transferee (a) assumes Tenant's obligations under this Lease and (b) agrees that, notwithstanding such assignment or transfer, the provisions of Section 13.1 hereof shall be binding upon it in respect of all future assignments and transfers.

       **Section 13.10    Tenant's Liability.**  The joint and several liability of Tenant and any successors-in-interest of Tenant and the due performance of Tenant's obligations under this Lease shall not be discharged, released or impaired by any agreement or stipulation made by Landlord, or any grantee or assignee of Landlord, extending the time, or modifying any of the terms and provisions of this Lease, or by

any waiver or failure of Landlord, or any grantee or assignee of Landlord, to enforce any of the terms and provisions of this Lease.

Section 13.11   **Listings in Building Directory.**  The listing of any name other than that of Tenant on the doors of the Premises, the Building directory or elsewhere shall not vest any right or interest in this Lease or in the Premises, nor be deemed to constitute Landlord's consent to any assignment or transfer of this Lease or to any sublease of the Premises or to the use or occupancy thereof by others.  Any such listing shall constitute a privilege revocable in Landlord's discretion by notice to Tenant.

Section 13.12   **Lease Disaffirmance or Rejection.**  If at any time after an assignment by Tenant named herein, this Lease is not affirmed or is rejected in any bankruptcy proceeding or any similar proceeding, or upon a termination of this Lease due to any such proceeding, Tenant named herein, upon request of Landlord given after such disaffirmance, rejection or termination (and actual notice thereof to Landlord in the event of a disaffirmance or rejection or in the event of termination other than by act of Landlord), shall (a) pay to Landlord all Rent and other charges due and owing by the assignee to Landlord under this Lease to and including the date of such disaffirmance, rejection or termination, and (b) as "tenant," enter into a new lease of the Premises with Landlord for a term commencing on the effective date of such disaffirmance, rejection or termination and ending on the Expiration Date, at the same Rent and upon the then executory terms, covenants and conditions contained in this Lease, except that (i) the rights of Tenant named herein under the new lease shall be subject to the possessory rights of the assignee under this Lease and the possessory rights of any persons or entities claiming through or under such assignee or by virtue of any statute or of any order of any court, (ii) such new lease shall require all defaults existing under this Lease to be cured by Tenant named herein with due diligence, and (iii) such new lease shall require Tenant named herein to pay all Rent which, had this Lease not been so disaffirmed, rejected or terminated, would have become due under the provisions of this Lease after the date of such disaffirmance, rejection or termination with respect to any period prior thereto.  If Tenant named herein defaults in its obligations to enter into such new lease for a period of ten (10) days after Landlord's request, then, in addition to all other rights and remedies by reason of default, either at law or in equity, Landlord shall have the same rights and remedies against Tenant named herein as if it had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reason of Tenant's default thereunder.

## ARTICLE 14

## ACCESS TO PREMISES

Section 14.1   **Landlord's Access. (a)**  Subject to the terms of Section 26.24 below, Landlord, Landlord's agents and utility service providers servicing the Project may erect, use and maintain concealed ducts, pipes and conduits in and through the Premises provided such use does not cause the usable area of the Premises to be reduced beyond a de minimis amount.  Landlord shall promptly repair any damage to the Premises caused by any work performed pursuant to this Article 14.

**(b)**     Subject to the terms of Section 26.24 below, Landlord, any Lessor or Mortgagee and any other party designated by Landlord and their respective agents shall have the right to enter the Premises at all reasonable times, upon reasonable notice (which notice may be oral) except in the case of emergency (in which event no notice shall be required), to examine the Premises, to show the Premises to prospective purchasers, Mortgagees, Lessors or, during the last twelve (12) months of the Lease Term, tenants, and their respective agents and representatives or others and to perform Work of Improvement to the Premises or the Project.

**(c)**     All parts (except surfaces facing the interior of the Premises) of all walls, windows and doors bounding the Premises, all balconies, terraces and roofs adjacent to the Premises, all space in or adjacent to the Premises used for shafts, stacks, stairways, mail chutes, conduits and other mechanical facilities, Building Systems, Building facilities and Common Areas are not part of the Premises, and Landlord shall have the use thereof and access thereto through the Premises for the purposes of Building operation, maintenance, alteration and repair.

**Section 14.2    Building Name.** Landlord has the right at any time to change the name, number or designation by which the Building or Project is commonly known.

**Section 14.3    Light and Air.** If at any time any windows of the Premises are temporarily darkened or covered over by reason of any Work of Improvement, any of such windows are permanently darkened or covered over due to any Requirement or there is otherwise a diminution of light, air or view by another structure which may hereafter be erected (whether or not by Landlord), Landlord shall not be liable for any damages and Tenant shall not be entitled to any compensation or abatement of any Rent, nor shall the same release Tenant from its obligations hereunder or constitute an actual or constructive eviction.

## ARTICLE 15

## DEFAULT

**Section 15.1    Tenant's Defaults.** Each of the following events shall be an **"Event of Default"** hereunder:

(a)    Tenant fails to pay when due any installment of Rent (provided that Tenant shall be entitled to a grace period before such failure to pay shall constitute an Event of Default of five (5) Business Days after written notice by Landlord to Tenant that such amount is past due for the first late payment of Rent during any twelve (12) month period); or

(b)    Except as otherwise specifically set forth in this Section 15.1, Tenant fails to observe or perform any other term, covenant or condition of this Lease and such failure continues for more than thirty (30) days (or three (3) Business Days with respect to a failure under Article 3, Article 9 or Section 26.10) after notice by Landlord to Tenant of such default, or if such default (other than a default under Article 3, Article 9 or Section 26.10) is of a nature that it cannot be completely remedied within thirty (30) days, failure by Tenant to commence to remedy such failure within said thirty (30) days, and thereafter diligently prosecute to completion all steps necessary to remedy such default, provided in all events the same is completed within ninety (90) days; or

(c)    if Landlord applies or retains any part of the security held by it hereunder, and Tenant fails to deposit with Landlord the amount so applied or retained by Landlord, within seven (7) Business Days after notice by Landlord to Tenant stating the amount applied, retained or drawn, as applicable; or

(d)    Tenant files a voluntary petition in bankruptcy or insolvency, or is adjudicated a bankrupt or insolvent, or files any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any present or future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, or makes an assignment for the benefit of creditors or seeks or consents to or acquiesces in the appointment of any trustee, receiver, liquidator or other similar official for Tenant or for all or any part of Tenant's property;

(e)    A court of competent jurisdiction shall enter an order, judgment or decree adjudicating Tenant bankrupt, or appointing a trustee, receiver or liquidator of Tenant, or of the whole or any substantial part of its property, without the consent of Tenant, or approving a petition filed against Tenant seeking reorganization or arrangement of Tenant under the bankruptcy laws of the United States, as now in effect or hereafter amended, or any state thereof, and such order, judgment or decree shall not be vacated or set aside or stayed within sixty (60) days from the date of entry thereof;

(f)    If the Guarantors shall fail to perform any of the obligations when due under the Guaranty of Lease from the Guarantors in favor of Landlord, guarantying the payment and performance by Tenant of its obligations under this Lease; or

EXHIBIT D    0094

**(g)**      If a Guarantor generally does not, or is unable to, or admits in writing its inability to, pay its debts as they become due or is subject to the filing of a petition, case or proceeding in bankruptcy.

The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by applicable Requirements.

### Section 15.2    Landlord's Remedies.

If Landlord elects to terminate this Lease, pursuant to Section 1951.2 of the California Civil Code, Landlord shall be entitled to recover from Tenant the aggregate of:

**(a)**      The worth at the time of award of the unpaid rent earned as of the date of the termination hereof;

**(b)**      The worth at the time of award of the amount by which the unpaid rent which would have been earned after the date of termination hereof until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

**(c)**      The worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided;

**(d)**      Any other amount necessary to compensate Landlord for the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom; and

**(e)**      Any other amount which Landlord may hereafter be permitted to recover from Tenant to compensate Landlord for the detriment caused by Tenant's default.

For the purposes of this Section 15.2, "rent" shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others, the "time of award" shall mean the date upon which the judgment in any action brought by Landlord against Tenant by reason of such Event of Default is entered or such earlier date as the court may determine; the "worth at the time of award" of the amounts referred to in Sections 15.2(a) and 15.2(b) shall be computed by allowing interest on such amounts at the Interest Rate; and the "worth at the time of award" of the amount referred to in Section 15.2(c) shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%) per annum.  Tenant agrees that such charges shall be recoverable by Landlord under California Code of Civil Procedure Section 1174(b) or any similar, successor or related provision of law.

### Section 15.3      Recovering Rent as It Comes Due.  Upon any Event of Default, in addition to any other remedies available to Landlord at law or in equity or under this Lease, Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations).  Accordingly, if Landlord does not elect to terminate this Lease, Landlord may, from time to time, enforce all of its rights and remedies under this Lease, including the right to recover all Rent as it becomes due.  Such remedy may be exercised by Landlord without prejudice to its right thereafter to terminate this Lease in accordance with the other provisions contained in this Article 15. Landlord's reentry to perform acts of maintenance or preservation of, or in connection with efforts to relet, the Premises, or any portion thereof, or the appointment of a receiver upon Landlord's initiative to protect Landlord's interest under this Lease shall not terminate Tenant's right to possession of the Premises or any portion thereof and, until Landlord elects to terminate this Lease, this Lease shall continue in full force and Landlord may pursue all its remedies hereunder.  Nothing in this Article 15 shall be deemed to affect Landlord's right to indemnification, under the indemnification clauses contained in this Lease, for Losses arising from events occurring prior to the termination of this Lease.

**Section 15.4    Reletting on Tenant's Behalf.** If Tenant abandons the Premises or if Landlord elects to reenter or takes possession of the Premises pursuant to any legal proceeding or pursuant to any notice provided by Requirements, and until Landlord elects to terminate this Lease, Landlord may, from time to time, without terminating this Lease, recover all Rent as it becomes due pursuant to Section 15.3 and/or relet the Premises or any part thereof for the account of and on behalf of Tenant, on any terms, for any term (whether or not longer than the Term), and at any rental as Landlord in its reasonable discretion may deem advisable, and Landlord may make any Work of Improvement to the Premises in connection therewith. Tenant hereby irrevocably constitutes and appoints Landlord as its attorney-in-fact, which appointment shall be deemed coupled with an interest and shall be irrevocable, for purposes of reletting the Premises pursuant to the immediately preceding sentence. If Landlord elects to so relet the Premises on behalf of Tenant, then rentals received by Landlord from such reletting shall be applied:

**(a)**    First, to reimburse Landlord for the costs and expenses of such reletting (including costs and expenses of retaking or repossessing the Premises, removing persons and property therefrom, securing new tenants, and, if Landlord maintains and operates the Premises, the costs thereof) and necessary or reasonable Work of Improvement.

**(b)**    Second, to the payment of any indebtedness of Tenant to Landlord other than Rent due and unpaid hereunder.

**(c)**    Third, to the payment of Rent due and unpaid hereunder, and the residue, if any, shall be held by Landlord and applied in payment of other or future obligations of Tenant to Landlord as the same may become due and payable.

Should the rentals received from such reletting, when applied in the manner and order indicated above, at any time be less than the total amount owing from Tenant pursuant to this Lease, then Tenant shall pay such deficiency to Landlord, and if Tenant does not pay such deficiency within five (5) days of delivery of notice thereof to Tenant, Landlord may bring an action against Tenant for recovery of such deficiency or pursue its other remedies hereunder or under California Civil Code Section 1951.8, California Code of Civil Procedure Section 1161 et seq., or any similar, successor or related Requirements.

**Section 15.5    General. (a)** All rights, powers and remedies of Landlord hereunder and under any other agreement now or hereafter in force between Landlord and Tenant shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to Landlord at law or in equity. The exercise of any one or more of such rights or remedies shall not impair Landlord's right to exercise any other right or remedy including any and all rights and remedies of Landlord under California Civil Code Section 1951.8, California Code of Civil Procedure Section 1161 et seq., or any similar, successor or related Requirements.

**(b)**    If, after Tenant's abandonment of the Premises, Tenant leaves behind any of Tenant's Property, then Landlord shall store such Tenant's Property at a warehouse or any other location at the risk, expense and for the account of Tenant, and such property shall be released only upon Tenant's payment of such charges, together with moving and other costs relating thereto and all other sums due and owing under this Lease. If Tenant does not reclaim such Tenant's Property within the period permitted by law, Landlord may sell such Tenant's Property in accordance with law and apply the proceeds of such sale to any sums due and owing hereunder, or retain said Property, granting Tenant credit against sums due and owing hereunder for the reasonable value of such Property.

**(c)**    To the extent permitted by law, Tenant hereby waives all provisions of, and protections under, any Requirement to the extent same are inconsistent and in conflict with specific terms and provisions hereof.

**Section 15.6    Interest.** If any payment of Rent is not paid when due, interest shall accrue on such payment, from the date such payment became due until paid at the Interest Rate. Tenant acknowledges that late payment by Tenant of Rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impracticable to fix. Such costs

include, without limitation, processing and accounting charges, and late charges that may be imposed on Landlord by the terms of any note secured by a Mortgage covering the Premises. Therefore, in addition to interest, if any amount is not paid when due, a late charge equal to five percent (5%) of such amount shall be assessed; provided, however, that on 2 occasions during any calendar year of the Term, Landlord shall give Tenant notice of such late payment and Tenant shall have a period of five (5) days thereafter in which to make such payment before any late charge is assessed. Such interest and late charges are separate and cumulative and are in addition to and shall not diminish or represent a substitute for any of Landlord's rights or remedies under any other provision of this Lease.

      **Section 15.7    Other Rights of Landlord.** If Tenant fails to pay any Additional Rent when due, Landlord, in addition to any other right or remedy, shall have the same rights and remedies as in the case of a default by Tenant in the payment of Fixed Rent. If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to any items Landlord sees fit, regardless of any request by Tenant.

## ARTICLE 16

## LANDLORD'S RIGHT TO CURE; FEES AND EXPENSES

      If Tenant defaults in the performance of its obligations under this Lease, Landlord, without waiving such default, may perform such obligations at Tenant's expense: (a) immediately, and without notice, in the case of emergency or if the default (i) materially interferes with the use by any other tenant of the Building or Project, (ii) materially interferes with the efficient operation of the Building or Project, (iii) results in a violation of any Requirement, or (iv) results or will result in a cancellation of any insurance policy maintained by Landlord, and (b) in any other case if such default continues after ten (10) days from the date Landlord gives notice of Landlord's intention to perform the defaulted obligation. All costs and expenses incurred by Landlord in connection with any such performance by it and all costs and expenses, including reasonable counsel fees and disbursements, incurred by Landlord in any action or proceeding (including any unlawful detainer proceeding) brought by Landlord or in which Landlord is a party to enforce any obligation of Tenant under this Lease and/or right of Landlord in or to the Premises or as a result of any default by Tenant under this Lease, shall be paid by Tenant to Landlord on demand, with interest thereon at the Interest Rate from the date incurred by Landlord. Except as expressly provided to the contrary in this Lease, all costs and expenses which, pursuant to this Lease, are incurred by Landlord and payable to Landlord by Tenant, and all charges, amounts and sums payable to Landlord by Tenant for any property, material, labor, utility or other services which, pursuant to this Lease, are attributable directly to Tenant's use and occupancy of the Premises or presence at the Building or Project, or at the request and for the account of Tenant, are provided, furnished or rendered by Landlord, shall become due and payable by Tenant to Landlord within ten (10) Business Days after receipt of Landlord's invoice for such amount.

## ARTICLE 17

## NO REPRESENTATIONS BY LANDLORD; LANDLORD'S APPROVAL

      **Section 17.1    No Representations.** Except as expressly set forth herein, Landlord and Landlord's agents have made no warranties, representations, statements or promises with respect to the Building, the Project or the Premises and no rights, easements or licenses are acquired by Tenant by implication or otherwise. Tenant is entering into this Lease after full investigation and is not relying upon any statement or representation made by Landlord not embodied in this Lease.

      **Section 17.2    No Money Damages.** Wherever in this Lease Landlord's consent or approval is required, if Landlord refuses to grant such consent or approval, whether or not Landlord expressly agreed that such consent or approval would not be unreasonably withheld, Tenant shall not make or exercise, and Tenant hereby waives, any claim for money damages (including any claim by way of set-off, counterclaim or defense) and/or any right to terminate this Lease based upon Tenant's claim or assertion that Landlord unreasonably withheld or delayed its consent or approval. Tenant's sole remedy shall be an action or

proceeding to enforce such provision, by specific performance, injunction or declaratory judgment. In no event shall Landlord or the Parties (as that term is defined in Section 26.3, below) be liable for, and Tenant, on behalf of itself and all other Tenant Parties, hereby waives any claim for, any indirect, consequential or punitive damages, including loss of profits or business opportunity, arising under or in connection with the Lease Documents.

**Section 17.3    Reasonable Efforts.**  For purposes of this Lease, "reasonable efforts" by Landlord shall not include an obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses whatsoever.

## ARTICLE 18

## END OF TERM

**Section 18.1    Expiration.**  Upon the expiration or other termination of this Lease, Tenant shall quit and surrender the Premises to Landlord vacant, broom clean and in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted, and Tenant shall remove all of Tenant's Property and Specialty Alterations.

**Section 18.2    Holdover Rent.**  Landlord and Tenant recognize that Landlord's damages resulting from Tenant's failure to timely surrender possession of the Premises may be substantial, may exceed the amount of the Rent payable hereunder, and will be impossible to accurately measure. Accordingly, if possession of the Premises is not surrendered to Landlord on the Expiration Date or sooner termination of this Lease, in addition to any other rights or remedies Landlord may have hereunder or at law, Tenant shall (a) pay to Landlord for each month (or any portion thereof) during which Tenant holds over in the Premises after the Expiration Date or sooner termination of this Lease, a sum equal to (i) during the first month of such holdover, 1.5 times the Rent payable under this Lease for the last full calendar month of the Term, and (ii) thereafter, 2 times the Rent payable under this Lease for the last full calendar month of the Term, (b) be liable to Landlord for (1) any payment or rent concession which Landlord may be required to make to any tenant obtained by Landlord for all or any part of the Premises (a "**New Tenant**") in order to induce such New Tenant not to terminate its lease by reason of the holding-over by Tenant, and (2) the loss of the benefit of the bargain if any New Tenant shall terminate its lease by reason of the holding-over by Tenant, and (c) indemnify Landlord against all claims for damages by any New Tenant. No holding-over by Tenant, nor the payment to Landlord of the amounts specified above, shall operate to extend the Term hereof. Nothing herein contained shall be deemed to permit Tenant to retain possession of the Premises after the Expiration Date or sooner termination of this Lease, and no acceptance by Landlord of payments from Tenant after the Expiration Date or sooner termination of this Lease shall be deemed to be other than on account of the amount to be paid by Tenant in accordance with the provisions of this Section 18.2.

## ARTICLE 19

## QUIET ENJOYMENT

Provided this Lease is in full force and effect and no Event of Default then exists, Tenant may peaceably and quietly enjoy the Premises without hindrance by Landlord or any person lawfully claiming through or under Landlord, subject to the terms and conditions of this Lease and to all Superior Leases and Mortgages.

## ARTICLE 20

## NO SURRENDER; NO WAIVER

**Section 20.1    No Surrender or Release.**  No act or thing done by Landlord or Landlord's agents or employees during the Term shall be deemed an acceptance of a surrender of the Premises, and no

provision of this Lease shall be deemed to have been waived by Landlord, unless such waiver is in writing and is signed by Landlord.

**Section 20.2    No Waiver.**  The failure of either party to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, or any of the Rules and Regulations, shall not be construed as a waiver or relinquishment for the future performance of such obligations of this Lease or the Rules and Regulations, or of the right to exercise such election but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.  The receipt by Landlord of any Rent payable pursuant to this Lease or any other sums with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Rent herein stipulated shall be deemed to be other than a payment on account of the earliest stipulated Rent, or as Landlord may elect to apply such payment, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided in this Lease.

**ARTICLE 21**

**WAIVER OF TRIAL BY JURY; COUNTERCLAIM**

**Section 21.1    Jury Trial Waiver.**  THE PARTIES HEREBY AGREE THAT THIS LEASE CONSTITUTES A WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY PURSUANT TO THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 631 AND EACH PARTY DOES HEREBY CONSTITUTE AND APPOINT THE OTHER PARTY ITS TRUE AND LAWFUL ATTORNEY-IN-FACT, WHICH APPOINTMENT IS COUPLED WITH AN INTEREST, AND EACH PARTY DOES HEREBY AUTHORIZE AND EMPOWER THE OTHER PARTY, IN THE NAME, PLACE AND STEAD OF SUCH PARTY, TO FILE THIS LEASE WITH THE CLERK OR JUDGE OF ANY COURT OF COMPETENT JURISDICTION AS A STATUTORY WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY.

LANDLORD'S INITIALS:                         TENANT'S INITIALS:

**Section 21.2    Waiver of Counterclaim.**  If Landlord commences any summary proceeding against Tenant, Tenant will not interpose any counterclaim of any nature or description in any such proceeding (unless failure to interpose such counterclaim would preclude Tenant from asserting in a separate action the claim which is the subject of such counterclaim), and will not seek to consolidate such proceeding with any other action which may have been or will be brought in any other court by Tenant.

**ARTICLE 22**

**NOTICES**

Except as otherwise expressly provided in this Lease, all consents, notices, demands, requests, approvals or other communications given under this Lease shall be in writing and shall be deemed sufficiently given or rendered if delivered by hand (provided a signed receipt is obtained) or if sent by registered or certified mail (return receipt requested) or by a nationally recognized overnight delivery service making receipted deliveries, addressed to Landlord and Tenant as set forth in Article 1, and to any Mortgagee or Lessor who shall require copies of notices and whose address is provided to Tenant, or to such other address(es) as Landlord, Tenant or any Mortgagee or Lessor may designate as its new address(es) for such purpose by notice given to the other in accordance with the provisions of this Article 22.  Any such approval, consent, notice, demand, request or other communication shall be deemed to have been given on the date of receipted delivery, refusal to accept delivery or when delivery is first attempted but cannot be made due to a change of address for which no notice is given or three (3) Business Days after it shall have been mailed as provided in this Article 22, whichever is earlier.

## ARTICLE 23

## RULES AND REGULATIONS

All Tenant Parties shall observe and comply with the Rules and Regulations, as supplemented or amended from time to time. Landlord reserves the right, from time to time with reasonable amendments or supplements, to adopt additional reasonable Rules and Regulations and to amend the Rules and Regulations then in effect with reasonable amendments or supplements. Nothing contained in this Lease shall impose upon Landlord any obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease against any other Building tenant, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, visitors or licensees, provided that Landlord shall enforce the Rules or Regulations against Tenant in a non-discriminatory fashion.

## ARTICLE 24

## BROKER

Landlord has retained Landlord's Agent as leasing agent in connection with this Lease and Landlord will be solely responsible for any fee that may be payable to Landlord's Agent. Landlord agrees to pay a commission to Tenant's Broker pursuant to a separate agreement. Each of Landlord and Tenant represents and warrants to the other that neither it nor its agents have dealt with any broker in connection with this Lease other than Landlord's Agent and Tenant's Broker. Each of Landlord and Tenant shall indemnify, defend, protect and hold the other party harmless from and against any and all Losses which the indemnified party may incur by reason of any claim of or liability to any broker, finder or like agent (other than Landlord's Agent and Tenant's Broker) arising out of any dealings claimed to have occurred between the indemnifying party and the claimant in connection with this Lease, and/or the above representation being false.

## ARTICLE 25

## INDEMNITY

**Section 25.1    Waiver of Liability.** Neither Landlord nor any of its Indemnitees shall be liable or responsible in any way for, and Tenant hereby waives all claims against the Indemnitees with respect to or arising out of (a) any death or any injury of any nature whatsoever that may be suffered or sustained by Tenant or any employee, licensee, invitee, guest, agent or customer of Tenant or any other person, from any causes whatsoever except to the extent such injury or death is caused by the gross negligence or willful misconduct of the Indemnitees; or (b) any loss or damage or injury to any property outside or within the Premises belonging to Tenant or its employees, agents, customers, licensees, invitees, guests or any other person; except to the extent such injury or damage is to property not covered by insurance carried (or required to be carried) by Tenant and is caused by the gross negligence or willful misconduct of the Indemnitees. Subject to the foregoing, none of the Indemnitees shall be liable for any damage or damages of any nature whatsoever to persons or property caused by explosion, fire, theft or breakage, by sprinkler, drainage or plumbing systems, by failure for any cause to supply adequate drainage, by the interruption of any public utility or service, by steam, gas, water, rain or other substances leaking, issuing or flowing into any part of the Premises, by natural occurrence, acts of the public enemy, riot, strike, insurrection, war, court order, requisition or order of governmental body or authority, or for any damage or inconvenience which may arise through repair, maintenance or alteration of any part of the Building, or by anything done or omitted to be done by any tenant, occupant or person in the Building. In addition, none of the Indemnitees shall be liable for any loss or damage for which Tenant is required to insure, nor for any loss or damage resulting from any construction, alterations or repair. Tenant further assumes all risk of, and agrees that the Indemnitees shall not be liable for, any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) sustained as a result of the Premises not having been inspected by a Certified Access Specialist (CASp).

**Section 25.2    Tenant's Indemnity.**  Tenant shall not do or permit to be done any act or thing upon the Premises, the Building or the Project which may subject Landlord to any liability or responsibility for injury, damages to persons or property or to any liability by reason of any violation of any Requirement, and shall exercise such control over the Premises as to fully protect Landlord against any such liability. Except to the extent of any such injury or damage resulting from the negligence or willful misconduct of Landlord or Landlord's agents or employees, Tenant shall indemnify, defend, protect and hold harmless each of the Indemnitees from and against any and all Losses, resulting from any claims (i) against the Indemnitees arising from any act, omission or negligence of any Tenant Party, (ii) against the Indemnitees arising from any accident, injury or damage to any person or to the property of any person and occurring in or about the Premises, and (iii) against the Indemnitees resulting from any breach, violation or nonperformance of any covenant, condition or agreement of this Lease on the part of Tenant to be fulfilled, kept, observed or performed.  Tenant hereby acknowledges and agrees that Tenant's indemnity obligations set forth in this Section 25.2 shall include any and all claims relating to or arising as a result of the Premises not having been inspected by a Certified Access Specialist (CASp).

**Section 25.3    Landlord's Indemnity.**  Landlord shall indemnify, defend, protect and hold harmless Tenant from and against all Losses incurred by Tenant arising from any accident, injury or damage to any person or the property of any person in or about the Common Areas (specifically excluding the Premises) to the extent attributable to the gross negligence or willful misconduct of Landlord or its employees or agents.

**Section 25.4    Defense and Settlement.**  If any claim, action or proceeding is made or brought against any Indemnitee which Tenant is required to indemnify hereunder, then upon demand by an Indemnitee, Tenant, at its sole cost and expense, shall resist or defend such claim, action or proceeding in the Indemnitee's name (if necessary), by attorneys approved by the Indemnitee, which approval shall not be unreasonably withheld (attorneys for Tenant's insurer shall be deemed approved for purposes of this Section 25.4).  Notwithstanding the foregoing, an Indemnitee may retain its own attorneys to participate or assist in defending any claim, action or proceeding involving potential liability in excess of the amount available under Tenant's liability insurance carried under Section 11.1 for such claim and Tenant shall pay the reasonable fees and disbursements of such attorneys.  If Tenant fails to diligently defend or if there is a legal conflict or other conflict of interest, then Landlord may retain separate counsel at Tenant's expense. Notwithstanding anything herein contained to the contrary, Tenant may direct the Indemnitee to settle any claim, suit or other proceeding provided that (a) such settlement shall involve no obligation on the part of the Indemnitee other than the payment of money, (b) any payments to be made pursuant to such settlement shall be paid in full exclusively by Tenant at the time such settlement is reached, (c) such settlement shall not require the Indemnitee to admit any liability, and (d) the Indemnitee shall have received an unconditional release from the other parties to such claim, suit or other proceeding.

## ARTICLE 26

## MISCELLANEOUS

**Section 26.1    Delivery.**  This Lease shall not be binding upon Landlord or Tenant unless and until Landlord shall have executed and delivered a fully executed copy of this Lease to Tenant.

**Section 26.2    Transfer of Project.**  Provided that the transferee assumes in writing the obligations of Landlord hereunder arising from and after the date of the Landlord Transfer (as defined hereinbelow), Landlord's obligations under this Lease shall not be binding upon the Landlord named herein after the sale, conveyance, assignment or transfer (collectively, a "**Landlord Transfer**") by such Landlord (or upon any subsequent landlord after the Landlord Transfer by such subsequent landlord) of its interest in the Building or the Project, as the case may be, and in the event of any such Landlord Transfer, Landlord (and any such subsequent Landlord) shall be entirely freed and relieved of all covenants and obligations of Landlord hereunder arising from and after the date of the Landlord Transfer, and the transferee of Landlord's interest (or that of such subsequent Landlord) in the Building or the Project, as the case may be, shall be deemed to have assumed all obligations under this Lease arising from and after the date of the Landlord Transfer.

**Section 26.3    Limitation on Liability.**  The liability of Landlord for Landlord's obligations under this Lease and any other documents executed by Landlord and Tenant in connection with this Lease (collectively, the "**Lease Documents**") shall be limited to Landlord's interest in the Building and Tenant shall not look to any other property or assets of Landlord or the property or assets of any direct or indirect partner, member, manager, shareholder, director, officer, principal, employee or agent of Landlord (collectively, the "**Parties**") in seeking either to enforce Landlord's obligations under the Lease Documents or to satisfy a judgment for Landlord's failure to perform such obligations; and none of the Parties shall be personally liable for the performance of Landlord's obligations under the Lease Documents.

**Section 26.4    Rent.**  All amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated Fixed Rent, Tenant's Tax Payment, Tenant's Operating Payment, Additional Rent or Rent, shall constitute rent for the purposes of Section 502(b)(6) of the United States Bankruptcy Code.

**Section 26.5    Entire Document.**  This Lease (including any Schedules and Exhibits referred to herein and all supplementary agreements provided for herein) contains the entire agreement between the parties and all prior negotiations and agreements are merged into this Lease.  All of the Schedules and Exhibits attached hereto are incorporated in and made a part of this Lease, provided that in the event of any inconsistency between the terms and provisions of this Lease and the terms and provisions of the Schedules and Exhibits hereto, the terms and provisions of this Lease shall control.

**Section 26.6    Governing Law.**  This Lease shall be governed in all respects by the laws of the State of California.

**Section 26.7    Unenforceability.**  If any provision of this Lease, or its application to any person or entity or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Lease or the application of such provision to any other person or entity or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by law.

**Section 26.8    Lease Disputes.**  **(a)** Tenant agrees that all disputes arising, directly or indirectly, out of or relating to this Lease, and all actions to enforce this Lease, shall be dealt with and adjudicated in the state courts of the State of California or the United States District Court for the Central District of California and for that purpose hereby expressly and irrevocably submits itself to the jurisdiction of such courts.  Tenant agrees that so far as is permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Lease, or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon it in any such court.

**(b)**    To the extent that Tenant has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, Tenant irrevocably waives such immunity in respect of its obligations under this Lease.

**Section 26.9    Landlord's Agent.**  Unless Landlord delivers notice to Tenant to the contrary, Landlord's Agent is authorized to act as Landlord's agent in connection with the performance of this Lease, and Tenant shall be entitled to rely upon correspondence received from Landlord's Agent.  Tenant acknowledges that Landlord's Agent is acting solely as agent for Landlord in connection with the foregoing; and neither Landlord's Agent nor any of its direct or indirect partners, members, managers, officers, shareholders, directors, employees, principals, agents or representatives shall have any liability to Tenant in connection with the performance of this Lease, and Tenant waives any and all claims against any and all of such parties arising out of, or in any way connected with, this Lease, the Building or the Project.

**Section 26.10    Estoppel.**  Within seven (7) days following request from Landlord, any Mortgagee or any Lessor, Tenant shall deliver to Landlord a statement executed and acknowledged by Tenant, in form reasonably satisfactory to Landlord, (a) stating the Commencement Date and the Expiration Date, and that

this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (b) setting forth the date to which the Fixed Rent and any Additional Rent have been paid, together with the amount of monthly Fixed Rent and Additional Rent then payable, (c) stating whether or not, to the best of Tenant's knowledge, Landlord is in default under this Lease, and, if Landlord is in default, setting forth the specific nature of all such defaults, (d) stating the amount of the Letter of Credit, if any, and/or the Security Deposit, if any, under this Lease, (e) stating whether there are any subleases or assignments affecting the Premises, (f) stating the address of Tenant to which all notices and communications under the Lease shall be sent, and (g) responding to any other matters reasonably requested by Landlord, such Mortgagee or such Lessor.  Tenant acknowledges that any statement delivered pursuant to this Section 26.10 may be relied upon by any purchaser or owner of the Project or the Building, or all or any portion of Landlord's interest in the Project or the Building or any Superior Lease, or by any Mortgagee, or assignee thereof or by any Lessor, or assignee thereof.

Section 26.11  **Certain Interpretational Rules.**  For purposes of this Lease, whenever the words "include", "includes", or "including" are used, they shall be deemed to be followed by the words "without limitation" and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa.  This Lease shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.  The captions in this Lease are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease or the intent of any provision hereof.

Section 26.12  **Parties Bound.**  The terms, covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and, except as otherwise provided in this Lease, to their respective legal representatives, successors, and assigns.

Section 26.13  **Memorandum of Lease.**  This Lease shall not be recorded; however, at Landlord's request, Landlord and Tenant shall promptly execute, acknowledge and deliver a memorandum with respect to this Lease sufficient for recording and Landlord may record the memorandum.  Within ten (10) days after the end of the Term, Tenant shall enter into such documentation as is reasonably required by Landlord to remove the memorandum of record.

Section 26.14  **Counterparts.**  This Lease and any other Lease Documents may be executed in 2 or more counterparts, which may be delivered electronically, via facsimile or by other means.  Each party may rely upon signatures delivered electronically or via facsimile as if such signatures were originals.  Each party that delivers counterparts electronically or via facsimile shall endeavor thereafter to deliver counterparts containing original signatures to the other party; however, the failure to deliver counterparts containing original signatures shall not affect the validity of any counterparts previously delivered electronically or via facsimile.  Each counterpart of this Lease (or of any of the other Lease Documents, as the case may be) shall be deemed to be an original thereof, and all such counterparts (including those delivered electronically or via facsimile), when taken together, shall constitute one and the same instrument.

Section 26.15  **Survival.**  All obligations and liabilities of Landlord or Tenant to the other which accrued before the expiration or other termination of this Lease, and all such obligations and liabilities which by their nature or under the circumstances can only be, or by the provisions of this Lease may be, performed after such expiration or other termination, shall survive the expiration or other termination of this Lease.  Without limiting the generality of the foregoing, the rights and obligations of the parties with respect to any indemnity under this Lease, and with respect to any Rent and any other amounts payable under this Lease, shall survive the expiration or other termination of this Lease.

Section 26.16  **Code Waivers.**  Tenant hereby waives any and all rights under and benefits of Subsection 1 of Section 1931, 1932, Subdivision 2, 1933, Subdivision 4, 1941, 1942 and 1950.7 (providing that a Landlord may only claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by a tenant or to clean the premises) of the California Civil Code, Section 1265.130 of the California Code of Civil Procedure (allowing either party to petition a court to terminate a lease in the event of a partial taking), and Section 1174(c) of the California

EXHIBIT D    0103

Code of Civil Procedure and Section 1951.7 of the California Civil Code (providing for Tenant's right to satisfy a judgment in order to prevent a forfeiture of this Lease or requiring Landlord to deliver written notice to Tenant of any reletting of the Premises), and any similar law, statute or ordinance now or hereinafter in effect.

**Section 26.17   Hazardous Substance Disclosure.**  California law requires landlords to disclose to tenants the presence or potential presence of certain Hazardous Materials.  Accordingly, Tenant is hereby advised that occupation of the Premises and use of the common areas of the Real Property may lead to exposure to Hazardous Materials such as, but not limited to, gasoline, diesel and other vehicle fluids, vehicle exhaust, office maintenance fluids, tobacco smoke, and building materials containing chemicals, such as formaldehyde.  In addition, California's Proposition 65, Health and Safety Code Section 25249.6 et. seq., requires notice that some of these Hazardous Materials are known by the State of California to cause cancer or reproductive harm.

**Section 26.18   Inability to Perform.**  This Lease and the obligation of Tenant to pay Rent and to perform all of the other covenants and agreements of Tenant hereunder shall not be affected, impaired or excused by any Unavoidable Delays.  Landlord shall use reasonable efforts to promptly notify Tenant of any Unavoidable Delay which prevents Landlord from fulfilling any of its obligations under this Lease.

**Section 26.19   Substitution of Other Premises**.  Landlord shall have the right to move Tenant to other space in the Project comparable to the Premises, and all terms hereof shall apply to the new space with equal force.  In such event, Landlord shall give Tenant prior notice, shall provide Tenant, at Landlord's sole cost and expense, with tenant improvements at least equal in quality to those in the Premises and shall move Tenant's effects to the new space at Landlord's sole cost and expense at such time and in such manner as to inconvenience Tenant as little as reasonably practicable.  Simultaneously with such relocation of the Premises, the parties shall immediately execute an amendment to this Lease stating the relocation of the Premises.  Landlord hereby agrees not to exercise its right to relocate Tenant from the Premises during the initial Term.

**Section 26.20   Financial Statements**.   Within one hundred twenty (120) days after the completion of Tenant's fiscal year, Tenant shall deliver to Landlord (i) Tenant's audited financial statements for the most recently completed fiscal year or (ii) if audited statements for Tenant are not prepared, then unaudited financial statements for the most recent fiscal year of Tenant which shall be certified to be true and correct by Tenant's Chief Financial Officer.  Upon Landlord's request, Tenant shall provide such additional information as Landlord may reasonably request to enable Landlord to assess the credit-worthiness of Tenant as a tenant of the Building.  Landlord shall endeavor to ensure that all financial statements furnished by Tenant are kept confidential by Landlord and any Mortgagee or prospective purchaser that may receive the same, and that such statements are used only for the purpose of assessing the credit-worthiness of Tenant as a tenant of the Building.

**Section 26.21   Development of the Project**.

**(a)      In General.**  Landlord reserves the right to subdivide all or a portion of the Project; provided, however, in no event shall such subdivision increase Tenant's monetary obligations under this Lease, or otherwise increase Tenant's obligations under this Lease or materially and adversely reduce Tenant's rights under this Lease.  Tenant agrees to execute and deliver, upon demand by Landlord and in the form requested by Landlord, any additional documents needed to conform this Lease to the circumstances resulting from such subdivision.  If portions of the Project or property adjacent to the Project (collectively, the **"Other Improvements"**) are owned or later acquired by an entity other than Landlord or an affiliate of Landlord, Landlord, at its option, may enter into an agreement with the owner or owners of any or all of the Other Improvements to provide (i) for reciprocal rights of access and/or use of the Project and the Other Improvements, (ii) for the common management, operation, maintenance, improvement and/or repair of all or any portion of the Project and the Other Improvements, provided that Tenant's rights under this Lease are not materially impaired, (iii) for the allocation of a portion of the Operating Expenses and Taxes to the Other Improvements and the operating expenses and taxes for the Other Improvements to the Project, and (iv) for the use or improvement of the Other Improvements and/or the Project in

EXHIBIT D   0104

connection with the improvement, construction, and/or excavation of the Other Improvements and/or the Project. Nothing contained herein shall be deemed or construed to limit or otherwise affect Landlord's right to convey all or any portion of the Project or any other of Landlord's rights described in this Lease.

**(b)    Building Renovations.** It is specifically understood and agreed that Landlord has made no representation or warranty to Tenant and has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, the Building, or any part of the Project and that no representations respecting the condition of the Premises or the Project have been made by Landlord to Tenant. However, Tenant hereby acknowledges that Landlord may during the Term renovate, improve, alter, or modify (collectively, the "**Renovations**") the Project, the Building and/or the Premises, including without limitation the Common Areas, the Building Systems, the roof and structural portions of the Building, which Renovations may include, without limitation, (i) converting subterranean levels of the Building from storage space to parking facilities, (ii) modifying the Common Areas and tenant spaces to comply with applicable Requirements, including regulations relating to the physically disabled, seismic conditions, and building safety and security, and (iii) installing new floor covering, lighting, and wall coverings in the Common Areas, and in connection with any Renovations, Landlord may, among other things, erect scaffolding or other necessary structures in the Building, limit or eliminate access to portions of the Project, including portions of the Common Areas, or perform work in the Building, which work may create noise, dust or leave debris in the Building. Except as set forth in Section 26.24, below, Tenant hereby agrees that such Renovations and Landlord's actions in connection with such Renovations shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent. Landlord shall use commercially reasonable efforts to minimize interference with Tenant's business operations and shall, to the extent practical, perform any work on Tenant's floor(s) after normal working hours. Except as set forth in Section 26.24, below, Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Renovations, nor shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from the Renovations or Landlord's actions in connection with such Renovations, or for any inconvenience or annoyance occasioned by such Renovations or Landlord's actions.

**Section 26.22   Tax Status of Beneficial Owner.** Tenant recognizes and acknowledges that Landlord and/or certain beneficial owners of Landlord may from time to time qualify as real estate investment trusts pursuant to Sections 856 et seq. of the Tax Code and that avoiding (a) the loss of such status, (b) the receipt of any income derived under any provision of this Lease that does not constitute "rents from real property" (in the case of real estate investment trusts), and (c) the imposition of income, penalty or similar taxes (each an "**Adverse Event**") is of material concern to Landlord and such beneficial owners. In the event that this Lease or any document contemplated hereby could, in the opinion of counsel to Landlord, result in or cause an Adverse Event, Tenant agrees to cooperate with Landlord in negotiating an amendment or modification thereof and shall at the request of Landlord execute and deliver such documents reasonably required to effect such amendment or modification. Any amendment or modification pursuant to this Section 26.22 shall be structured so that the economic results to Landlord and Tenant shall be substantially similar to those set forth in this Lease without regard to such amendment or modification. Without limiting any of Landlord's other rights under this Section 26.22, Landlord may waive the receipt of any amount payable to Landlord hereunder and such waiver shall constitute an amendment or modification of this Lease with respect to such payment. Tenant expressly covenants and agrees not to enter into any sublease or assignment which provides for rental or other payment for such use, occupancy, or utilization based in whole or in part on the net income or profits derived by any person from the property leased, used, occupied, or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and that any such purported sublease or assignment shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy, or utilization of any part of the Premises.

**Section 26.23   Authority**. If Tenant is a corporation, trust, limited liability company or partnership, each individual executing this Lease on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in California and that Tenant has full right and authority to execute and deliver this Lease and that each person signing on behalf of Tenant is authorized

to do so. In such event, Tenant shall, within ten (10) days after execution of this Lease, deliver to Landlord satisfactory evidence of such authority, and, upon demand by Landlord, Tenant shall also deliver to Landlord satisfactory evidence of (i) good standing in Tenant's state of formation and (ii) qualification to do business in California.

**Section 26.24   Abatement Event**. In the event that Tenant is prevented from using, and does not use, the Premises or any portion thereof, as a result of any failure to provide services, utilities or access to the Premises to the extent Landlord is obligated to provide same under this Lease (any such set of circumstances to be known as an "**Abatement Event**"), then Tenant shall give Landlord notice of such Abatement Event, and if such Abatement Event continues for five (5) consecutive Business Days after Landlord's receipt of any such notice, (the "**Eligibility Period**"), then the Fixed Rent, Tax Payment, Operating Payment and Tenant's obligation to pay for parking (to the extent not utilized by Tenant) shall be abated or reduced, as the case may be, after the expiration of the Eligibility Period for such time that Tenant continues to be so prevented from using, and does not use, the Premises or a portion thereof, in the proportion that the rentable area of the portion of the Premises that Tenant is prevented from using, and does not use, bears to the total rentable area of the Premises; provided, however, in the event that Tenant is prevented from using, and does not use, a portion of the Premises for a period of time in excess of the Eligibility Period and the remaining portion of the Premises is not sufficient to allow Tenant to effectively conduct its business therein, and if Tenant does not conduct its business from such remaining portion, then for such time after expiration of the Eligibility Period during which Tenant is so prevented from effectively conducting its business therein, the Fixed Rent, Tax Payment and Operating Payment for the entire Premises shall be abated for such time as Tenant continues to be so prevented from using, and does not use, the Premises and Tenant's obligation to pay for parking shall be abated for such time as Tenant continues to be so prevented from using, and does not use, the Premises. If, however, Tenant reoccupies any portion of the Premises during such period, the Rent allocable to such reoccupied portion, based on the proportion that the rentable area of such reoccupied portion of the Premises bears to the total rentable area of the Premises, shall be payable by Tenant from the date Tenant reoccupies such portion of the Premises. Such right to abate Fixed Rent, Tax Payment and Operating Payment shall be Tenant's sole and exclusive remedy at law or in equity for an Abatement Event. To the extent Tenant is entitled to abatement without regard to the Eligibility Period because of an event described in Section 11.3 or Article 12 of this Lease, then the Eligibility Period shall not be applicable. Except as provided in this Section 26.24, nothing contained herein shall be interpreted to mean that Tenant is excused from paying Rent due hereunder.

**Section 26.25   Attorneys' Fees**. In the event that either Landlord or Tenant should bring suit for the possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provision of this Lease or for any other relief against the other, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party therein shall be paid by the other party.

**Section 26.26   Guaranty**. Landlord's execution of this Lease is conditioned upon its receipt of a guaranty (the "**Guaranty**") of Tenant's obligations under this Lease executed by the guarantors named in the Basic Lease Provisions in Article 1 above (each, the "**Guarantor**" and collectively, the "**Guarantors**"), such Guaranty to be in the form attached hereto as **Exhibit H**. The execution of such Guaranty is a material inducement to Landlord to enter into this Lease.

## ARTICLE 27

## SECURITY DEPOSIT

**Section 27.1   Security Deposit**. Tenant shall deposit the Security Deposit with Landlord upon the execution of this Lease in cash as security for the faithful performance and observance by Tenant of the terms, covenants and conditions of this Lease.

**Section 27.2   Application of Security**. If (a) an Event of Default by Tenant occurs in the payment or performance of any of the terms, covenants or conditions of this Lease, including the payment of Rent, or (b) Tenant fails to make any installment of Rent as and when due, Landlord may apply or retain

the whole or any part of the Security Deposit, to the extent required for the payment of any Fixed Rent or any other sum as to which Tenant is in default including (i) any sum which Landlord may expend or may be required to expend by reason of Tenant's default, and/or (ii) any damages to which Landlord is entitled pursuant to this Lease, whether such damages accrue before or after summary proceedings or other reentry by Landlord.  If Landlord applies or retains any part of the Security Deposit, Tenant, upon demand, shall deposit with Landlord the amount so applied or retained so that Landlord shall have the full Security Deposit on hand at all times during the Term.  If Tenant shall comply with all of the terms, covenants and conditions of this Lease, the Security Deposit shall be returned to Tenant within forty-five (45) days after the Expiration Date and after delivery of possession of the Premises to Landlord in the manner required by this Lease, and such obligation of Landlord shall survive the termination of this Lease.  Tenant hereby irrevocably waives and relinquishes any and all rights, benefits, or protections, if any, Tenant now has, or in the future may have, under Section 1950.7 of the California Civil Code, any successor statue, and all other provisions of law, now or hereafter in effect, including, but not limited to, any provision of law which (A) establishes the time frame by which a landlord must refund a security deposit under a lease, or (B) provides that a landlord may claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by a tenant, or to clean the subject premises.  Tenant acknowledges and agrees that that (I) any statutory time frames for the return of a security deposit are superseded by the express period identified in this Section 27.2, above, and (II) rather than be so limited, Landlord may claim from the Security Deposit (1) any and all sums expressly identified in this Article 27, above, and (2) any additional sums reasonably necessary to compensate Landlord for any and all losses or damages caused by Tenant's default of this Lease, including, but not limited to, all damages or rent due upon termination of this Lease pursuant to Section 1951.2 of the California Civil Code.

**Section 27.3   Transfer**.  Upon a sale or other transfer of the Project or the Building, or any financing of Landlord's interest therein, Landlord shall have the right to transfer the Security Deposit to its transferee or lender.  Tenant shall look solely to the new landlord or lender for the return of such Security Deposit and the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new landlord.  Tenant shall not assign or encumber or attempt to assign or encumber the Security Deposit and neither Landlord nor its successors or assigns shall be bound by any such action or attempted assignment, or encumbrance.

## ARTICLE 28

## PARKING

Tenant shall have the right, but not the obligation, rent from Landlord, commencing on the Commencement Date, up to five (5) unreserved parking passes on a monthly basis throughout the Term, which parking passes shall pertain to the Project parking facility servicing the Project ("**Project Parking Facility**").  Tenant may change the number of parking passes rented pursuant to this Article 28 upon thirty (30) days prior written notice to Landlord, provided that in no event shall Tenant be entitled to rent more than the amount and type of parking passes allotted to Tenant as set forth in this Article 28 above.  Landlord shall have the right to provide parking for the Project at off-site locations other than the Project Parking Facility (without relocating Tenant's passes for the Project Parking Facility as specified above), and in such event, said off-site parking areas shall be deemed part of the Project for purposes of this Lease.  Landlord shall have the right to change, delete or modify such off-site parking areas.  Tenant shall pay to Landlord for automobile parking passes on a monthly basis the prevailing rate charged from time to time at the location of such parking passes.  In addition, Tenant shall be responsible for the full amount of any taxes imposed by any governmental authority in connection with the renting of such parking passes by Tenant or the use of the Project Parking Facility by Tenant.  Tenant's continued right to use the parking passes is conditioned upon Tenant abiding by all reasonable rules and regulations which are prescribed from time to time for the orderly operation and use of the Project Parking Facility, including any sticker or other identification system reasonably established by Landlord or an operator of the Project Parking Facility, Tenant's cooperation in seeing that Tenant's employees and visitors also comply with such rules and regulations and Tenant not being in default under this Lease.  Tenant's insurance and indemnification obligations in Articles 11 and 25 of this Lease shall be fully applicable to Tenant's use of the Project parking facility.  Landlord specifically reserves the right to change the size, configuration, design, layout and all

other aspects of the Project Parking Facility at any time and Tenant acknowledges and agrees that Landlord may, without incurring any liability to Tenant and without any abatement of Rent under this Lease, from time to time, close-off or restrict access to the Project Parking Facility for purposes of permitting or facilitating any such construction, alteration or improvements.  Landlord may delegate its responsibilities hereunder to a parking operator in which case such parking operator shall have all the rights of control attributed hereby to the Landlord.  The parking passes rented by Tenant pursuant to this Article 28 are provided to Tenant solely for use by Tenant's own personnel and such passes may not be transferred, assigned, subleased or otherwise alienated by Tenant without Landlord's prior approval.  Tenant may validate visitor parking by such method or methods as the Landlord may establish, at the validation rate from time to time generally applicable to visitor parking.

**[signatures appear on following page]**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:                                          TENANT:

WILSHIRE COURTYARD, L.P.                            MCCADDEN PROPERTY GROUP, LLC,
a Delaware limited partnership                      a Delaware limited liability company

By:   Wilshire Courtyard GP, L.L.C.                 By: _____
      a Delaware limited liability company,         Name: _Jared Rechnitz_____
      its general partner                           Title: _authorized Signatory_____

      By: _____             By: _____
      Name: _____              Name: _Rachel Rechnitz_____
      Its: _____Paul Galiano_____             Title: _authorized Signatory_____
              Senior Managing Director

**EXHIBIT A**

**Floor Plan**

The floor plan which follows is intended solely to identify the general location of the Premises, and should not be used for any other purpose.  All areas, dimensions and locations are approximate, and any physical conditions indicated may not exist as shown.



## EXHIBIT B

### Definitions

**Base Rate:**  The annual rate of interest publicly announced from time to time by Citibank, N.A., or its successor, in New York, New York as its "base rate" (or such other term as may be used by Citibank, N.A., from time to time, for the rate presently referred to as its "base rate").

**Building Standard Installations:**  The type of core and shell improvements typically provided by Landlord in connection with the initial occupancy of tenants in the Building.

**Building Systems:**  The mechanical, electrical, plumbing, sanitary, sprinkler, heating, ventilation and air conditioning, security, life-safety, elevator and other service systems or facilities of the Building up to the point of connection of localized distribution to the Premises (excluding, however, supplemental HVAC systems of tenants, sprinklers and the horizontal distribution systems within and servicing the Premises and by which mechanical, electrical, plumbing, sanitary, heating, ventilating and air conditioning, security, life-safety and other service systems are distributed from the base Building risers, feeders, panelboards, etc. for provision of such services to the Premises).

**Business Days:**  All days, excluding Saturdays, Sundays and Observed Holidays.

**Common Areas:**  The lobby, plaza and sidewalk areas, subterranean parking facilities (if any) and other similar areas of general access and the areas on individual multi-tenant floors in the Building devoted to corridors, elevator lobbies, restrooms, and other similar facilities serving the Premises.

**Comparable Buildings:**  First-class office buildings of comparable age and quality located in the Miracle Mile area of Los Angeles, California.

**Excluded Expenses:**  (a) Taxes; (b) franchise or income taxes imposed upon Landlord; (c) mortgage amortization and interest, except to the extent the same may be included in Operating Expenses pursuant to the terms of Section 7.1(e) of this Lease; (d) leasing commissions; (e) the cost of tenant installations and decorations incurred in connection with preparing space for any Building tenant, including work letters and concessions; (f) fixed rent under Superior Leases, if any; (g) management fees to the extent in excess of the greater of (A) three and one-half percent (3.5%) of the gross rentals and other revenues collected for the Project, and (B) fees charged for the management of a majority of the other Comparable Buildings; (h) wages, salaries and benefits paid to any persons above the grade of property manager or chief engineer (or employees with equivalent responsibilities regardless of job title) and their respective immediate supervisors; (i) legal and accounting fees relating to (A) disputes with tenants, prospective tenants or other occupants of the Building, (B) disputes with purchasers, prospective purchasers, mortgagees or prospective mortgagees of the Building or the Project or any part of either, or (C) negotiations of leases, contracts of sale or mortgages; (j) costs of services provided to other tenants of the Building on a "rent-inclusion" basis which are not provided to Tenant on such basis; (k) costs that are reimbursed out of insurance, warranty or condemnation proceeds, or which are reimbursed by Tenant or other tenants other than pursuant to an expense escalation clause; (l) costs in the nature of penalties or fines; (m) except with respect to management fees (which are subject to (g) above),costs for services, supplies or repairs paid to any related entity in excess of costs that would be payable in an "arm's length" or unrelated situation for comparable services, supplies or repairs; (n) allowances, concessions or other costs and expenses of improving or decorating any demised or demisable space in the Building; (o) advertising and promotional expenses in connection with leasing of the Building; (p) the costs of installing, operating and maintaining a specialty improvement, including a cafeteria, lodging or private dining facility, or an athletic, luncheon or recreational club unless Tenant is permitted to make use of such facility without additional cost (other than payments for key deposits, use of towels or other incidental items) or on a subsidized basis consistent with other users; (q) any costs or expenses (including fines, interest, penalties and legal fees) arising out of Landlord's failure to timely pay Operating Expenses or Taxes; (r) costs incurred to comply with applicable Requirements relating to any Hazardous Materials which were in existence in the Building or on the Real Property prior to the date of this Lease, and were of such a nature that a federal,

State or municipal governmental authority, if it had then had knowledge of the presence of such Hazardous Materials, in the state, and under the conditions that it then existed in the Building or on the Real Property, would have then required the removal of such Hazardous Materials or other remedial or containment action with respect thereto (the "**Pre-Existing Hazardous Materials**"); (s) costs incurred to remove, remedy, contain, or treat Hazardous Materials, which Hazardous Materials are brought into the Building or onto the Real Property after the date of this Lease by Landlord, any other tenant of the Building or any third party and is of such a nature, at that time, that a federal, State or municipal governmental authority, if it had then had knowledge of the presence of such Hazardous Materials, in the state, and under the conditions, that it then existed in the Building or on the Real Property, would have then required the removal of such Hazardous Materials or other remedial or containment action with respect thereto; and (t) Capital Costs other than those expressly included in Operating Expenses pursuant to Section 7.1.

**Governmental Authority:** The United States of America, the City of Los Angeles, County of Los Angeles, or State of California, or any political subdivision, agency, department, commission, board, bureau or instrumentality of any of the foregoing, now existing or hereafter created, having jurisdiction over the Project.

**Hazardous Materials:** Any substances, materials or wastes currently or in the future deemed or defined in any Requirement as "hazardous substances," "toxic substances," "contaminants," "pollutants" or words of similar import.

**HVAC System:** The Building System designed to provide heating, ventilation and air conditioning.

**Indemnitees:** Landlord, Landlord's Agent, each Mortgagee and Lessor, and each of their respective direct and indirect partners, officers, shareholders, directors, members, managers, trustees, beneficiaries, employees, principals, contractors, servants, agents, and representatives.

**Lease Year:** The first Lease Year shall commence on the Commencement Date and shall end on the last day of the calendar month preceding the month in which the first anniversary of the Commencement Date occurs. Each succeeding Lease Year shall commence on the day following the end of the preceding Lease Year and shall extend for twelve (12) consecutive months; provided, however, that the last Lease Year shall expire on the Expiration Date.

**Lessor:** A lessor under a Superior Lease.

**Losses:** Any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature (including reasonable attorneys' fees and disbursements) incurred in connection with any claim, proceeding or judgment and the defense thereof, and including all costs of repairing any damage to the Premises, the Building or the Project or the appurtenances of any of the foregoing to which a particular indemnity and hold harmless agreement applies.

**Mortgage(s):** Any mortgage, trust indenture or other financing document which may now or hereafter affect the Premises, the Project, the Building or any Superior Lease and the leasehold interest created thereby, and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor, and advances made thereunder.

**Mortgagee(s):** Any mortgagee, trustee or other holder of a Mortgage.

**Observed Holidays:** New Year's Day, Martin Luther King Day, Presidents Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, plus days observed by the State of California, the City of Los Angeles as holidays, and/or any local union recognized holidays.

**Ordinary Business Hours:** 8:00 a.m. to 6:00 p.m. on Business Days and 9:00 a.m. to 1:00 p.m. on Saturdays.

**Prohibited Use:** Any use or occupancy of the Premises that in Landlord's reasonable judgment would: (a) cause damage to the Project, the Building or any equipment, facilities or other systems therein; (b) impair the appearance of the Building or Project; (c) interfere with the efficient and economical maintenance, operation and repair of the Premises, the Building or the Project or the equipment, facilities or systems thereof; (d) adversely affect any service provided to, and/or the use and occupancy by, any Project or Building tenant or occupant, and/or injure or annoy any Project or Building tenant or occupants by reason of noise, odors, or vibrations; (e) violate the certificate of occupancy issued for the Premises, the Building or the Project; (f) materially and adversely affect the first-class image of the Building or Project; or (g) result in protests or civil disorder or commotions at, or other disruptions of the normal business activities in, the Project. Prohibited Use also includes the use of any part of the Premises for: (i) a restaurant or bar; (ii) the preparation, consumption, storage, manufacture or sale of food or beverages (except in connection with vending machines (provided that each machine, where necessary, shall have a waterproof pan thereunder and be connected to a drain) and/or warming kitchens installed for the use of Tenant's employees only), liquor, tobacco or drugs; (iii) the business of photocopying, multilith or offset printing (except photocopying in connection with Tenant's own business); (iv) a school or classroom; (v) lodging or sleeping; (vi) the operation of retail facilities (meaning a business whose primary patronage arises from the generalized solicitation of the general public to visit Tenant's offices in person without a prior appointment) of a savings and loan association or retail facilities of any financial, lending, securities brokerage or investment activity; (vii) a payroll office; (viii) a barber, beauty or manicure shop; (ix) an employment agency or similar enterprise; (x) offices of any Governmental Authority, any foreign government, the United Nations, or any agency or department of the foregoing; (xi) the manufacture, retail sale, storage of merchandise or auction of merchandise, goods or property of any kind to the general public which could reasonably be expected to create a volume of pedestrian traffic substantially in excess of that normally encountered in the Premises; (xii) the rendering of medical, dental or other therapeutic or diagnostic services; or (xiii) any illegal purposes or any activity constituting a nuisance.

**Requirements:** All present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes and executive orders, extraordinary and ordinary of (i) all Governmental Authorities, including, without limitation, (A) the Americans With Disabilities Act, 42 U.S.C. §12101 (et seq.), and any law of like import, and all rules, regulations and government orders with respect thereto, and (B) any of the foregoing relating to Hazardous Materials, environmental matters, public health and safety matters and landmarks protection, (ii) any applicable fire rating bureau or other body exercising similar functions, affecting the Project or the maintenance, use or occupation thereof, or any street, avenue or sidewalk comprising a part of or in front thereof or any vault in or under the same, (iii) all requirements of all insurance bodies affecting the Premises, (iv) utility service providers, and (v) Mortgagees or Lessors. "Requirements" shall also include the terms and conditions of any certificate of occupancy issued for the Premises or the Building, and any other covenants, conditions or restrictions affecting the Building and/or the Project from time to time.

**Rules and Regulations:** The rules and regulations annexed to and made a part of this Lease as **Exhibit F,** as they may be modified from time to time by Landlord.

**Specialty Alterations:** Alterations which are not standard office installations such as kitchens, executive bathrooms, raised computer floors, computer room installations, supplemental HVAC equipment, safe deposit boxes, vaults, libraries or file rooms requiring reinforcement of floors, internal staircases, slab penetrations, conveyors, dumbwaiters, and other Alterations of a similar character. All Specialty Alterations are Above-Building Standard Installations.

**Substantial Completion:** As to any construction performed by any party in the Premises, "Substantial Completion" or "Substantially Completed" means that such work has been completed, as reasonably determined by Landlord's architect, in accordance with (a) the provisions of this Lease applicable thereto, (b) the plans and specifications for such work, and (c) all applicable Requirements, except for minor details of construction, decoration and mechanical adjustments, if any, the noncompletion of which does not materially interfere with Tenant's use of the Premises or which in accordance with good construction practices should be completed after the completion of other work in the Premises or Building.

**Superior Lease(s):**  Any ground or underlying lease of the Project or any part thereof heretofore or hereafter made by Landlord and all renewals, extensions, supplements, amendments, modifications, consolidations, and replacements thereof.

**Tax Code**:  The Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as amended.

**Tenant Delay:**  Any action or inaction by Tenant, which actually delays Landlord in fulfilling any of Landlord's obligations under this Lease.

**Tenant-Insured Improvements**:  All Alterations and any other alterations, modifications or tenant improvements in the Premises, regardless of whether such Alterations, or other alterations, modifications or tenant improvements are installed by Landlord or Tenant.

**Tenant Party:**  Tenant and any subtenants or occupants of the Premises and their respective agents, contractors, subcontractors, employees, invitees or licensees.

**Tenant's Property:**  Tenant's movable fixtures and movable partitions, telephone and other equipment, computer systems, telecommunications, data and other cabling, trade fixtures, furniture, furnishings, and other items of personal property which are removable without material damage to the Building.

**Unavoidable Delays:**  Landlord's inability to fulfill or delay in fulfilling any of its obligations under this Lease expressly or impliedly to be performed by Landlord or Landlord's inability to make or delay in making any repairs, additions, alterations, improvements or decorations or Landlord's inability to supply or delay in supplying any equipment or fixtures, if Landlord's inability or delay is due to or arises by reason of strikes, labor troubles or by accident, or by any cause whatsoever beyond Landlord's reasonable control, including governmental preemption in connection with a national emergency, Requirements or shortages, or unavailability of labor, fuel, steam, water, electricity or materials, or delays caused by Tenant or other tenants, mechanical breakdown, acts of God, acts of war, enemy action, terrorism, bio-terrorism, civil commotion, fire or other casualty.

**<u>EXHIBIT C</u>**

**INTENTIONALLY OMITTED**

## EXHIBIT D

### Design Standards

(a)    **HVAC**.  The Building HVAC System serving the Premises is designed to maintain average temperatures within the Premises during Ordinary Business Hours of (i) not less than 68° F. during the heating season when the outdoor temperature is 40° F. or more and (ii) not more than 78° F. during the cooling season, when the outdoor temperatures are at 89° F. dry bulb with, in the case of clauses (i) and (ii), a population load per floor of not more than one person per 250 square feet of usable area, other than in dining and other special use areas per floor for all purposes, and shades fully drawn and closed, including lighting and power, and to provide at least 0.15 CFM of outside ventilation per square foot of rentable area.  Use of the Premises, or any part thereof, in a manner exceeding the foregoing design conditions or rearrangement of partitioning after the initial preparation of the Premises which interferes with normal operation of the air-conditioning service in the Premises may require changes in the air-conditioning system serving the Premises at Tenant's expense.

(b)    **Electrical**.  The Building Electrical system serving the Premises is designed to provide electricity as follows:

(i)    High voltage (480/277 Volt) connected power for lighting, as required by applicable Requirements, and

(ii)    5.0 watts per usable square foot of low voltage (120/208 volt) connected power for convenience receptacles.

**EXHIBIT E**

**Cleaning Specifications**

**GENERAL CLEANING**

NIGHTLY

### General Offices:

1.  All hard surfaced flooring to be swept using approved dustdown preparation.

2.  Carpet sweep all carpets, moving only light furniture (desks, file cabinets, etc. not to be moved).

3.  Hand dust and wipe clean all furniture, fixtures and window sills.

4.  Empty all waste receptacles and remove wastepaper.

5.  Wash clean all Building water fountains and coolers.

6.  Sweep all private stairways.

### Lavatories:

1.  Sweep and wash all floors, using proper disinfectants.

2.  Wash and polish all mirrors, shelves, bright work and enameled surfaces.

3.  Wash and disinfect all basins, bowls and urinals.

4.  Wash all toilet seats.

5.  Hand dust and clean all partitions, tile walls, dispensers and receptacles in lavatories and restrooms.

6.  Empty paper receptacles, fill receptacles from tenant supply and remove wastepaper.

7.  Fill toilet tissue holders from tenant supply.

8.  Empty and clean sanitary disposal receptacles.

WEEKLY

1.  Vacuum all carpeting and rugs.

2.  Dust all door louvers and other ventilating louvers within a person's normal reach.

3.  Wipe clean all brass and other bright work.

**NOT MORE THAN 3 TIMES PER YEAR**

High dust premises complete including the following:

1.  Dust all pictures, frames, charts, graphs and similar wall hangings not reached in nightly cleaning.

2.  Dust all vertical surfaces, such as walls, partitions, doors, door frames and other surfaces not reached in nightly cleaning.

3.  Dust all venetian blinds.

4.  Wash all windows.

## EXHIBIT F

### Rules and Regulations

1.      Nothing shall be attached to the outside walls of the Building.  Other than Building standard blinds, no curtains, blinds, shades, screens or other obstructions shall be attached to or hung in or used in connection with any exterior window or entry door of the Premises, without the prior consent of Landlord.

2.      No sign, advertisement, notice or other lettering visible from the exterior of the Premises shall be exhibited, inscribed, painted or affixed to any part of the Premises without the prior written consent of Landlord.  All lettering on doors shall be inscribed, painted or affixed in a size, color and style acceptable to Landlord.

3.      The grills, louvers, skylights, windows and doors that reflect or admit light and/or air into the Premises or Common Areas shall not be covered or obstructed by Tenant, nor shall any articles be placed on the window sills, radiators or convectors.

4.      Landlord shall have the right to prohibit any advertising by any Tenant which, in Landlord's opinion, tends to impair the reputation of the Building, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

5.      Common Areas shall not be obstructed or encumbered by any Tenant or used for any purposes other than ingress of egress to and from the Premises and for delivery of merchandise and equipment in a prompt and efficient manner, using elevators and passageways designated for such delivery by Landlord.

6.      Except in those areas designated by Tenant as "security areas," all locks or bolts of any kind shall be operable by the Building's Master Key.  No locks shall be placed upon any of the doors or windows by Tenant, nor shall any changes be made in locks or the mechanism thereof which shall make such locks inoperable by the Building's Master Key.  Tenant shall, upon the termination of its Lease, deliver to Landlord all keys of stores, offices and lavatories, either furnished to or otherwise procured by Tenant and in the event of the loss of any keys furnished by Landlord, Tenant shall pay to Landlord the cost thereof.

7.      Tenant shall keep the entrance door to the Premises closed at all times.

8.      All movement in or out of any freight, furniture, boxes, crates or any other large object or matter of any description must take place during such times and in such elevators as Landlord may prescribe.  Landlord reserves the right to inspect all articles to be brought into the Building and to exclude from the Building all articles which violate any of these Rules and Regulations or the Lease.  Landlord may require that any person leaving the public areas of the Building with any article to submit a pass, signed by an authorized person, listing each article being removed, but the establishment and enforcement of such requirement shall not impose any responsibility on Landlord for the protection of any Tenant against the removal of property from the Premises.

9.      All hand trucks shall be equipped with rubber tires, side guards and such other safeguards as Landlord may require.

10.     No Tenant Party shall be permitted to have access to the Building's roof, mechanical, electrical or telephone rooms without permission from Landlord.

11.     Tenant shall not permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors, vibrations or interfere in any way with other tenants or those having business therein.

12.     Tenant shall not employ any person or persons other than the janitor of Landlord for the purpose of cleaning the Premises, unless otherwise agreed to by Landlord. Tenant shall not cause any unnecessary labor by reason of such Tenant's carelessness or indifference in the preservation of good order and cleanliness.

13.     Tenant shall store all its trash and recyclables within its Premises. No material shall be disposed of which may result in a violation of any Requirement. All refuse disposal shall be made only though entryways and elevators provided for such purposes and at such times as Landlord shall designate. Tenant shall use the Building's hauler.

14.     Tenant shall not deface any part of the Building. No boring, cutting or stringing of wires shall be permitted, except with prior consent of Landlord, and as Landlord may direct.

15.     The water and wash closets, electrical closets, mechanical rooms, fire stairs and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed and no sweepings, rubbish, rags, acids or other substances shall be deposited therein. All damages resulting from any misuse of the fixtures shall be borne by Tenant where a Tenant Party caused the same.

16.     Tenant, before closing and leaving the Premises at any time, shall see that all lights, water faucets, etc. are turned off. All entrance doors in the Premises shall be kept locked by Tenant when the Premises are not in use.

17.     No bicycles, in-line roller skates, vehicles or animals of any kind (except for seeing eye dogs) shall be brought into or kept by any Tenant in or about the Premises or the Building.

18.     Canvassing or soliciting in the Building is prohibited.

19.     Employees of Landlord or Landlord's Agent shall not perform any work or do anything outside of the regular duties, unless under special instructions from the office of Landlord or in response to any emergency condition.

20.     Tenant is responsible for the delivery and pick up of all mail from the United States Post Office.

21.     Landlord reserves the right to exclude from the Building during other than Ordinary Business Hours all persons who do not present a valid Building pass. Tenant shall be responsible for all persons for whom a pass shall be issued at the request of Tenant and shall be liable to Landlord for all acts of such persons.

22.     No smoking shall be permitted in, on or about the Premises, the Building or the Project. Tenant shall comply with the State of California "No-Smoking" law set forth in California Labor Code Section 6404.5, or any successor statute, and any local "No-Smoking" ordinance which may be in effect from time to time and which is not superseded by such State law.

23.     Landlord shall not be responsible to Tenant or to any other person or entity for the non-observance or violation of these Rules and Regulations by any other tenant or other person or entity. Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition to its occupancy of the Premises.

24.     The review/alteration of Tenant drawings and/or specifications by Landlord's Agent and any of its representatives is not intended to verify Tenant's engineering or design requirements and/or solutions. The review/alteration is performed to determine compatibility with the Building Systems and lease conditions. Tenant renovations must adhere to the Building's applicable Standard Operating Procedures and be compatible with all Building Systems.

**EXHIBIT G**

**VIA HAND DELIVERY**

_____, 20__

_____
_____
_____
_____

**[NOTE – REVISE AS NECESSARY TO REFLECT TRANSACTION]**

RE:    Lease ("Lease") dated _____, 20__ between, _____ as "Tenant", and Wilshire Courtyard, L.P., as "Landlord", for the premises located at 5700 Wilshire Boulevard, Los Angeles, California, Suite _____

*Commencement Agreement*

Dear _____:

            We have deemed the Work in Suite _____ "substantially complete" (subject to punchlist items that have been noted on the walkthroughs) as of _____. In accordance with Articles 1 and 2 and Exhibit G of the above-referenced Lease, this letter is to confirm the following:

**Premises** consist of _____ square feet on the ___ floor and are hereby delivered by the Landlord as of _____.

**Commencement Date** is _____.

**Tenant's Share** of the Premises is _____%.

**Expiration Date** is _____, 20___ unless earlier terminated.

Should Landlord not receive a signed response within ten (10) days from the date above, the aforementioned dates shall be deemed to be accepted by Tenant.

If you concur with the aforementioned, please execute and return one original copy to my attention.

Thank you.

Sincerely,

**TISHMAN SPEYER**

_____
Property Manager

**ACCEPTED AND AGREED:**

_____
By: _Mudof_

Name: _Jared Rechnitz_

Title: _authorized Signatory_

## EXHIBIT H

## FORM OF GUARANTY

JONA RECHNITZ, an individual, and RACHEL KAHN, an individual (collectively, the "**Guarantor**"), as a material inducement to and in consideration of WILSHIRE COURTYARD, L.P., a Delaware limited partnership ("**Landlord**") entering into a written lease (as amended, modified, supplemented, extended, restated or replaced, the "**Lease**") with MCCADDEN PROPERTY GROUP, LLC, a Delaware limited liability company ("**Tenant**"), dated the same date as this Guaranty of Lease, pursuant to which Landlord leased to Tenant, and Tenant leased from Landlord, premises located on the third (3rd) floor, commonly known as Suite 355, of that certain building located at 5700 Wilshire Boulevard, Los Angeles, California (the "**Building**"), unconditionally and absolutely guarantee and promise to and for the benefit of Landlord that Tenant shall timely perform all of the obligations of Tenant under the Lease when due. If Tenant at any time fails to pay rent when due under the Lease or shall otherwise default in the timely performance of any provisions of the Lease, the Guarantor shall immediately perform such obligations of Tenant, including, without limitation, the payment of any rent past due under the Lease, and pay Landlord all damages, costs and expenses that may arise as a result of such default by Tenant, including, without limitation, all reasonable attorneys' fees and disbursements incurred by Landlord or caused by any such default by Tenant and/or by the enforcement of this Guaranty of Lease. The address of the Guarantor is at 441 West End Avenue, Apt. No. 12A, New York, New York 10024, Attn: Jona Rechnitz.

This Guaranty of Lease is an absolute and unconditional guaranty of payment and of performance. It shall be enforceable against each Guarantor without the necessity of any suit or proceeding on Landlord's part of any kind or nature whatsoever against Tenant, its successors and assigns, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or any other notice or demand to which the Guarantor might otherwise be entitled, all of which each Guarantor hereby expressly waives; and Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of each Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, or against Tenant's successors and assigns, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (a) the release or discharge of Tenant in any creditors' proceedings, receivership, bankruptcy or other proceeding; (b) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code or other statute or from the decision in any court; or (c) the rejection or disaffirmance of the Lease in any such proceeding.

If Guarantor is more than one person, Guarantor's obligations are joint and several and are independent of Tenant's obligations. A separate action may be brought or prosecuted against any Guarantor whether the action is brought or prosecuted against any other Guarantor or Tenant, or all, or whether any other Guarantor or Tenant, or all, are joined in the action.

This Guaranty shall continue to be effective or be reinstated if at any time the payment of any amount due under the Lease is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned.

Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty of Lease.

The provisions of the Lease may be changed by agreement between Landlord and Tenant at any time, or by course of conduct, without the consent of or without notice to Guarantor. This Guaranty of Lease shall guarantee the performance of the Lease as modified, amended, supplemented, extended, restated or replaced and is a guaranty of the Tenant's performance of the Lease and payment of the sums due thereunder and not of collection. Assignment of the Lease (as permitted by the Lease) shall not affect

EXHIBIT H
-1-

EXHIBIT D    0122

this Guaranty of Lease. Landlord's consent to any assignment or assignments and successive assignments by Tenant and Tenant's assigns of the Lease, made either with or without notice to the Guarantor, shall in no manner whatsoever release the Guarantor from any liability under this Guaranty of Lease.

This Guaranty of Lease shall not be affected by Landlord's failure or delay to assert any claim or demand or to enforce any of its rights.  Partial or single exercise of any right, power or privilege under this Guaranty of Lease shall not preclude any other or further exercise of any right, power or privilege by Landlord.  Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty of Lease.

If Tenant fails to pay rent when due under the Lease or otherwise defaults under the Lease, Landlord may proceed immediately against Guarantor or Tenant, or both, or Landlord may enforce against Guarantor or Tenant, or both, any rights that it has under the Lease, or pursuant to applicable laws.  If the Lease terminates and Landlord has any rights it may enforce against Tenant after termination, Landlord may enforce those rights against Guarantor without giving prior notice to Tenant or Guarantor, or without making any demand on either of them.

Guarantor waives the right to require Landlord to (1) proceed against Tenant; (2) proceed against or exhaust any security that Landlord holds from Tenant; or (3) pursue any other remedy in Landlord's power.  Guarantor waives any defense by reason of any disability of Tenant, and waives any other defense based on the termination of Tenant's liability from any cause.  Until all Tenant's obligations to Landlord have been discharged in full, Guarantor has no right of subrogation against Tenant.  Guarantor waives its right to enforce any remedies that Landlord now has, or later may have, against Tenant.  Guarantor waives any right to participate in any security now or later held by Landlord.  Guarantor waives all presentments, notices of dishonor, and notices of acceptance of this Guaranty of Lease, and waives all notices of the existence, creation, or incurring of new or additional obligations.

Guarantor further agrees that Landlord may, without notice, assign this Guaranty of Lease in whole or in part and expressly waives the provisions of California Civil Code Section 2845.  If Landlord disposes of its interest in the Lease, "Landlord," as used in this Guaranty of Lease, shall mean Landlord's successors and assigns.  Additionally, without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under California Civil Code §§2809, 2810, 2819, 2845, 2847, 2848, 2849 and 2850.

If Landlord is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Landlord all costs incurred, including, without limitation, reasonable attorneys' fees and expenses.

Guarantor's obligations under this Guaranty of Lease shall be binding on Guarantor's successors and shall inure to the benefit of Landlord's successors, assigns and designees and to any mortgagee or beneficiary under a deed of trust to which the Lease has been assigned and their respective successors and assigns.

This Guaranty of Lease shall be governed by the laws of the State of California.  Guarantor hereby submits itself to the jurisdiction of the courts of the State of California, and hereby irrevocably appoints Tenant, or, if Tenant is more than one person, then any one of them, the manager, assistant manager and any acting manager of the facility being operated at any time during the term of the Lease at the Premises, and (if Tenant is a corporation, trustee or partnership) all persons of Tenant upon whom service of process may be served for service upon Tenant as its agents for the service of process in any action against any Guarantor arising out of this Guaranty.  Pursuant to such service, suit may be brought against Guarantor in the County of Los Angeles.  This provision does not affect any right to serve process upon Guarantor in any other manner permitted by law.

Guarantor shall from time to time within 10 days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty of Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and

effect as modified and stating such modifications).  Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Building.

   If any portion of this Guaranty of Lease is invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty of Lease.  This Guaranty of Lease is dated as of June 14, 2017.

     GUARANTORS:

     _____
     Jona Rechnitz, an individual

     _____
     Rachel Kahn, an individual

## GUARANTY

JONA RECHNITZ, an individual, and RACHEL KAHN, an individual (collectively, the "**Guarantor**"), as a material inducement to and in consideration of WILSHIRE COURTYARD, L.P., a Delaware limited partnership ("**Landlord**") entering into a written lease (as amended, modified, supplemented, extended, restated or replaced, the "**Lease**") with MCCADDEN PROPERTY GROUP, LLC, a Delaware limited liability company ("**Tenant**"), dated the same date as this Guaranty of Lease, pursuant to which Landlord leased to Tenant, and Tenant leased from Landlord, premises located on the third (3ʳᵈ) floor, commonly known as Suite 355, of that certain building located at 5700 Wilshire Boulevard, Los Angeles, California (the "**Building**"), unconditionally and absolutely guarantee and promise to and for the benefit of Landlord that Tenant shall timely perform all of the obligations of Tenant under the Lease when due. If Tenant at any time fails to pay rent when due under the Lease or shall otherwise default in the timely performance of any provisions of the Lease, the Guarantor shall immediately perform such obligations of Tenant, including, without limitation, the payment of any rent past due under the Lease, and pay Landlord all damages, costs and expenses that may arise as a result of such default by Tenant, including, without limitation, all reasonable attorneys' fees and disbursements incurred by Landlord or caused by any such default by Tenant and/or by the enforcement of this Guaranty of Lease. The address of the Guarantor is at 441 West End Avenue, Apt. No. 12A, New York, New York 10024, Attn: Jona Rechnitz.

This Guaranty of Lease is an absolute and unconditional guaranty of payment and of performance. It shall be enforceable against each Guarantor without the necessity of any suit or proceeding on Landlord's part of any kind or nature whatsoever against Tenant, its successors and assigns, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or any other notice or demand to which the Guarantor might otherwise be entitled, all of which each Guarantor hereby expressly waives; and Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of each Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, or against Tenant's successors and assigns, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (a) the release or discharge of Tenant in any creditors' proceedings, receivership, bankruptcy or other proceeding; (b) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code or other statute or from the decision in any court; or (c) the rejection or disaffirmance of the Lease in any such proceeding.

If Guarantor is more than one person, Guarantor's obligations are joint and several and are independent of Tenant's obligations. A separate action may be brought or prosecuted against any Guarantor whether the action is brought or prosecuted against any other Guarantor or Tenant, or all, or whether any other Guarantor or Tenant, or all, are joined in the action.

This Guaranty shall continue to be effective or be reinstated if at any time the payment of any amount due under the Lease is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned.

Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty of Lease.

The provisions of the Lease may be changed by agreement between Landlord and Tenant at any time, or by course of conduct, without the consent of or without notice to Guarantor. This Guaranty of Lease shall guarantee the performance of the Lease as modified, amended, supplemented, extended, restated or replaced and is a guaranty of the Tenant's performance of the Lease and payment of the sums due thereunder and not of collection. Assignment of the Lease (as permitted by the Lease) shall not affect this Guaranty of Lease. Landlord's consent to any assignment or assignments and successive assignments

by Tenant and Tenant's assigns of the Lease, made either with or without notice to the Guarantor, shall in no manner whatsoever release the Guarantor from any liability under this Guaranty of Lease.

This Guaranty of Lease shall not be affected by Landlord's failure or delay to assert any claim or demand or to enforce any of its rights. Partial or single exercise of any right, power or privilege under this Guaranty of Lease shall not preclude any other or further exercise of any right, power or privilege by Landlord. Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty of Lease.

If Tenant fails to pay rent when due under the Lease or otherwise defaults under the Lease, Landlord may proceed immediately against Guarantor or Tenant, or both, or Landlord may enforce against Guarantor or Tenant, or both, any rights that it has under the Lease, or pursuant to applicable laws. If the Lease terminates and Landlord has any rights it may enforce against Tenant after termination, Landlord may enforce those rights against Guarantor without giving prior notice to Tenant or Guarantor, or without making any demand on either of them.

Guarantor waives the right to require Landlord to (1) proceed against Tenant; (2) proceed against or exhaust any security that Landlord holds from Tenant; or (3) pursue any other remedy in Landlord's power. Guarantor waives any defense by reason of any disability of Tenant, and waives any other defense based on the termination of Tenant's liability from any cause. Until all Tenant's obligations to Landlord have been discharged in full, Guarantor has no right of subrogation against Tenant. Guarantor waives its right to enforce any remedies that Landlord now has, or later may have, against Tenant. Guarantor waives any right to participate in any security now or later held by Landlord. Guarantor waives all presentments, notices of dishonor, and notices of acceptance of this Guaranty of Lease, and waives all notices of the existence, creation, or incurring of new or additional obligations.

Guarantor further agrees that Landlord may, without notice, assign this Guaranty of Lease in whole or in part and expressly waives the provisions of California Civil Code Section 2845. If Landlord disposes of its interest in the Lease, "Landlord," as used in this Guaranty of Lease, shall mean Landlord's successors and assigns. Additionally, without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under California Civil Code §§2809, 2810, 2819, 2845, 2847, 2848, 2849 and 2850.

If Landlord is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Landlord all costs incurred, including, without limitation, reasonable attorneys' fees and expenses.

Guarantor's obligations under this Guaranty of Lease shall be binding on Guarantor's successors and shall inure to the benefit of Landlord's successors, assigns and designees and to any mortgagee or beneficiary under a deed of trust to which the Lease has been assigned and their respective successors and assigns.

This Guaranty of Lease shall be governed by the laws of the State of California. Guarantor hereby submits itself to the jurisdiction of the courts of the State of California, and hereby irrevocably appoints Tenant, or, if Tenant is more than one person, then any one of them, the manager, assistant manager and any acting manager of the facility being operated at any time during the term of the Lease at the Premises, and (if Tenant is a corporation, trustee or partnership) all persons of Tenant upon whom service of process may be served for service upon Tenant as its agents for the service of process in any action against any Guarantor arising out of this Guaranty. Pursuant to such service, suit may be brought against Guarantor in the County of Los Angeles. This provision does not affect any right to serve process upon Guarantor in any other manner permitted by law.

Guarantor shall from time to time within 10 days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty of Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and

effect as modified and stating such modifications).  Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Building.

If any portion of this Guaranty of Lease is invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty of Lease.  This Guaranty of Lease is dated as of June 14, 2017.

GUARANTORS:

_____
Jona Rechnitz, an individual

_____
Rachel Kahn, an individual

# EXHIBIT B

EXHIBIT D   0128

**BY MESSENGER**

## THREE DAY NOTICE TO PAY RENT OR QUIT

To:     Mccadden Property Group
5700 Wilshire Boulevard, Suite 355
Los Angeles, CA 90036

And All Others in Possession

Re:     Lease dated as of June 14, 2017 (the "Lease") between Wilshire Courtyard L.P. ("Landlord") and Mccadden Property Group ("Tenant") for the premises commonly known as 5700 Wilshire Boulevard, Suite 355, Los Angeles, CA 90036 (the "Premises")

**NOTICE IS HEREBY GIVEN** that Tenant has committed a default and breach of the Lease, by which Tenant holds possession of the Premises as a month to month tenant. Pursuant to California Code of Civil Procedure section 1161.1, Landlord estimates and believes that Rent (as defined in the Lease) in the amount of $28,077.47 is due and owing within the preceding twelve months (exclusive of late charges to which Landlord may also be entitled), as set forth in the attached.

**DEMAND IS HEREBY MADE UPON TENANT** that, within **THREE (3) DAYS** after service of this notice upon Tenant, Tenant pay said sum OR vacate and deliver possession of the above-described Premises, to the undersigned, as authorized agent for Landlord. Pursuant to Code of Civil Procedure section 1161(2), Tenant may deliver said sum to the following person(s), as authorized agent for the Landlord, via personal delivery, between the hours of 9:00 a.m. to 5:00 p.m., Monday through Friday, holidays excepted:

Patricia Costopoulos | General Manager
Wilshire Courtyard
5700 Wilshire Boulevard, Suite 365
Los Angeles, California 90036
Telephone:  (323) 939-0300

If Tenant fails either to pay the amount demanded in this notice or to vacate and deliver possession of the Premises within said **THREE (3) DAYS**, the undersigned will institute legal proceedings for unlawful detainer against Tenant to recover possession of the Premises, to declare the Lease forfeited, and to recover rent, damages and costs of suit.

**TENANT IS NOTIFIED** that acceptance of any partial payment by the Landlord does not constitute a waiver of any rights, including any right the Landlord may have to recover possession of the Premises, as provided in California Code of Civil Procedure section 1161.1. If Landlord does not intend to accept a payment that has been sent to a lock box, Landlord will return the payment as soon as Landlord becomes aware of it. The fact that Tenant's check has been deposited does not mean that Landlord was aware of it and intended to accept it.

**TENANT IS FURTHER NOTIFIED** that by this notice, Landlord elects to and does hereby declare a forfeiture of the Lease under which Tenant holds possession of the Premises if Tenant fails to pay the estimated amount demanded in this notice within said **THREE (3) DAYS**.

Dated: June 4, 2019

_____
Todd Whitman,
Attorney and Authorized Agent of Wilshire
Courtyard, L.P.

NOTICE TO PAY OR QUIT

EXHIBIT D   0130

**MCCADDEN PROPERTY GROUP, LLC**

5700 WILSHIRE BOULEVARD
SUITE 355
LOS ANGELES, CA, 90036
USA

Statement Date : 6/1/2019

Property Id : 6F01-P01

Contract Id : 6F01-00046

Account Number : 6F01-000046

Amount May Be Remitted Electronically :

To :          **WELLS FARGO BANK, NA**

Account :     **Wilshire Courtyard LP - Lockbox Account**

Account # :   **4123026486**

ABA for Wires :   **121000248**

ABA for ACH :     **121000248**

Remit Payment via Overnight/Courier ONLY to :

**WILSHIRE COURTYARD LP**
BOX 844429
3440 FLAIR DRIVE
EL MONTE, CA, 91731
USA

| Date | Floor | Unit | Billing Type | Additional Description | Charges | Payments | Amount Due |
|------|-------|------|--------------|------------------------|---------|----------|------------|
| 1/1/2019 | 03 | 03-0355 | Real Estate Tax | 2019 RE Tax Escalation | $14.65 | $14.46 | $0.19 |
| 2/1/2019 | 03 | 03-0355 | Operating Escalation | 2019 Operating Escalation | $202.08 | $0.00 | $202.08 |
| 2/1/2019 | 03 | 03-0355 | Real Estate Tax | 2019 RE Tax Escalation | $14.65 | $0.00 | $14.65 |
| 3/1/2019 | 03 | 03-0355 | Base Rent | Base Rent | $6,649.42 | $0.00 | $6,649.42 |
| 3/1/2019 | 03 | 03-0355 | Operating Escalation | 2019 Operating Escalation | $202.08 | $0.00 | $202.08 |
| 3/1/2019 | 03 | 03-0355 | Real Estate Tax | 2019 RE Tax Escalation | $14.65 | $0.00 | $14.65 |
| 3/1/2019 | 03 | 03-0355 | Prior Year Esc | 2018 OPEX Escalation True-up | $513.50 | $0.00 | $513.50 |
| 3/1/2019 | 03 | 03-0355 | Prior Year RE Tax | 2018 RE Tax Escalation True-up | $-117.54 | $0.00 | $-117.54 |
| 4/1/2019 | 03 | 03-0355 | Base Rent | Base Rent | $6,649.42 | $0.00 | $6,649.42 |
| 4/1/2019 | 03 | 03-0355 | Operating Escalation | 2019 Operating Escalation | $202.08 | $0.00 | $202.08 |
| 4/1/2019 | 03 | 03-0355 | Real Estate Tax | 2019 RE Tax Escalation | $14.65 | $0.00 | $14.65 |

5700 WILSHIRE COURTYARD LP

**MCCADDEN PROPERTY GROUP, LLC**

5700 WILSHIRE BOULEVARD
SUITE 355
LOS ANGELES, CA, 90036
USA

| | |
|---|---|
| Statement Date : | 6/1/2019 |
| Property Id : | 6F01-P01 |
| Contract Id : | 6F01-00046 |
| Account Number : | 6F01-000046 |

Amount May Be Remitted Electronically :

| | |
|---|---|
| To : | **WELLS FARGO BANK, NA** |
| Account : | **Wilshire Courtyard LP - Lockbox Account** |
| Account # : | **4123026486** |
| ABA for Wires : | **121000248** |
| ABA for ACH : | **121000248** |

Remit Payment via Overnight/Courier ONLY to :

**WILSHIRE COURTYARD LP**
BOX 844429
3440 FLAIR DRIVE
EL MONTE, CA, 91731
USA

| Date | Floor | Unit | Billing Type | Additional Description | Charges | Payments | Amount Due |
|---|---|---|---|---|---|---|---|
| 5/1/2019 | 03 | 03-0355 | Base Rent | Base Rent | $6,649.42 | $0.00 | $6,649.42 |
| 5/1/2019 | 03 | 03-0355 | Operating Escalation | 2019 Operating Escalation | $202.08 | $0.00 | $202.08 |
| 5/1/2019 | 03 | 03-0355 | Real Estate Tax | 2019 RE Tax Escalation | $14.65 | $0.00 | $14.65 |
| 5/28/2019 | | | | WIRE # 052819A | $-6,649.43 | $-6,649.42 | $-0.01 |
| 6/1/2019 | 03 | 03-0355 | Base Rent | Base Rent | $6,649.42 | $0.00 | $6,649.42 |
| 6/1/2019 | 03 | 03-0355 | Operating Escalation | 2019 Operating Escalation | $202.08 | $0.00 | $202.08 |
| 6/1/2019 | 03 | 03-0355 | Real Estate Tax | 2019 RE Tax Escalation | $14.65 | $0.00 | $14.65 |

| Current | 30 | 60 | 90 | 120+ | Balance Due |
|---|---|---|---|---|---|
| 6,866.14 | 6,866.15 | 6,866.15 | 7,478.84 | 0.19 | 28,077.47 |

For Billing Questions, Please Call  (323) 939-0300

**KEEP THIS PORTION FOR YOUR RECORDS**

From :

5700 WILSHIRE BLVD
LOS ANGELES, CA, 90036
USA

**PLEASE RETURN THIS PORTION WITH PAYMENT. THANK YOU**

| Statement Date | Property Id | Contract Id | Account Number | Amount Due |
|---|---|---|---|---|
| 6/1/2019 | 6F01-P01 | 6F01-00046 | 6F01-000046 | 28,077.47 |

MAKE CHECKS PAYABLE TO :

**5700 WILSHIRE COURTYARD LP**

REMIT PAYMENT VIA STANDARD MAIL TO :

**WILSHIRE COURTYARD LP**
PO BOX 844429
LOS ANGELES, CA, 90084-4429
USA

**AMOUNT PAID**

$

Bill To :

MCCADDEN PROPERTY GROUP, LLC

5700 WILSHIRE BOULEVARD
SUITE 355
LOS ANGELES, CA, 90036
USA

EXHIBIT D   0132

TODD E. WHITMAN                                      SBN: 173878
  ALLEN, MATKINS, LECK, GAMBLE, MALLORY & NATSIS, LLP
  1901 AVENUE OF THE STARS, SUITE 1800   LOS ANGELES, CA 90067

## PROOF OF SERVICE

I, the undersigned declare that I served the Notice (s) below as indicated:

THREE-DAY NOTICE TO PAY RENT OR QUIT

The above described Notice (s) were served on the following named parties in the manner set forth below:

NAME OF OCCUPANT:   MCCADDEN PROPERTY GROUP

DATE OF Posting:   June 4, 2019
TIME OF Posting:   04:42 pm

DATE OF MAILING:   June 4, 2019

ADDRESS OF PROPERTY:   5700 WILSHIRE BLVD., SUITE 355
                       LOS ANGELES, CA 90036
                       (BUSINESS)

☐ 1. PERSONAL SERVICE          By delivering a copy of the Notice(s) on the above named occupant(s)

☒ 2. CONSTRUCTIVE SERVICE      After due and diligent effort, by service of said Notice(s) as authorized by C.C.P.
                               Section 1162 (2,3) on each of the above named parties in the manner set forth below.

XX By posting a copy for each of the above named parties on June 4, 2019 at 04:42 pm in a conspicuous place on the
   property; and thereafter mailing a copy to each said party by depositing said copies in the United States mail, in a
   sealed envelope with postage fully prepaid, addressed to each said party at their place where the property is
   situated on June 4, 2019.

Fee for Service:                          I declare under penalty of perjury under the laws of The
NATIONWIDE County:  LOS ANGELES           State of California that the foregoing information
LEGAL                                     contained in the return of service and statement of
     Registration No.:  2018032404        service fees is true and correct and that this declaration
     Nationwide Legal, LLC (12-234648)    was executed on June 5, 2019.
     1609 James M. Wood Blvd., 2nd Fl
     Los Angeles, CA 90015
     (213) 249-9999
     Ref: WILSHIRE COURTYARD              Signature: _____
                                                           ROBERT BROOKS

**PROOF OF SERVICE**

982(a)(23)[New July 1, 1987]                                          Order#: 1200119/NTQ
                                                            EXHIBIT D    0133

TODD E. WHITMAN
ALLEN, MATKINS, LECK, GAMBLE, MALLORY & NATSIS, LLP  SBN: 173878
1901 AVENUE OF THE STARS, SUITE 1800  LOS ANGELES, CA 90067

## PROOF OF SERVICE

I, the undersigned declare that I served the Notice (s) below as indicated:

THREE-DAY NOTICE TO PAY RENT OR QUIT

The above described Notice (s) were served on the following named parties in the manner set forth below:

NAME OF OCCUPANT:  ALL OTHERS IN POSSESSION

DATE OF Posting:  June 4, 2019
TIME OF Posting:  04:42 pm

DATE OF MAILING:  June 4, 2019

ADDRESS OF PROPERTY:  5700 WILSHIRE BLVD., SUITE 355
LOS ANGELES, CA 90036
(BUSINESS)

☐  1. PERSONAL SERVICE  By delivering a copy of the Notice(s) on the above named occupant(s)

☒  2. CONSTRUCTIVE SERVICE  After due and diligent effort, by service of said Notice(s) as authorized by C.C.P.
Section 1162 (2,3) on each of the above named parties in the manner set forth below.

<u>XX</u> By posting a copy for each of the above named parties on June 4, 2019 at 04:42 pm in a conspicuous place on the
property; and thereafter mailing a copy to each said party by depositing said copies in the United States mail, in a
sealed envelope with postage fully prepaid, addressed to each said party at their place where the property is
situated on June 4, 2019.

Fee for Service:
NATIONWIDE LEGAL  County: LOS ANGELES
Registration No.: 2018032404
Nationwide Legal, LLC (12-234648)
1609 James M. Wood Blvd., 2nd Fl
Los Angeles, CA 90015
(213) 249-9999
Ref: WILSHIRE COURTYARD

I declare under penalty of perjury under the laws of The
State of California that the foregoing information
contained in the return of service and statement of
service fees is true and correct and that this declaration
was executed on June 5, 2019.

Signature: _____
ROBERT BROOKS

## PROOF OF SERVICE

982(a)(23)[New July 1, 1987]  Order#: 1200120/NTQ
EXHIBIT D  0134

# EXHIBIT E

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

### United States District Court

Southern _____ District of New York _____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 1 7 2020

Caption:

UNITED STATES OF AMERICA _____ v.

JONA RECHNITZ _____

Docket No.: 1:16 CR. 00389-01

Alvin K. Hellerstein _____

(District Court Judge)

Notice is hereby given that _Jona Rechnitz_____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ✓ , other ▯ _____

entered in this action on _March 3, 2020_____ .                    (specify)

(date)

This appeal concerns: Conviction only ▯___   Sentence only ✓▯   Conviction & Sentence ▯___   Other ▯___

Defendant found guilty by plea ✓ ▯ trial ▯ ▯ N/A ▯    .

Offense occurred after November 1, 1987? Yes ✓ ▯  No ▯    N/A ▯

Date of sentence: _12/19/2019_____ N/A ▯___▯

Bail/Jail Disposition: Committed ▯___   Not committed ✓ ▯  N/A ▯

Appellant is represented by counsel? Yes ✓ ▯ No ▯    If yes, provide the following information:

Defendant's Counsel:   Alan Levine

Counsel's Address:   Cooley LLP

55 Hudson Yards, New York, NY  10001

Counsel's Phone:   212-479-6000

Assistant U.S. Attorney:   Martin Bell

AUSA's Address:   United States Attorney's Office, SDNY

New York, NY 10007

AUSA's Phone:   212)-637-2463

Signature

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x
                      :

UNITED STATES OF AMERICA,         :   **ORDER DENYING MOTION**
                       :   **FOR RESTITUTION**

  -against-                 :
                       :   16 Cr. 389 (AKH)
JONA RECHNITZ,               :
                       :

              Defendant.   :
                       :

--------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

      On December 20, 2019, I sentenced Defendant Jona Rechnitz for conspiracy to

commit wire fraud.  At that time, I ordered, *inter alia*, Defendant to pay restitution in the amount

of $19 million, joint and several with his two co-conspirators, Norman Seabrook and Murray

Huberfeld, *see* 16 Cr. 467.  I ordered Rechnitz to make restitution payments at a rate of $500,000

per year.  However, unlike his co-conspirators, I ordered that Defendant's restitution liability be

capped at $10 million.  *See* ECF No. 80 (sentencing).

      On February 27, 2020, after imposition of the sentence but before the judgment

was filed, the Correction Officers' Benevolent Association ("COBA") moved to amend the

sentence to recognize COBA's full right to restitution, as a victim of the Rechnitz-Huberfeld-

Seabrook conspiracy.  COBA moved, pursuant to the Crime Victims' Rights Act ("CVRA"), *see*

18 U.S.C. § 3771, for an order requiring Defendant Rechnitz to pay immediately the balance still

owing to COBA, $14.25 million, after having recouped $4.75 million from Huberfeld.[1]  In its

motion, COBA argues a compelling point, that Rechnitz, as the arranger of the bribe underlying

the conspiracy, was just as responsible to make full restitution for COBA's loss as Huberfeld, the

---

[1] Huberfeld, Seabrook, and Rechnitz each have filed appeals from the court's restitution orders, among other issues.

bribe-giver, and Seabrook, the bribe-taker.  COBA argues that it was wrong for me to be swayed

by the government's and Rechnitz's pleas at the sentencing that Rechnitz's cooperation should

result in a lesser restitution obligation for Rechnitz.  In seeking immediate repayment, COBA

points to my finding that the financial information supplied by Rechnitz to Probation was

unreliable, and COBA provides information elicited in a California lawsuit, post-sentencing, that

raises serious doubts about the truth of Rechnitz's claim that he cannot afford to make payments

more quickly than $500,000 per year, or in an amount more than $10 million in total.[2]  *See* ECF

Nos. 81, 82; *see also Cf., e.g., United States v. Grant*, 235 F.3d 95, 100 (2d Cir. 2000) ("Surely,

however, there would be a remedy that would permit the gathering of assets that were unknown

to the authorities as the result of a defendant's dishonesty.").

 Although I am sympathetic to COBA's arguments and its efforts to gain

restitution on behalf of the pension rights of the New York City correction officers, I am without

jurisdiction to grant the relief they seek.

 On March 3, 2020, I issued the court's judgment.  *See* ECF No. 84.  COBA's

motion was filed on February 27, 2020, after sentencing but before the judgment was filed.

Rechnitz filed his opposition to COBA's motion on March 12, 2020, *see* ECF No. 85, and filed a

notice of appeal on March 17, 2020, *see* ECF No. 86.

 As "a general matter, '[t]he filing of a notice of appeal is an event of jurisdictional

significance——it confers jurisdiction on the court of appeals and divests the district court of its

control over those aspects of the case involved in the appeal.'"  *United States v. Rodgers*, 101

F.3d 247, 251 (2d Cir. 1996) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56,

58 (1982)); *see also, e.g., New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1349

---

[2] *See Noval v. Rechnitz, et al.*, Cal. Sup. Ct., Complaint (Feb. 10, 2020) (available at ECF No. 83-2).

EXHIBIT F   0137

(2d Cir. 1989) ("Because it is a waste of judicial resources for two courts to be considering the

same issues in the same case at the same time, the filing of a notice of appeal is jurisdictionally

significant; it terminates the district court's consideration and control over those aspects of the

case that are on appeal."). Accordingly, the "district court does not regain jurisdiction until the

issuance of the mandate by the clerk of the court of appeals." *Rodgers*, 101 F.3d at 251. While

this "divestiture of jurisdiction rule is … not a per se rule," but rather a "judicially crafted rule

…. guided by concerns of efficiency," *id.*, the exceptions to this rule are inapplicable here, *see,*

*e.g., United States v. Zedner*, 55 F.3d 68, 83 (2d Cir. 2008) (Pooler, J., dissenting) (collecting

cases involving exceptions), and the fact remains that "if an appeal is taken from a judgment

determining the entire action, the district court's hands are tied," *Terry*, 886 F.2d at 1350.

In light of the foregoing principles, COBA's motion for restitution is denied

without prejudice. COBA must seek relief from the Second Circuit. *See* 18 U.S.C. § 3771(d)(3)

("If the district court denies the relief sought, the movant may petition the court of appeals for a

writ of mandamus.").[3]

The Clerk is directed to terminate the open motion (ECF No. 81).

SO ORDERED.

Dated:      March 26, 2020                          _____/s/_____
            New York, New York                          ALVIN K. HELLERSTEIN
                                                        United States District Judge

---

[3] One housekeeping note. As Defendant's briefing points out, COBA made a number of pre-sentencing undocketed
submissions stating COBA's position that Rechnitz ought to be held liable for the full $19 million in restitution
under the Mandatory Victims Restitution Act, *see* 18 U.S.C. § 3664A, although none of these submissions formally
moved for payment to be made to COBA under the CVRA. Because COBA's motion here is dismissed on
jurisdictional grounds, I do not reach Defendant's contention regarding timeliness, *i.e.*, Defendants argue that
COBA's earlier submissions convert the present motion into one for reconsideration, which in turn renders the
instant motion untimely under Local Criminal Rule 49.1(d). Nor do I consider whether 18 U.S.C. § 3771(d)(5)
permits COBA to reopen a sentence under these circumstances, given that they had an opportunity to be heard at the
sentencing through a COBA representative. *See* 18 U.S.C. § 3771(d)(5)(a) (victims may reopen a sentence "only if"
they assert the right to be heard in the relevant proceeding and that right "was denied").

EXHIBIT F    0138

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): <u>OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER APPROVING DISMISSAL OF CHAPTER 7 CASE AND FOR PAYMENT IN COMPROMISE AND SETTLEMENT OF ADMINISTRATIVE FEES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF BARUCH C. COHEN IN SUPPORT THEREOF</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>June 1, 2021</u>  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) <u>June 1, 2021</u>, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Honorable Barry Russell
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

☐ Service information continued on attached page.

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 1, 2021 | Cheryl Caldwell | /s/Cheryl Caldwell |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

CC 2704248v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION (if needed):**

**1.   <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>**

Jessica L Bagdanov     jbagdanov@bg.law, ecf@bg.law
Baruch C Cohen     bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com
Carolyn A Dye     trustee@cadye.com
Bernard J Kornberg     bjk@severson.com, elw@severson.com
Sam S Leslie (TR)     sleslie@trusteeleslie.com,
SLESLIE@ECF.AXOSFS.COM;trustee@trusteeleslie.com;C195@ecfcbis.com
Daniel A Lev     dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com
Benjamin Nachimson     ben.nachimson@wnlawyers.com, ben.nachimson@wnlawyers.com
Ronald N Richards     ron@ronaldrichards.com, morani@ronaldrichards.com
Neal Salisian     ECF@salisianlee.com
Jeffrey L Sumpter     jsumpter@epiqtrustee.com, jsumpter@cbiz.com
Derrick Talerico     dtalerico@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com
United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
Jessica Wellington     jwellington@bg.law, ecf@bg.law
David B Zolkin     dzolkin@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

CC 2704248v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                      **F 9013-3.1.PROOF.SERVICE**